**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARK HOHIDER and ROBERT DIPAOLO,     )
On Behalf of Themselves and All Others     )
Similarly Situated,     )
                Plaintiffs,     )
v.     )
           )
UNITED PARCEL SERVICE, INC.,     )
              Defendant.     )
           )
           ) Consolidated Civil Action No. 04-363
PRESTON EUGENE BRANUM,     )
On Behalf of Himself and All Others     )
Similarly Situated,     )
              Plaintiff,     )
v.     )
           )
UNITED PARCEL SERVICE, INC.,     )
              Defendant.     )

**MEMORANDUM OPINION**

CONTI, District Judge.

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III. STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    A. Rule 23 Requirements for Class Certification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    B. Confusion Over the Appropriate Standard of Review For Deciding Class Certification.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
    C. Supreme Court decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    D. Case law from the United States Courts of Appeals. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV. FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    A. General Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    B. UPS's Formal ADA Compliance Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        1. ADA Compliance Procedures Prior to 1999. . . . . . . . . . . . . . . . . . . . . . . . . . 35
        2. ADA Compliance Procedures After 1999. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

a. "United Parcel Service Americans with Disabilities Act Procedural
Compliance Manual" and procedures set forth therein
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
(i) Reasonable Accommodation. . . . . . . . . . . . . . . . . . . . . . . . . . . 39
(ii) The UPS ADA Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
b. The "Ten-Step Process"   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
(i) Step One: "Commence the Process". . . . . . . . . . . . . . . . . . . . 44
(ii) Step Two: "Gather Medical Information". . . . . . . . . . . . . . . 44
(iii) Step Three: "Evaluate Whether the Employee May Have a
Disability". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
(iv) Step Four: "Notify the Employee"
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
(v) Step Five: "Meet with the Employee (Hold Checklist Meeting)"
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
(vi) Step Six: "Identify Potential Reasonable Accommodations
(Complete Written Checklist)". . . . . . . . . . . . . . . . . . . . . . 49
(vii) Step Seven: "Evaluate Appropriate Accommodations (ADA
Committee Meets)". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
(viii) Step Eight: "Bargain with the Union".. . . . . . . . . . . . . . . . 51
(ix) Step Nine: "Notify the Employee" . . . . . . . . . . . . . . . . . . . . 51
(x) Step Ten: "Close the File". . . . . . . . . . . . . . . . . . . . . . . . . . . 52
c. Miscellaneous Manual Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
d. Other ADA Training Materials. . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
e. Notice to Employees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
C.  ADA and Other Kinds of Accommodations in the Sample Districts. . . . . . . . . . . . . 55
1. ADA Accommodations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
2. Other Accommodations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
D.  Other General Evidence Submitted by UPS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
E. Challenged Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
1. The Alleged "100% Healed Policy". . . . . . . . . . . . . . . . . . . . . . . . . . . 60
a. Evidence from Managers and Former Managers Concerning the
Existence of the "100% Release" or "No Restrictions" Policy
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
b. Evidence from Employees and Former Employees Concerning the
Existence of the "100% Release" or "No Restrictions" Policy
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
c. Evidence from UPS's Internal Emails. . . . . . . . . . . . . . . . . . . . . . . 64
d. Evidence from UPS's Early Training Materials. . . . . . . . . . . . . . . 67
e. Evidence from EEOC Determinations. . . . . . . . . . . . . . . . . . . . . . 69
2. Other Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

V. ADA CLAIMS AND PATTERN-OR-PRACTICE FRAMEWORK
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

2

A. Scrutiny of Specific Legal Claims Is Required to Decide Class Certification. . . . . . . 74

B. The Americans with Disabilities Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

1. Failure to Make Reasonable Accommodations; Failure to Engage in Interactive Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

2. Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

C. "Pattern-or-Practice" Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

1. Franks v. Bowman Transportation Company. . . . . . . . . . . . . . . . . . . . . . . . 89

2. International Brotherhood of Teamsters v. United States. . . . . . . . . . . . . . . . 95

3. Cooper v. Federal Reserve Bank of Richmond . . . . . . . . . . . . . . . . . . . . . . 105

4. Applicability of pattern-or-practice framework to private-plaintiff ADA lawsuits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

VI. CLASS DEFINITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

VII. CLASS CERTIFICATION REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

A. Rule 23(a) Prerequisites. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

1. Numerosity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

2. Commonality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

a. 100% Healed Policy Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

b. The Other Reasonable Accommodation Policies Claims . . . . . . . . . . 146

(i) Implementation of the Formal ADA Compliance Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

(ii) Uniform Pretextual Job Descriptions . . . . . . . . . . . . . . . . . . 147

(iii) Prohibiting Employees from Returning to Work With Restrictions and Preventing Use of Seniority Rights to Transfer Positions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

(iv) Withdrawing of Accommodations Previously Provided and then Denying Requests for the Previously Provided Accommodations Claims . . . . . . . . . . . . . . . . . . . . . . . 150

c. Retaliation Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

d. Summary of Commonality Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

3. Typicality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

4. Adequacy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

a. Class Counsel.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

b. Plaintiffs' Adequacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

B. Rule 23(b)(2) Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

1. Grounds generally applicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

2. Cohesiveness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

3. Claims primarily for monetary relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

a. The Incidental Damages Approach. . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

b. The Discretionary Approach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

c. Decisions by the United States Court of Appeals for the Third Circuit
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
        C. Bifurcation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

VIII. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

IX. ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
        A.  Class Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
        B.  Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
        C.  Class Definition
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
        D.  Class Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
        E.  Other Miscellaneous Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

## I. INTRODUCTION

Pending before the court is a motion for class certification (Doc. No. 180) filed pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) by plaintiffs Mark Hohider ("Hohider") and Robert DiPaolo ("DiPaolo") and consolidated plaintiff Preston Eugene Branum ("Branum")(collectively, "plaintiffs") on behalf of themselves and all others similarly situated against defendant United Parcel Service, Inc. ("defendant" or "UPS").  Plaintiffs allege in this civil action that UPS engages in a variety of policies and practices that violate the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA").  Plaintiffs seek certification of a nationwide class to litigate their claims against UPS.

Plaintiffs specifically challenge the following alleged policies at UPS as violative of the ADA and appropriate for classwide adjudication:

> (1) enforcing a "100% release" or "no restrictions" unwritten policy, which prohibits employees from returning to UPS in any vacant position unless the employee can return to his or her last position without any medical restrictions;

4

(2) disseminating a written corporate "ADA compliance policy," which is implemented nationwide to delay and avoid providing accommodations, that is illegal, both on its face and as applied;

(3) using uniform job descriptions, which intentionally fail to describe the essential functions of available UPS jobs, as a pretext to prevent disabled employees from holding any UPS job;

(4) prohibiting employees from returning to work in an alternative job within the employees' restrictions and preventing employees from using union seniority rights to transfer to a position that accommodates their disabilities;

(5) withdrawing accommodations previously provided to disabled workers, and then denying requests for the previously provided accommodations; and

(6) treating persons who make requests for accommodations differently and less favorably in the terms, conditions, rights and privileges, of or incident to, their employment as a result of engaging in this protected act under the ADA.

Plaintiffs' Brief in Support of Motion for Class Certification ("Pls.' Br.")(Doc. No. 180) at 3-4.

The court discerns that plaintiffs seek certification of two <u>kinds</u> of ADA claims against UPS: (1) the first five policies implicate whether UPS's alleged policies, practices and procedures that control reentry into the workplace, or otherwise govern the making of reasonable accommodations, violate the ADA (the "reasonable accommodation policies claims"); and (ii) the sixth policy implicates whether UPS retaliates against its employees in violation of the ADA (the "retaliation claims").[1]  <u>See</u> Plaintiffs' Amended [Proposed] Order Granting Plaintiffs'

---

[1] The alleged fifth policy, withdrawing accommodations previously provided to disabled workers, and then denying requests for the previously provided accommodations, appears to involve a hybrid claim implicating both failure to accommodate <u>and</u> retaliation.

Motion for Class Certification (Doc. No. 155-2) at 2 (proposing certification of "(i) claims concerning whether UPS's policies, practices and procedures that control reentry into the workplace or otherwise govern the making of reasonable accommodations under Title I of the ADA to employees in UPS's workforce violate the ADA; and (ii) claims concerning whether UPS retaliates against its employees in violation of the ADA.").

The reasonable accommodation policies claims can be further distinguished. Plaintiffs' principal allegation appears to be that UPS enforces an unwritten, de facto "100% healed" return-to-work policy (the "100% healed policy claim"). Plaintiffs argue that the 100% healed policy claim, if proven, constitutes a per se violation of the ADA's requirements relating to the making of reasonable accommodations. That is, plaintiffs argue that at the merits stage of this litigation, with respect to the 100% healed policy claim, if plaintiffs prove the existence of the alleged 100% healed policy, the policy could be declared unlawful and appropriate injunctive and declaratory relief could flow from that determination. Plaintiffs' other reasonable accommodation policies claims appear primarily to be alleging violations of the ADA as a result of the implementation of those policies and not as per se violations.

What makes this matter a case of first impression is that plaintiffs, in a case where defendant challenges whether the proposed class encompasses only persons with disabilities as defined in the ADA, seek to litigate all their ADA claims by virtue of certification of a Rule 23(b)(2) private-plaintiff class and pursuant to the pattern-or-practice framework articulated by the United States Supreme Court in International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977). Plaintiffs attack not alleged individual instances of discrimination, but alleged company-wide policies relating to the ADA. Plaintiffs, therefore, characterize each of their

6

reasonable accommodation policies claims as pattern-or-practice variants of a "failure to make a reasonable accommodation" claim that an individual plaintiff could bring under the ADA in an individual lawsuit.   These claims challenge UPS's alleged company-wide policies of non-accommodation in violation of the ADA.  Plaintiffs also appear to argue, although less directly, that their retaliation claims can be litigated pursuant to the Teamsters pattern-or-practice framework.

UPS, however, denies the existence of the alleged 100% healed policy and maintains that its formal ADA compliance policies are designed to and do afford employees robust protection under the ADA.  In addition, UPS strenuously argues that class certification in this case is inappropriate for a variety of reasons.  These reasons include UPS's arguments that the class definition itself is unworkable and requires a host of individualized determinations merely to determine membership in the class; that plaintiffs have failed to satisfy each of the Rule 23(a) prerequisites, largely due to the myriad individualized issues in the case with respect to determinations of disability and whether reasonable accommodations were possible in individual circumstances; and that the undisputed evidence demonstrates that UPS did not act in a manner generally applicable to the proposed class, as required by Rule 23(b)(2).  In addition, UPS argues that certification pursuant to Rule 23(b)(2) is inappropriate because plaintiffs seek considerable compensatory damages.

Plaintiffs in their pleadings seek certification of the following proposed class:

> Those persons throughout the United States who: (i) according to
> the records of UPS, its agents and contractors have been employed
> by UPS at any time since May 10, 2000, including those employees
> absent from work and receiving either workers' compensation or
> short or long term disability insurance benefits; and (ii) have been

> absent from work because of a medical impairment;  and (iii) are disabled as defined under the Americans with Disabilities Act (ADA); and (iv) have attempted to return to work or continue to work at UPS or have submitted to UPS a medical release that permits the employee to work with restrictions and conditions, or have been disqualified by UPS from returning to work; and (v) were harmed as a result of UPS's policies, practices and procedures that control reentry into the workplace or otherwise govern the making of reasonable accommodations under Title I of the ADA to employees in UPS's workforce.
>
> Excluded from the Class are all presently working UPS management employees with supervisory authority over the formulation or implementation of the UPS policies and practices alleged in this action to violate the ADA.

Plaintiffs' Motion for Class Certification ("Pls.' Mot.")(Doc. No. 180).  The court and the parties, however, discussed a modified class definition at the hearing on class certification.  See Transcript of January 27, 2006 Hearing on Class Certification ("Jan. 27, 2006 Tr.")(Doc. No. 157) at 34-41, 44-45.[2]  The sufficiency of plaintiffs' proposed class definition will be addressed in more detail below.

In the instant opinion, the court will address several threshold legal issues furiously disputed by the parties before undertaking a rigorous Rule 23 analysis.  First, the court will address the appropriate standard of review for deciding whether class certification is appropriate.  Second, the court will determine whether plaintiffs can litigate their claims pursuant to the Teamsters pattern-or-practice framework of proof.  Third, the court will examine the sufficiency of the class definition, and whether the class as proposed or as modified is readily ascertainable.

---

[2]The court, for ease of reference, will use the pagination generated by the electronic case filing system ("CM/ECF") listed at the top right-hand side of each page to cite to specific pages of any hearing transcript that has been electronically filed on the docket rather than the internal pagination generated by the court reporter's software.

The court, after addressing those threshold issues, will undertake the claim-specific analysis required by Rule 23 and the United States Court of Appeals for the Third Circuit to determine whether class certification is appropriate in this case.  One other central issue in this case warrants mention at the outset of this opinion.  The parties furiously dispute whether this class action can be brought as a Rule 23(b)(2) class action in light of the nature of some of the relief that is sought.  That issue will be dealt with in more detail later in this opinion.

The court ultimately concludes for the reasons set forth in this memorandum opinion that (1) plaintiffs' claims are subject to the pattern-or-practice framework of proof enunciated by the Supreme Court in Franks v. Transportation Co., 424 U.S. 747 (1976), International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977), and Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867 (1984), which does not require an individualized inquiry at the liability stage adjudicating whether a company-wide policy is unlawful under the discrimination statutes; (2) the class definition must be modified as set forth herein; (3) plaintiffs met their burden to establish the Rule 23(a) requirements with respect to the 100% healed policy claim, the implementation of the formal ADA compliance policy claim, and the use of uniform pretextual job descriptions claim, but not with respect to the prohibiting employees from returning to work with restrictions and using seniority rights claim, the withdrawal of accommodations claim, or the retaliation claims; and (4) Rule 23(b)(2) certification is appropriate for the 100% healed policy claim, the implementation of the formal ADA compliance policy claim, and the use of uniform pretextual job descriptions claim to the extent that plaintiffs seek declaratory and injunctive relief and monetary relief that is incidental to the injunctive or declaratory relief with respect to these claims, but Rule 23(b)(2) certification will not be granted for other monetary

relief including compensatory damages and punitive damages as part of this class action.

## II. PROCEDURAL HISTORY

On March 10, 2004, plaintiffs Hohider and DiPaolo filed the above-captioned civil action against UPS alleging that UPS's employment practices concerning employees who attempt to return to work after an absence for medical reasons violate the ADA and the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. (the "Rehab Act"). (Doc. No. 1). In response to UPS's subsequent motion to dismiss, (Doc. No. 7), plaintiffs Hohider and DiPaolo withdrew the Rehab Act claim. (Doc. No. 12).

On June 29, 2004, plaintiffs Hohider and DiPaolo filed their first motion for class certification, (Doc. No. 16), and their first motion for bifurcation of issues at trial, (Doc. No. 15). In response, UPS filed a motion seeking a scheduling conference to address the need for discovery on certification issues prior to the parties' briefing and the court's decision on the class certification issue. (Doc. No. 21). On July 16, 2004, the court ordered that briefing on plaintiffs' motion for class certification be stayed pending disposition of UPS's motion for a scheduling conference. (Doc. No. 23).

On July 27, 2004, the court held a hearing and addressed the need for discovery prior to briefing and deciding class certification. (Doc. No. 26). At that hearing, after determining that discovery prior to briefing and deciding the class certification motion would be allowed, the court directed the parties to meet and confer and file a class certification discovery plan. The court also denied without prejudice plaintiffs' pending motion for class certification, (Doc. No. 16), and motion for bifurcation of issues at trial, (Doc. No. 15). On August 15, 2004, the court held a case management conference with the parties and set dates for class certification

10

discovery.

During class certification discovery, several issues arose that required briefing by the parties and resolution by the court, leading to extensions of the discovery period and the briefing schedule for deciding the class certification motion.  For example, plaintiffs initially sought nationwide discovery from all sixty of UPS's districts.  After briefing on whether nationwide discovery should be allowed, the court determined that for the purposes of class certification, plaintiffs could seek discovery from UPS from five UPS districts – the Laurel Mountain district directly implicated by the individual named plaintiffs' allegations and four other districts.  See Transcript of October 4, 2004 Status Conference (Doc. No. 46) at 51, 54-55. In addition, discovery issues arose, including with respect to discovery sought from third party International Brotherhood of Teamsters, plaintiffs' counsel's contacts with certain former and current managerial employees of UPS, the identity of individuals who had contacted plaintiffs' counsel regarding the case and the question whether those communications were privileged or discoverable.  See (Doc. Nos. 86, 91, 92)(hearing transcripts). Some of these issues were resolved by stipulation of the parties, (Doc. No. 97); other issues required rulings by the court.

Around the same time that class certification discovery was proceeding in the above-captioned civil action brought by plaintiffs Hohider and DiPaolo, on November 4, 2004, consolidated plaintiff Branum filed a similar civil action against UPS in this court, also alleging that UPS's employment practices violate the ADA and seeking class action treatment of his claims.  (Doc. No. 1 in Civ. No. 04-1686).  Plaintiffs' counsel and defendant's counsel in the Hohider and DiPaolo case entered appearances in the Branum case.  Shortly after the Branum civil action was filed, plaintiffs' counsel filed motions to consolidate the two cases, (Doc. No.

11

50; Doc. No. 14 in Civ. No. 04-1686).  UPS opposed consolidation.  (Doc. No. 59).  On February

11, 2005, the court held a hearing on plaintiffs' motion to consolidate the two cases for all

purposes.  (Doc. No. 92).  At the hearing, the court ordered that the two cases were consolidated

only for the purpose of discovery, indicating that the court would reconsider consolidation for all

purposes after deciding UPS's then-pending motion to dismiss Branum's claims and UPS's then-

pending motion for summary judgment with respect to Hohider's claims, both of which motions

raised similar issues with respect to whether the scope of the EEOC investigations in each case,

or what could reasonably be expected to grow out of those EEOC investigations, encompassed

class claims.

        On April 13, 2005, the court granted the motion of the EEOC for leave to file a brief as

an amicus curiae in support of plaintiff Hohider and in opposition to UPS's motion for summary

judgment.  (Doc. No. 93-1).  The court subsequently denied UPS's motion to dismiss Branum's

claims, (Doc. No. 17 in Civ. No. 04-1686), without prejudice to UPS's right to raise the issue

whether the scope of the EEOC investigation encompassed class claims on a more fully

developed record in a motion for summary judgment and the court denied UPS's motion for

summary judgment with respect to Hohider's claims.  (Doc. No.  144).  On December 27, 2005,

the court consolidated the two civil actions for all purposes at the above-captioned number.

        Currently before the court is an abundance of briefing and a voluminous record

concerning plaintiffs' renewed motion for class certification.  This briefing includes plaintiffs'

renewed motion, (Doc. No. 180), an accompanying corrected proposed order, (Doc. No. 155), an

accompanying brief in support, (Doc. No. 181), accompanying appendices, (Doc. Nos. 121, 122,

123, 124) and plaintiffs' reply brief, (Doc. No. 184 with Exhibits at Doc. Nos. 143-2 through

143-5), as well as UPS's brief in opposition, (Doc. Nos. 182 (redacted) and 183 (unredacted)),

UPS's appendices, (Doc. Nos. 130 (redacted), 131, 132, 133, 134, 135, 137 (unredacted portions

of appendix)), and UPS's surreply brief, (Doc. No. 186).  In addition, both plaintiffs and UPS

have filed multiple notices of supplemental authority and responses which the court will give

whatever weight is deemed appropriate.  See (Doc. Nos. 161-78; 189-95, 199-201).

## III.  STANDARD OF REVIEW

### A. Rule 23 Requirements for Class Certification

To be certified, a class must satisfy the four requirements of Federal Rule of Civil

Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of

representation.  FED.R.CIV.P. 23(a).  If the Rule 23(a) requirements are met, the court must then

find that the class fits within one of the three categories of class actions set forth in Federal Rule

of Civil Procedure 23(b).  In re Community Bank of Northern Virginia, 418 F.3d 277, 302 (3d

Cir. 2005); see Chiang v. Veneman, 385 F.3d 256, 264 (3d Cir. 2004); In re LifeUSA, 242 F.3d

136, 143 (3d Cir. 2001); Georgine v. Amchem. Prods., Inc., 83 F.3d 610, 624 (3d Cir. 1996),

aff'd sub nom. Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997); Baby Neal v. Casey, 43

F.3d 48, 55 (3d Cir. 1994).  The proponent of class certification has the burden of proving each

of the prerequisites of a class action under Rule 23(a) and that the class fits within one of the

three categories of class actions set forth in Rule 23(b).  Chiang, 385 F.3d at 264; Davis v.

Romney, 490 F.2d 1360, 1366 (3d Cir. 1974) (citing J. MOORE, 3B MOORE'S FEDERAL PRACTICE

¶23.02-2 (2d ed.1969)).

**B. Confusion Over the Appropriate Standard of Review For Deciding Class Certification**

Less well settled as a matter of law, however, is the appropriate standard of review a district court should use when deciding a motion for class certification.  Perhaps not surprisingly in this case, therefore, the parties vigorously dispute how much deference, if any, the court should give to plaintiffs' factual allegations concerning the propriety of certification.  In addition, in light of the voluminous factual record compiled in class certification discovery and submitted to the court for its consideration in deciding the class certification motion, the parties dispute how stringently the court should review the factual record before it, and in particular factual disputes between the parties, to determine whether the class certification requirements are met.[3]

Plaintiffs initially argued in their principal brief, in light of Chiang, 385 F.3d at 262, and the oft-quoted language used by the Supreme Court in Eisen v. Carlisle & Jacquelin, 417 U.S. 154 (1974), that it is not necessary for plaintiffs to establish the merits of their case at the class certification stage and the court, in determining whether the class will be certified, should accept the substantive allegations of the complaint as true.  Defendant, however, argued that in light of the weight of authority from the United States Court of Appeals for the Third Circuit and other United States Courts of Appeals, the court must go beyond the pleadings to decide class certification and make whatever factual and legal inquiries are necessary to determine whether the Rule 23 requirements are met – even if this more stringent review requires a preliminary

---

[3]This issue takes on heightened practical importance for a district court in light of the effects of the 2003 amendments to Rule 23, which the United States Court of Appeals for the Third Circuit recently interpreted as a matter of first impression to require that district courts must include in class certification orders a clear and complete summary of those claims, issues, or defenses subject to class treatment.  Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of America, 453 F.3d 179, 184-85 (3d Cir. 2006).

inquiry into issues enmeshed with the merits of plaintiffs' claims.  See Newton v. Merrill, Lynch,
Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir. 2001); Johnston v. HBO Management,
Inc., 265 F.3d 178 (3d Cir. 2001); Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir.
2001); see also In re Initial Public Offering Securities Litig., 471 F.3d 24 (2d Cir. 2006)("In re
IPO"); Heerwagen v. Clear Channel Communications, Inc., 435 F.3d 219 (2d Cir. 2006); Gariety
v. Grant Thornton, LLP, 368 F.3d 356 (4th Cir. 2004); Caridad v. Metro-North Commuter
Railroad, 191 F.3d 283 (2d Cir. 1999).[4]

    Plaintiffs in a supplemental brief conceded that the court may "peek behind the
pleadings" to assess class allegations, but maintained that a court generally should refrain from
conducting a preliminary inquiry into the merits at the class certification stage, acknowledging
the Newton decision but citing Barnes v. American Tobacco Co., 161 F.3d 127, 140 (3d Cir.
1998), and Chiang for the proposition that the court should not reach merits issues at the
certification stage.  Defendant responded that plaintiffs continued to understate the court's duty
to scrutinize the factual record and make findings as necessary to determine whether the class
certification requirements are met, and in supplemental briefing asked the court specifically to
consider recent decisions from the United States Courts of Appeals for the Second Circuit and
the Third Circuit on this issue.  See Beck v. Maximus, Inc., 457 F.3d 291 (3d Cir. 2006);  In re
IPO, 471 F.3d 24 (2d Cir. 2006).

    The apparent confusion over the appropriate standard of review a district court employs

---

[4]This issue is key in the instant case because there is some, although certainly not
complete, overlap between deciding issues related to the propriety of class certification as a Rule
23(b)(2) class – whether UPS "has acted or refused to act on grounds generally applicable to the
class" – and some merits issues – whether there exists at UPS a de facto policy that violates the
ADA and whether UPS implements its formal compliance policies in good faith.

to decide whether certification is appropriate is understandable in light of the current state of the law.  Applicable case law on this issue until recently has not been the height of clarity.[5]  While it is manifestly clear since <u>General Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147, 161 (1982), that district courts must apply a "rigorous analysis" to determine whether plaintiffs have shown that the requirements of Rule 23 have been met, courts have disagreed regarding the standard they should apply in making that determination.  This court, therefore, will examine relevant Supreme Court decisions, decisions from the various United States Courts of Appeals, including the United States Court of Appeals for the Third Circuit, and the effect of the 2003 Amendments to Rule 23 in an effort to articulate clearly the standard of review this court will apply to the factual record in this case to determine whether the Rule 23 requirements are met with respect to some or all of the claims plaintiffs argue are appropriately subject to class treatment.

**C. Supreme Court decisions**

The two principal United States Supreme Court decisions which discuss the appropriate standard of review a district court should employ to decide whether to grant or deny a motion for

---

[5]Judge Newman's careful opinion in <u>In re IPO</u> discussing the evolution of case law in the Second Circuit and noting the need for clarification of a district court's role in assessing a motion for class certification recognizes that confusion.  <u>See In re IPO</u>, 471 F.3d at 40 ("Obviously, we can no longer continue to advise district courts that "some showing," <u>Caridad</u>, 191 F.3d at 292, of meeting Rule 23 requirements will suffice and that "findings" are required, <u>see</u> [<u>Parker v. Time Warner Entertainment Co.</u>, 331 F.3d 13, 21 (2d Cir. 2003)], or that an expert's report will sustain a plaintiff's burden so long as it is not "fatally flawed," <u>see</u> [<u>In re Visa Check/MasterMoney Antitrust Litigation</u>, 280 F.3d 124, 135 (2d Cir. 2001)], and that the plaintiff must prove Rule 23 requirements, <u>see Heerwagen</u>, 435 F.3d at 233.").  As Judge Newman commented, "As the author of <u>Caridad</u>, I welcome the opportunity to acknowledge the shortcomings of its language and to participate with the panel in the pending case in providing needed clarification."  <u>Id</u>. at 35 n.6.

class certification under Rule 23  – <u>Eisen</u> and <u>Falcon</u> – have been interpreted by federal courts as

offering somewhat contradictory guidance with respect to the appropriate standard of review in

class certification decisions.  In <u>Eisen</u>, the Supreme Court stated that:

> We find nothing in either the language or history of Rule 23 that
> gives a court any authority to conduct a preliminary inquiry into the
> merits of a suit in order to determine whether it may be maintained
> as a class action. . . .  **"In determining the propriety of a class
> action, the question is not whether the plaintiff or plaintiffs
> have stated a cause of action or will prevail on the merits, but
> rather whether the requirements of Rule 23 are met."**

<u>Id</u>. at 177-78 (quoting <u>Miller v. Mackey International</u>, 452 F.2d 424 (5th Cir. 1971)).[6]  The

United States Court of Appeals for the Third Circuit subsequently appeared to interpret <u>Eisen</u> on

at least one occasion to mean "that, in determining whether a class will be certified, the

substantive allegations of the complaint must be taken as true."  <u>Chiang</u>, 385 F.3d at 262 (citing

<u>Eisen</u>, 417 U.S. at 77-78).[7]

In the other principal Supreme Court decision regarding Rule 23 requirements, however,

_____

[6]As pointed out by the United States Courts of Appeals for the Second and Third Circuits, however, the Supreme Court in proscribing a preliminary inquiry into the merits in <u>Eisen</u> was focused on an issue with no direct bearing on the decision whether to certify a class in that case. <u>See</u> <u>In re IPO</u>, 471 F.3d at 33; <u>Newton</u>, 259 F.3d at 166-67.  Instead, the Supreme Court proscribed preliminary merits inquiries when reviewing the district court's decision to impose 90% of the notice costs on the respondent in that case, a decision which the district court predicated on its finding that the petitioner was "more than likely" to prevail on his claims. <u>Eisen</u>, 417 U.S. at 177.

[7]This statement in <u>Chiang</u> did not arise in the context of a close analysis of the issue of what is the appropriate standard of review for deciding class certification motions.  The court of appeals has never explicitly repudiated it.  Other decisions by the court of appeals, however, which focus more directly on the issue of the appropriate standard of review for a district court deciding certification – although they predate <u>Chiang</u> – call the continued validity of this statement into question.  <u>See</u>, <u>e.g.</u>, <u>Johnston</u>, 265 F.3d 178; <u>Newton</u>, 259 F.3d at 167; <u>see also</u> <u>Szabo</u>, 249 F.3d 672 (cited with approval and followed in <u>Newton</u>).

the Supreme Court instructed that a class action "may only be certified if the trial court is

satisfied, <u>after a rigorous analysis</u>, that the prerequisites of Rule 23(a) have been satisfied."

<u>Falcon</u>, 457 U.S. at 161 (emphasis added).  As the United States Court of Appeals for the Second

Circuit recently commented in <u>In re IPO</u>, while "the double use of the word 'satisfied' is

somewhat perplexing," the important point from the <u>Falcon</u> decision is that "the requirements of

Rule 23 must be <u>met</u>, not just supported by some evidence."   471 F.3d at 33 (emphasis added).

Moreover, in <u>Falcon</u>, the Supreme Court explained that, in the context of discussing the Rule

23(a) prerequisites, "actual, not presumed, conformance with [the Rule] remains indispensable."

<u>Id</u>. at 160.  The Supreme Court also recognized in <u>Falcon</u> that "the class determination generally

involves considerations that are enmeshed in the factual and legal issues comprising the

plaintiff's cause of action." <u>Id</u>. at 160 (quoting <u>Coopers & Lybrand v. Livesay</u>, 437 U.S. 463

(1978))(internal quotations omitted)).

**D. Case law from the United States Courts of Appeals**

      Other than the <u>Eisen</u> and <u>Falcon</u> decisions, however, the United States Supreme Court has

not recently or in detail addressed the appropriate standard of review a district court should use

when deciding certification.  The courts of appeals have struggled to guide district courts

regarding the appropriate standard of review for deciding certification motions.  District courts,

in turn, have approached the issue with trepidation, as if steering a course through the choppy

waters between Scylla and Charybdis.  As those courts of appeals that have addressed the issue in

detail have recognized, district courts deciding certification under the recent state of the law have

perceived themselves to be caught between two dangers in a situation where moving away from

one can cause a court to risk running afoul of the other:  On the one hand, district courts have

resisted making preliminary inquiries into merits issues as apparently proscribed by the Supreme

Court in Eisen; on the other hand, district courts attempting to follow the guidance of Falcon

have resisted deciding certification without a sufficiently "rigorous analysis" that assures that the

Rule 23 requirements have been met, including some consideration of the underlying facts.

At bottom, courts have struggled to make sufficiently rigorous factual "findings" in

support of certification decisions while at the same time avoiding – if possible – making

"findings" on merits issues.  This struggle has led to various descriptions over time of the

standard of review that a district court should use in deciding a certification motion. See, e.g., In

re IPO, 471 F.3d at 34-40 (surveying case law within the Second Circuit and in other circuits).

Thankfully, a consensus is emerging among the United States Courts of Appeals.  While

for some time district courts perceived a split in authority between the approach of the United

States Courts of Appeals for the Seventh and the Fourth Circuits versus that of the Second

Circuit –  see, e.g., In re Natural Gas Commodities Litigation, 231 F.R.D. 171, 180 n.4 (S.D.N.Y.

2005); DeMarco v. Robertson Stephens Inc., 228 F.R.D. 468, 470 (S.D.N.Y. 2005) – over time,

the approach of those and other courts of appeals have dovetailed toward the standard first

articulated in detail by the United States Court of Appeals for the Seventh Circuit in Szabo v.

Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001), a decision cited with approval and

followed by the United States Court of Appeals for the Third Circuit in Newton, 259 F.3d at 165-

68.

In Szabo, the United States Court of Appeals for the Seventh Circuit focused on the

appropriate standard of review used by a district court deciding class certification.  The district

court in that case assumed for the purposes of the class certification motion that the substantive

allegations in the complaint were true.  Id. at 674-75.[8]  The court of appeals reasoned that "[t]he proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it."  Id. at 675.  The court of appeals distinguished the standards of review for deciding a motion for class certification and a motion to dismiss pursuant to Rule 12(b)(6) as standards that "differ in kind."  Id. at 676.  The court of appeals noted that a Rule 12(b)(6) motion tests the legal sufficiency of a pleading in a situation where the factual sufficiency of the allegations will be tested later – in a motion for summary judgment or at trial.  Id. at 675.  By contrast, the court of appeals noted that an order certifying a class usually is the district judge's last word on the subject – there generally is no subsequent test of the decision's factual premises.  Id. at 676.

The court of appeals in Szabo reasoned that "[b]efore deciding whether to allow a case to proceed as a class action, therefore, a judge should make whatever factual and legal inquiries are necessary under Rule 23."  Id.  The court of appeals made clear that this obligation of the judge applies to the Rule 23(a) prerequisites as well as to whether class certification is appropriate

---

[8]The court of appeals in Szabo considered an interlocutory appeal of a district court's certification of a nationwide class of persons who had bought machine tools that included a component part manufactured by the defendant.  249 F.3d at 673-74.  The court of appeals noted that a nationwide class in what was fundamentally a breach-of-warranty action but also included a claim of fraud posed serious problems concerning choice of law, the manageability of the suit, and the propriety of class certification.  249 F.3d at 674.  The court of appeals in its decision, however, primarily focused on the appropriate standard of review, noting that one of the reasons for granting discretionary appellate review in Szabo was the district court's decision to accept the substantive allegations in the complaint as true for the purposes of deciding the certification motion.  The court of appeals commented that the district court decision implied that important legal principles had evaded attention by appellate courts, and district courts had not correctly understood the applicable principles concerning the appropriate standard of review for deciding a certification motion.  Id. at 675.

under Rule 23(b).[9]  Id.  The court of appeals directed:

> **Questions such as these require the exercise of judgment and the application of sound discretion; they differ in kind from legal rulings under Rule 12(b)(6).  And if some of the considerations under Rule 23(b)(3) . . . overlap the merits** – as they do in this case, where it is not possible to evaluate impending difficulties without making a choice of law, and not possible to make a sound choice of law without deciding whether [the defendant] authorized or ratified the dealers' representations – **then the judge must make a preliminary inquiry into the merits**.

Id (emphasis added).  The court of appeals in Szabo reasoned that courts make similar inquiries routinely under Rule 12(b)(1) and 12(b)(2), and that, if necessary, courts may hold a hearing to make preliminary factual determinations concerning jurisdiction, venue, and the like.  Id. at 676-77.

The court of appeals in Szabo addressed head-on the district court's apparent misunderstanding of the Eisen decision, noting that "[t]he district judge thought that [Eisen] adopts the approach of Rule 12(b)(6) for decisions under Rule 23;" however, "[w]e do not read Eisen so."  Id.  The court of appeals noted that in Eisen, the Supreme Court observed that the 1966 amendment to Rule 23 departed from the earlier handling of class claims by placing certification ahead of a decision on the merits:

> A class thus can lose as well as win, while in a permissive-intervention system the case is decided on the merits before the identities of the parties to be bound are known.  The success of the 1966 amendments (which are still in force) depends on making a definitive class certification decision before deciding the case on the merits, and on judicial willingness to certify classes that have weak claims as well as strong ones.

_____

[9]In Szabo, the court of appeals scrutinized a decision to certify a Rule 23(b)(3) class.  The same reasoning is applicable to a court's determination whether to certify a Rule 23(b)(2) class such as this proposed class.

Id. at 677.  The court, therefore, reasoned:

> A court may not say something like "let's resolve the merits first
> and worry about the class later" . . . or "I'm not going to certify a
> class unless I think that the plaintiffs will prevail."

Id.  The court of appeals noted, however, that "nothing in the 1966 amendments to Rule 23, or

the opinion in Eisen, prevents the district court from looking beneath the surface of a complaint

to conduct the inquiries identified in that rule and exercise the discretion it confers."  Id.  The

court also commented that "[p]laintiffs cannot tie the judge's hands by making allegations

relevant to both the merits and class certification."  Id. (quoting Eggleston v. Chicago

Journeymen Plumbers' Local No. 130, 657 F.2d 890, 895 (7th Cir.1981)( "Eisen has not been

interpreted so broadly . . . as to foreclose inquiry into whether plaintiff is asserting a claim which,

assuming its merit, will satisfy the requirements of Rule 23 as distinguished from an inquiry into

the merits of plaintiff's particular individual claim.").

The court of appeals in Szabo characterized the district court's approach in that case as

reminiscent of the "across-the-board" rule jettisoned by the Supreme Court in Falcon, noting that

in circuits that were following the across-the-board rule, district courts had been required to

assume that all members of a proposed class were situated similarly to plaintiff and to certify

classes "across the board."  Id.  The court of appeals explained that Falcon held that "similarity

of claims and situations must be demonstrated rather than assumed," quoting the pointed

observation from Falcon that "sometimes it may be necessary for the court to probe beyond the

pleadings before coming to rest on the certification question . . . [A]ctual, not presumed,

conformance with Rule 23(a) remains . . . indispensable."  Id. (quoting Falcon, 457 U.S. at 160).

In Szabo, the court held that the Falcon rule "is equally true of Rule 23(b)."  Id. The court of

22

appeals issued the following caveat against using too deferential a standard of review to decide

class certification:

> Certifying classes on the basis of incontestable allegations in the
> complaint moves the court's discretion to the plaintiff's attorneys –
> who may use it in ways injurious to other class members, as well as
> ways injurious to defendants.  Both the absent class members and
> defendants are entitled to the protection of independent judicial
> review of the plaintiff's allegations.

Id.[10]

   In Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir.

2001), the United States Court of Appeals for the Third Circuit cited Szabo with approval and –

notwithstanding the somewhat confusing statement in Chiang that a court at the certification

stage should accept the substantive allegations of the complaint as true – adopted the same

approach.  In Newton, the court of appeals affirmed the denial of certification by the district court

of a putative class of investors.[11]  The court of appeals granted an interlocutory appeal under

Federal Rule of Civil Procedure 23(f) to determine whether the plaintiffs' securities fraud claims

satisfied the requirements for class certification under Rule 23 and ultimately affirmed the district

court's denial of certification.  Id.

---

   [10]The concerns of absent class members are mitigated in the Rule 23(b)(2) context where
notice and opt-out are not required as a matter of law and absent class members may be bound by
injunctive or declaratory relief regardless of whether they participate in the class action. The
force of the court of appeals' caveat in Szabo, however, still holds.

   [11]The plaintiffs in Newton sued their broker-dealers who traded on the National
Association of Securities Dealers Automated Quotation System (NASDAQ) under section 10(b)
of the Securities Exchange Act of 1934 and Rule 10b-5 for allegedly breaching their duty of best
execution.  Newton, 259 F.3d at 162.  Despite the broker-dealers' duty to execute trades under
the most "favorable terms reasonably available," the investors charged that the defendants in
Newton executed orders at the price offered on the central National Best Bid and Offer system
(NBBO), failing to investigate other feasible alternatives that potentially offered better prices.  Id.

In reviewing the district court's decision, the court of appeals as a threshold matter analyzed in detail the effect of the 1998 amendment to Rule 23 providing interlocutory appeal, id. at 162-65, but also had occasion to review the appropriate standard of review a district court should employ in deciding certification, id. at 165-69.  The court of appeals noted that, generally, a district court abuses its discretion if its decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact."  Id. at 165-66 (quoting In re General Motors Corp. Pick Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 783 (3d Cir.1995)(quoting Int'l Union, UAW v. Mack Trucks, Inc., 820 F.2d 91, 95 (3d Cir.1987))(internal quotations omitted).  The court of appeals instructed that "[a] class certification decision requires a thorough examination of the factual and legal allegations."  Id. at 166 (citing Barnes v. Am. Tobacco Co., 161 F.3d 127, 140 (3d Cir.1998), cert. denied, 526 U.S. 1114 (1999)).  The court of appeals recognized that "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."  Id. (quoting Falcon, 457 U.S. at 160; citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997) (Breyer, J., concurring in part and dissenting in part); 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, § 1785 at 16 (West Supp.2000))(internal quotations omitted).  The court of appeals in Newton quoted Szabo for the principle that "[b]efore deciding whether to allow a case to proceed as a class action, . . . [courts] should make whatever factual and legal inquiries are necessary under Rule 23."  Id. (quoting Szabo, 249 F.3d at 676)(internal quotations omitted).[12]

---

[12]The court of appeals also cited 5 MOORE'S FEDERAL PRACTICE § 23.46[4] ("[B]ecause the determination of a certification request invariably involves some examination of factual and legal issues underlying the plaintiffs' cause of action, a court may consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.").  Newton, 259 F.3d at 166.

24

The court of appeals took the opportunity in <u>Newton</u> to examine the <u>Eisen</u> decision and its admonition that "nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." <u>Id</u>.  The court of appeals commented that "this admonition must be examined in context," and recognized that  "[a]t the time, it was ancillary to the principal issue of whether Fed.R.Civ.P. 23 required a class representative in a securities class action to provide notice to all class members." <u>Id</u>.  The court of appeals in <u>Newton</u> explained the evolution of case law following <u>Eisen</u>, noting:

> Not long after <u>Eisen</u>, the Court stepped away from this bright-line declaration in <u>Coopers & Lybrand v. Livesay</u>, when it held that "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims. The typicality of the representative's claims or defenses, the adequacy of the representative, and the presence of common questions of law or fact are obvious examples. The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits . . . ."

<u>Id</u>. (quoting <u>Coopers & Lybrand v. Livesay</u>, 437 U.S. 463, 469 n.12 (1978)).  In <u>Newton</u>, the court also recognized:

> Subsequently, in [<u>Falcon</u>], the Court appeared to move even further away from <u>Eisen</u>, recognizing that "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question. . . . [A]ctual, not presumed conformance with Rule 23(a) remains . . . indispensable."

<u>Id</u>.

      In <u>Newton</u>, the court of appeals concluded that the reasoning in <u>Falcon</u> applied to issues arising under Rule 23(b)(3).  <u>Id</u>. (citing <u>Szabo</u>, 249 F.3d at 677).  "As the Court concluded in

25

Livesay, class certification may require courts to answer questions that are often 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"  Id. (quoting Livesay, 437 U.S. at 469 (internal quotations omitted)).  The court of appeals instructed that "[t]o address these questions, courts may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.'"  Id. (quoting 5 MOORE'S FEDERAL PRACTICE § 23.61[5]).  In Newton, the court of appeals cited Szabo, 249 F.3d at 677 (holding courts may "[look] beneath the surface of a complaint" to "make a preliminary inquiry into the merits"); Amchem, 521 U.S. at 615 (Fed.R.Civ.P. 23(b)(3) invites a "close look" before determining class certification); 7B WRIGHT, MILLER & KANE, § 1785 at 16 (West Supp.2000) (courts not precluded from "necessary inquiry into the underlying elements of the case in order to evaluate whether Rule 23 has been met"); and MOORE'S FEDERAL PRACTICE, MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.1 ("The decision on whether or not to certify a class, therefore, can be as important as decisions on the merits of the action and should be made only after consideration of all relevant evidence and arguments presented by the parties.").

The court of appeals commented that since Eisen, "the nature of class actions and how they are litigated have undergone a sea change."  Id. at 167-68.  The court of appeals recognized that several United States Courts of Appeals since Eisen have required district courts to go beyond the pleadings in order to decide whether the class certification requirements are met, citing Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir.1996)("[g]oing beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues"); Szabo, 249 F.3d at 675-78; Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234

26

(11th Cir.2000); <u>Hanon v. Dataproducts Corp.</u>, 976 F.2d 497, 508-09 (9th Cir.1992).  The United

States Court of Appeals for the Third Circuit held:

> In reviewing a motion for class certification, a preliminary inquiry
> into the merits is sometimes necessary to determine whether the
> alleged claims can be properly resolved as a class action.  This is
> such an instance. We must probe beyond the surface of plaintiffs'
> allegations in performing our review to assess whether plaintiffs'
> securities claims satisfy Fed.R.Civ.P. 23's requirements.

<u>Newton</u>, 259 F.3d at 168-69 (footnotes omitted); <u>see</u> <u>Beck v. Maximus</u>, 457 F.3d 291, 297 (3d

Cir. 2006)("Depending on the circumstances, class certification questions are sometimes

'enmeshed in the factual and legal issues comprising the plaintiff's cause of action,' and 'courts

may delve beyond the pleadings to determine whether the requirements for class certification are

satisfied.'")(quoting <u>Newton</u>, 259 F.3d at 167).

 The guidance provided by the United States Court of Appeals for the Third Circuit is

clear.  District courts are required <u>when</u> <u>necessary</u> to delve beyond the pleadings to determine

whether Rule 23 requirements are met.  The United States Courts of Appeals for the Second,

Fourth, and Seventh Circuits have adopted the same or a largely similar approach.  <u>See</u>, <u>e.g.</u>, <u>In re</u>

<u>IPO</u>, 471 F.3d 24 (2d Cir.);[13] <u>Gariety</u>, 368 F.3d 356 (4th Cir.);[14] <u>Szabo</u>, 249 F.3d 672 (7th Cir.).

---

[13]Judge Newman's careful opinion in <u>In re IPO</u> elucidates the standard of review a district
court should use when determining whether certification is warranted, and whether "findings" are
required:

> It would seem to be beyond dispute that a district court may not
> grant class certification without making a determination that all of
> the Rule 23 requirements are met. We resist saying that what are
> required are "findings" because that word usually implies that a
> district judge is resolving a disputed issue of fact. Although there
> are often factual disputes in connection with Rule 23 requirements,
> and such disputes must be resolved with findings, the ultimate
> issue as to each requirement is really a mixed question of fact and
> law.

27

Fear by the parties that a district court's findings made solely for the purpose of deciding

_____

In re IPO, 471 F.3d at 40. The United States Court of Appeals for the Second Circuit in In re IPO explicitly moved away from its somewhat confusing precedent to join the predominant view and "[aligned itself] with Szabo, Gariety, and all of the other decisions discussed above that have required definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues." Id.

[14]The United States Court of Appeals for the Fourth Circuit in Gariety considered the 2003 amendments to Rule 23. The court noted that upon amending Rule 23(c) to require the court to determine class certification "at an early practicable time" instead of "as soon as practicable after commencement of [the] action," the Advisory Committee explained that "preexisting and longstanding practice" allowing discovery in aid of the certification decision prompted the change. Gariety, 368 F.3d at 365 (quoting FED.R.CIV.P. 23 2003 Adv. Comm. Notes)("[I]t is appropriate to conduct controlled discovery into the 'merits,' limited to those aspects relevant to making the certification decision on an informed basis."). In this case, "controlled discovery" in aid of the certification decision was allowed, and limited to five sample districts rather than to UPS facilities nationwide.

In Gariety, the court reasoned that, despite the confusion it engendered, the gravamen of Eisen was not that a district court should accept the plaintiffs' pleadings as true when assessing whether a class should be certified, but rather that a district court should not expand the Rule 23 certification analysis to include consideration whether the proposed class is ultimately likely to prevail on the merits. Id. The court of appeals stated:

> Thus, while an evaluation of the merits to determine the strength of plaintiffs' case is not part of a Rule 23 analysis, the factors spelled out in Rule 23 must be addressed through findings, even if they overlap with issues on the merits. Eisen's prohibition against assessing plaintiffs' likelihood of success on the merits as part of a Rule 23 certification does not mean that consideration of facts necessary to a Rule 23 determination is foreclosed merely because they are required to be proved as part of the merits. The analysis under Rule 23 must focus on the requirements of the rule, and if findings made in connection with those requirements overlap findings that will have to be made on the merits, such overlap is only coincidental. **The findings made for resolving a class action certification motion serve the court only in its determination of whether the requirements of Rule 23 have been demonstrated**.

Id. (emphasis added). The court of appeals ultimately remanded the Gariety case to the district court to look beyond the pleadings and conduct a rigorous analysis of whether certification requirements were met – including making findings under Rule 23(b)(3). Id.

certification will somehow affect merits determinations later in the litigation is unwarranted:

> The district court's concern that Rule 23 findings might prejudice
> later process on the merits need not lead to the conclusion that such
> findings cannot be made. The jury or factfinder can be given free
> hand to find all of the facts required to render a verdict on the
> merits, and if its finding on any fact differs from a finding made in
> connection with class action certification, the ultimate factfinder's
> finding on the merits will govern the judgment.

Gariety, 368 F.3d at 365.  In Gariety, the court of appeals identified preliminary injunction

practice as a model for this practice.  Id. ("Courts make factual findings in determining whether a

preliminary injunction should issue, but those findings do not bind the jury adjudging the merits,

and the jury's findings on the merits govern the judgment to be entered in the case.")(citing Univ.

of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  In In re IPO, the Court of Appeals for the

Second Circuit concurred with the rationale in Gariety regarding whether prejudice inured to the

defendant if the court examined issues that overlap with the merits:

> The Fourth Circuit in Gariety considered and fully answered the
> concern expressed in Eisen (with respect to a merits inquiry on an
> issue unrelated to a Rule 23 requirement) that a merits inquiry on
> an issue that is related to the merits would prejudice the defendant.
> The Fourth Circuit noted that such an inquiry would not bind the
> ultimate fact-finder. . . . A trial judge's finding on a merits issue for
> purposes of a Rule 23 requirement no more binds the court to rule
> for the plaintiff on the ultimate merits of that issue than does a
> finding that the plaintiff has shown a probability of success for
> purposes of a preliminary injunction.

In re IPO, 471 F.3d at 38.[15]

At the class certification stage, a district court makes a determination that some legal

---

[15]In In re IPO the United States Court of Appeals for the Second Circuit noted that "[t]he First Circuit has expressed a mild disagreement with this strong line of authority. . . although aligning itself with 'the majority view' that permits merits inquiry."  471 F.3d at 38 (citing In re Polymedica Corp. Securities Litig., 432 F.3d 1 (1st Cir. 2005)).

standard – e.g., numerosity, commonality, or predominance – is met; in so doing, a court may resolve underlying factual disputes, and as to these disputes, the court must be persuaded that the fact at issue has been established; much like a district court makes a "ruling" or "determines" other threshold issues that involve disputed issues of fact – such as the determination that a court has subject-matter jurisdiction. In re IPO, 471 F.3d at 40.[16] "The more troublesome issue arises when the Rule 23 requirement overlaps with an issue on the merits." Id. "With Eisen properly understood to preclude consideration of the merits only when a merits issue is unrelated to a Rule 23 requirement, there is no reason to lessen a district court's obligation to make a determination that every Rule 23 requirement is met before certifying a class just because of some or even full overlap of that requirement with a merits issue." Id. "[T]he determination as to a Rule 23 requirement is made only for purposes of class certification and is not binding on the trier of facts, even if that trier is the class certification judge." Id. (citing Gariety, 368 F.3d at 366)(emphasis added).

Perhaps the best articulation of the standard of review was set forth in In re IPO. There, the court of appeals summarized its conclusions with respect to the appropriate standard of review for deciding class certification as follows:

> [W]e reach the following conclusions: (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the

---

[16]Rule 23 determinations differ from other threshold issues like subject-matter jurisdiction in how the discretion of a district court is scrutinized upon appellate review. In re IPO, 471 F.3d at 38.

applicable legal standard, that the requirement is met; (3) the
obligation to make such determinations is not lessened by overlap
between a Rule 23 requirement and a merits issue, even a merits
issue that is identical with a Rule 23 requirement; (4) in making
such determinations, a district judge should not assess any aspect
of the merits unrelated to a Rule 23 requirement; and (5) a district
judge has ample discretion to circumscribe both the extent of
discovery concerning Rule 23 requirements and the extent of a
hearing to determine whether such requirements are met in order to
assure that a class certification motion does not become a pretext
for a partial trial of the merits.

Id. This articulation of the standard for determining whether a court must consider the merits in

resolving class certification issues is consistent with the approach of the United States Court of

Appeals for the Third Circuit in Newton, and captures the standard of review that this court will

apply in the instant case.[17]

It does not appear that the 2003 amendments to Rule 23 affect the standard of review in a

substantial way.  The courts of appeals that have addressed the appropriate standard of review for

class certification since the 2003 amendments to Rule 23 have commented on the significance, if

any, of the amendments to the issue at hand.  For example, in In re IPO, the United States Court

of Appeals for the Second Circuit commented that neither the amended rule nor the committee's

commentary explicitly resolved the apparent split of authority between court of appeals' then

"ambiguous Caridad/Visa Check/Heerwagen" approach to determining Rule 23 requirements and

---

[17]As pointed out in In re IPO, overlap between a Rule 23 requirement and a merits issue
justifies some adjustment in a district court's procedures at the class certification stage.  Id.  "To
avoid the risk that a Rule 23 hearing will extend into a protracted mini-trial of substantial
portions of the underlying litigation, a district judge must be accorded considerable discretion to
limit both discovery and the extent of the hearing on Rule 23 requirements. But even with some
limits on discovery and the extent of the hearing, the district judge must receive enough
evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement
has been met."  Id.

the predominant view of the other circuits that class certification requires findings with respect to such requirements, even if such findings involve consideration of merits issues.  Id. at 39.

The court of appeals in In re IPO noted that two of the 2003 changes, however, arguably could be read in combination to permit more extensive inquiry into whether Rule 23 requirements are met: first, that the amended rule removed the provision that class certification "may be conditional;" second, that the amended rule replaces the provision of prior Rule 23(c)(1)(A) that a class certification decision be made "as soon as practicable" with a provision requiring the decision "at an early practicable time."  Id.  Further, the court of appeals in In re IPO noted that the advisory committee stated "that '[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met.' " Id. (quoting FED.R.CIV.P. 23(c)(1)(C) 2003 Adv. Comm. Notes).  In addition, the court noted that the advisory committee, although condemning an evaluation of the probable outcome on the merits, blessed the use of controlled discovery in aid of the certification decision, including controlled discovery into the "merits," limited to those aspects relevant to making a certification decision on an informed basis.  Id; see Gariety, at 368 F.3d at 365.  Because the force of the 2003 amendments with respect to the appropriate standard of review is adequately captured in the various decisions of the courts of appeals that addressed the issue, this court will follow the applicable standard of review as set forth by Szabo, Gariety, Newton, and In re IPO.

This court will examine the facts marshaled during class certification discovery and presented to the court for its review in deciding whether the Rule 23 requirements are met and class certification is warranted in this case.  The court notes that the parties have compiled and submitted a voluminous factual record concerning class certification in this case.  Defendant

presented an appendix over 2,000 pages long and plaintiff presented appendices totaling a similar length.  Much of the factual background is not in dispute, although the legal consequences of those facts are the subject of serious disagreement.  Some key facts, however, are disputed.  Where necessary, the court will resolve factual disputes relevant to each Rule 23 requirement.  Where there is overlap between a Rule 23 requirement and a merits issue, the court will resolve that dispute with respect to determining whether the Rule 23 requirement has been met.  The court otherwise will not assess any aspect of the merits unrelated to a Rule 23 requirement.  Any findings in this memorandum opinion, therefore, are made solely for the purpose of deciding certification and will not bind the fact finder at the merits stage of this litigation.  The following part of this memorandum opinion will review the factual background of the case as a preface to the Rule 23 analysis.

## IV. FACTUAL BACKGROUND

### A. General Background

UPS was founded as a messenger service in 1907, and currently is the world's largest package delivery company, delivering approximately 3.4 billion packages and documents per year.  Declaration of R. Joseph Lee ("Lee Decl."), UPS Appendix to UPS's Opposition to Plaintiff's Motion for Class Certification ("UPS App.") at 538-40 ¶4; see Bates v. UPS, No. C99-2216, slip. op. at 5 (N.D. Cal. Oct. 21, 2004)("Findings of Fact & Conclusions of Law")("Bates Findings")(Plaintiff's Appendix of Legal Authorities ("Pls.' Leg. App."), Tab 1 at 5).  UPS employs approximately 328,000 individuals in the United States and over 360,000 individuals worldwide.  Lee Decl. ¶4 ; see Bates Findings at 5.  In the United States, UPS's package

operations are divided into seven regions, which in turn are divided into sixty distinct geographical districts.  Lee Decl. ¶5.

There are over 1700 UPS facilities within the sixty geographical districts.  Id.  Each district is responsible for delivery of packages within a specified geographical area.  Id.  A district consists of business units called "Package Centers" and "Hubs."  Id.  Each district is further subdivided for the purpose of support functions such as "Plant Engineering," "Industrial Engineering," "Finance and Accounting," "Human Resources," "Labor," "Automotive," "Security," and "Business Development."  Id.

Approximately 200,000 UPS employees in the United States are covered by some form of a collective bargaining agreement.  Id. ¶6.  Some employees are covered by the National Master United Parcel Service Agreement (the "National Master Agreement") between UPS and the Teamsters United Parcel Service National Negotiating Committee representing local unions affiliated with the International Brotherhood of Teamsters.  Id.  In addition to the National Master Agreement, some employees are covered by supplemental collective bargaining agreements.  Id. ¶7.

Class certification discovery in this case was limited to five of UPS's sixty districts (the "sample districts").  The sample districts included the North Illinois district, the Southeast California district, the Georgia district, the Gulf South district, and the Laurel Mountain district.  See Plaintiffs' Appendix of Exhibits in support of Motion for Class Certification ("Pls.' Ex. App."), Tab 2 (Apr. 21, 2005 email from Joseph E. Culleiton to Christian Bagin).  While the exact number of UPS employees working in a particular district changes on a regular basis, id., UPS generally employs approximately 34,500 individuals, or approximately 10.5% of its

34

domestic workforce, in the five sample districts.  Id. (noting that, as of October 2004, UPS

employed 34,474 individuals in the five sample districts as follows:  North Illinois (7,471),

Southeast California (9,777), Georgia (7,705), Gulf South (4,458), and Laurel Mountain (5,064)).

**B. UPS's Formal ADA Compliance Procedures**

    **1. ADA Compliance Procedures Prior to 1999**

        Since the passage of the ADA, UPS has developed formal ADA compliance procedures

to guide its employees.  See Declaration of Roman M. Williams ("Williams Decl."), UPS App. at

2-7 ¶¶2-7; Lee Decl. ¶11-17.  Over the years, UPS revised its formal ADA compliance

procedures.  For example, in 1992, after the ADA went into effect, UPS distributed a

Management Guide to its supervisory personnel entitled "Injured Employees:  Focus on Abilities;

Health and Safety and the ADA"(the "Focus on Abilities manual").  Lee Decl. ¶11, Ex. G.[18]  The

Focus on Abilities manual, which is copyrighted 1992, described the ADA and UPS's procedures

concerning the ADA at that time, including its procedure for requests for accommodations,

examples of reasonable accommodations, confidentiality concerns, and terminology related to the

ADA and disabilities.  Lee Decl., Ex. G.

---

    [18]Plaintiffs submitted a similarly titled document, "Injured Employees: Focus on
Abilities, Health and Safety and the ADA" (the "Focus on Abilities presentation materials"),
which appears to be training material meant to accompany a live presentation to employees.  Pls.'
Ex. App., Tab 5.  The first page of the Focus on Abilities presentation materials indicates that the
presentation will take 45 minutes; related materials include a "Trainer's Guide," "Handouts,"
"Overheads," and "Participant's Guide;" and that the objective is "[t]o examine how the ADA
has affected the practices and policies of our Health and Safety department."  Id. at 1.  These
materials are not dated.  UPS submits that these materials relied upon by plaintiffs predate the
ADA procedure developed in 1999 and 2000, and were superseded by subsequent training in
connection with the revised ADA procedure.  Lee Decl. ¶¶14-15.

For example, the Focus on Abilities manual contained UPS's corporate mission statement at the time concerning the ADA, noting that, because UPS as a federal contractor already had taken measures to comply with the Rehab Act,

> [the passage of the ADA] provides an opportunity for UPS to rededicate the entire organization to the goal of removing existing barriers and providing opportunities for individuals with disabilities. This will provide UPS with an additional resource of qualified people, while allowing individuals with disabilities the opportunity to contribute to the success of UPS as well as to their own economic goals and career pursuits.

Id. at 1.  Concerning requests for accommodation, the Focus on Abilities manual stated:

> UPS procedure requires specific steps to be followed when a request for an accommodation is received.  In addition, documentation must be completed and retained by Human Resource Departments.
>
> If an employee makes a request for an accommodation, the individual should be assured that their request will receive attention by the appropriate management people.  No judgments or promises should be made at the time the request is made.  Each request should be carefully evaluated.   The Human Resources manager should be notified immediately to ensure prompt response to the request.  An individual requesting an accommodation must participate and cooperate in the evaluation process.

Id. at 4.  In closing, the Focus on Abilities manual noted:

> It is the responsibility of UPS managers and supervisors to ensure that individuals with disabilities are given the same opportunities and impartial treatment that has historically guided us in all our relationships with employees and customers.  To achieve this goal, it simply requires a focus on the talents and abilities of individuals.

Id. at 7.

Shortly thereafter, UPS updated its longstanding internal publication "Impartial Employment and Promotion Guide" to include a discussion of the ADA.  See Lee Decl. ¶12, Ex.

36

H.  UPS submitted to the court a copy of this guide which is copyrighted 1993 and marked "[r]evised June 1993."  Lee Decl., Ex. H.  The guide, first published in 1965 and periodically updated thereafter, was intended to be issued by UPS to all UPS managers and supervisors and proclaimed to be a reference source and policy statement for the company.  Id. at iii.  The guide listed the ADA among other federal laws applicable to the employment context in which the company operated.  Id. at 11.  In the section of the guide addressing "implementing our policies," the guide identified among other workshops that were part of UPS's formal training at the time the "Focus on Abilities Workshop."  Id. at 28.  The guide described that workshop as one that "educates management on the laws regarding nondiscrimination towards individuals with a disability," and whose primary message was "focus[ing] on looking at their ability rather than disability."  Id.

### 2. ADA Compliance Procedures After 1999

#### a. "United Parcel Service Americans with Disabilities Act Procedural Compliance Manual" and procedures set forth therein

In 1999, UPS with the assistance of outside legal counsel developed a more detailed ADA procedural compliance manual.  Lee Decl. ¶13,  Ex. I, also filed at Pls.' Ex. App., Tab 3.[19]   The outcome was the "United Parcel Service Americans with Disabilities Act Procedural Compliance Manual"(the "Manual"), which provides guidance on UPS's ADA procedures.  Lee Decl. ¶13.  UPS submits that the Manual was updated in 2000.  Id.  The court understands that the Manual

---

[19] The parties filed what appear to be identical copies of the Manual without its full appendices.  Both submissions are Bates-stamped UPS-000219 – UPS-000314.  The court will cite references to the Manual by referring to the Manual's internal pagination (pages 1-89).

sets forth the ADA procedural compliance program at UPS that remains in force to the present day.  See id. at 13-15.

UPS developed the Manual "to provide guidance on 'reasonable accommodation' and other important concepts under the ADA, with the goal of insuring the fair and equitable treatment of all individuals," according to the introductory letter on the Manual's first page of text.  Lee Decl., Ex. I at [1].  The Manual was intended to supplement the UPS Code of Business Conduct and the UPS Policy Book.  Id.  The Manual was not intended to set forth an exhaustive list of procedures for situations that could arise at UPS relating to the ADA, nor was it intended to establish a mandatory ADA procedure for all employees in all circumstances:

> No generalized discussion can adequately capture the complexity and individualized nature of claims that will arise in the UPS environment. Accordingly, **this manual neither provides an exhaustive list of permitted or prohibited conduct under the ADA nor establishes a mandatory ADA procedure** that must be followed by all personnel in all circumstances.

Id. (emphasis added).  Instead the Manual "suggests recommended but flexible procedures to encourage the prompt and equitable resolution of all requests for accommodation."  Id. (emphasis added).  The Manual sets forth UPS's position that "[t]hese procedures go above and beyond what is actually required by law and should not be construed as a comprehensive statement of the ADA's requirements."  Id.  The Manual notes that nothing in the Manual is intended to constitute a contractual obligation and individuals are not entitled to contractual rights or guaranteed procedures as set forth in the Manual other than what they are otherwise entitled to as a matter of law.  Id.

Although this statement makes explicit that UPS, when developing the Manual, did not intend to set forth an exhaustive, mandatory ADA compliance procedure that governed all situations, the Manual does set forth detailed guidance on, among other things, the scope of the ADA and reasonable accommodation under the ADA.  The Manual specifically prescribes an ADA compliance procedure for UPS employees in a section entitled "Evaluating Requests for Accommodation in the UPS Environment," id. at 34-58, and a subsection entitled "The UPS ADA Procedure," id. at 42-57.

(i) Reasonable Accommodation

With respect to "reasonable accommodation" generally, the Manual notes that "[t]he ADA imposes an affirmative obligation on UPS to provide reasonable accommodation to qualified individuals with disabilities" and this "involves the removal of both physical obstacles and policies and procedures in the workplace that create barriers to the full employment of individuals with disabilities."  Id. at 13.  It explains "reasonable accommodation" to be "any change in the work environment or adjustment in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities."  Id.  The Manual notes that employees generally have the initial obligation to inform a manager or supervisor that an accommodation is needed and to identify the desired accommodation, but that no magic words are required for an employee to put the company on notice.  Id. at 14.  Further, it describes the importance of an "effective accommodation" – i.e., one that enables the disabled individual to perform the essential functions of the job in question.  Id.

The Manual identifies "particular accommodations that may be 'reasonable' in some cases," including (1) modifications of the work environment, such as structural changes to the

39

workplace to address accessability of lunchrooms, restrooms, work area, or training rooms; (2)

auxiliary aids, including modifying equipment or acquiring and using low-tech and high-tech

devices; (3) job restructuring, for example "altering the time or manner in which an essential

function is performed" or "redistributing or eliminating the nonessential, marginal job functions

of a position entirely;" (4) reassignment to open positions in certain cases; (5) transfer; (6) leave

of absence; (7) "light duty;" (8) a modified work schedule; and (9) shift changes.  The Manual

also addresses unreasonable accommodations and "undue hardship" as well as the impact of the

collective bargaining agreements on requests for accommodation.  Id. at 15-20.

### (ii) The UPS ADA Procedure

In Section II of the Manual, UPS sets forth specific procedures for "Evaluating Requests

for Accommodation in the UPS Environment."  Id. at 34-59.  The Manual notes that "[t]he

process of evaluating requests for accommodation made by individuals is a multi-disciplinary

task involving personnel at both the district and region levels."  Id. at 35 (emphasis added).  The

Manual notes that because in the company's experience requests for accommodation from

applicants (as opposed to current employees) vary widely from case to case and often demand

heightened flexibility and quick response times from involved personnel, UPS's ADA procedure

as set forth in the Manual applies on its face only to current employees.  Id.

The Manual gives further guidance concerning what constitutes a request for an

accommodation, and what duties it triggers for managers, including who needs to be informed (in

the first instance, generally the District Workforce Planning Manager ("DWPM")), what

information can be requested (the company has developed a packet to be sent to employees who

request accommodations), how requests should be documented,[20] and confidentiality concerns. Id. at 35-38.

According to the Manual, responsibility for processing and deciding a request for accommodation under the ADA is shared among UPS's  managers and personnel at the district and regional level.  The Manual provides an overview of roles and responsibilities of various managers and personnel who are involved in the decisionmaking process concerning ADA requests for accommodation.  Id. at 39-41.  For example, the Manual instructs that, while the list is not exhaustive and personnel are encouraged to consult with other district and region managers for guidance when appropriate, the following individuals play a role in processing an employee's request for an accommodation under the ADA:

> (1) Generally the DWPM is responsible for coordinating and managing an employee's request for accommodation, including exploring the availability and existence of appropriate accommodations with the employee, union (where applicable), and region level decisionmakers; assisting in determining which accommodation, if any, is warranted or feasible; and serving as UPS's primary liaison with all employees throughout the process. Id. at 39.

> (2) The Occupational Health Supervisor ("OHS") serves as a liaison between the company, the employee, and the employee's identified physician for purposes of securing all medical information necessary to evaluate whether the employee has a "disability" covered by the ADA; assists in determining whether an employee is a qualified individual with a disability; and participates in identifying accommodations with the employee and

---

[20]The DWPM will open a "Request File" which should include a form to record the date the request was made, the date it was forwarded to another manager, and the date a decision was reached, as well as copies of all correspondence sent or received during the accommodation request process, all medical information received from or submitted on behalf of the employee, any agreements with the union concerning the employee, and any other documentation relating to the process.  Manual at 35-38.

DWPM.  Id.

(3) The Region Workforce Planning Manager ("RWPM") "is involved in all decisionmaking aspects of the ADA process" and is responsible for initially determining in conjunction with the Region Occupational Health Manager whether it appears that the employee has a condition which may be a covered "disability."  Id. at 40. The RWPM is likewise ultimately responsible for identifying what accommodation, if any, UPS will offer to a qualified employee.  Id. "In all cases, the RWPM is charged with overseeing the application of ADA policies, procedures, and decisionmaking throughout the districts in his or her region."  Id.

(4) The Region Occupational Health Manager ("ROHM") participates in the decisionmaking process and provides guidance in determining (a) whether the employee has a disability under the ADA, (b) whether the employee is a qualified individual with a disability, and (c) what, if any, accommodation should be expended to the employee.  Id.

(5) The District Human Resources Manager ("DHRM") participates in determining what accommodation, if any, will be offered to qualified employees with disabilities under the ADA. Id.  In addition, the DHRM is kept apprised of the status of employee requests throughout the process and is available to advise and assist district personnel in carrying out their assigned tasks.  Id.

(6) The District Labor Relations Manager ("DLRM") serves as the principal contact with the unions and is responsible for ensuring that the company satisfies its obligations under all applicable collective bargaining agreements in executing its ADA procedures. Id.  The DLRM also assists in identifying potential accommodations for employees and in determining which accommodation, if any, the company should offer.  Id.  Where an accommodation will be offered to a union employee, the DLRM negotiates with the union over the parameters of the accommodation and drafts a written accommodation agreement when appropriate.  Id. at 41.

(7) The union Business Agent ("BA") is involved in the ADA process only when it is a bargaining unit employee who has made a request for accommodation. The DLRM will negotiate with the BA (or his designee) before an accommodation is provided to a

42

bargaining union employee pursuant the National Master Agreement.  Id.

(8) The Corporate Legal Department is available to assist decisionmakers in resolving all issues of concern that arise during the ADA process, and should be apprised whenever there is a dispute among decisionmakers or between decisionmakers and the employee regarding whether the employee's condition is one that is covered under the ADA, whether the employee is qualified within the meaning of the ADA, or whether a particular accommodation is reasonable as a matter of law.  Id.

(9) Outside Counsel are likewise available to assist ADA decisionmakers with respect to all aspects of the process, although as a general matter, outside counsel should be contacted only after securing the approval of the Corporate Legal Department.  Id.

**b. The "Ten-Step Process"**

The Manual also sets forth the so-called "ten-step process,"[21] which is highly contentious in this litigation.  The ten-step process constitutes the backbone of UPS's ADA procedure for resolving requests for accommodation.  Indeed, it is this formal procedure, among other policies and practices at UPS, which plaintiffs challenge in this litigation as the embodiment of bad faith and abuse of process.  UPS, on the other hand, maintains that its formal procedures, including its ten-step process, are developed and executed in full compliance with the letter and the spirit of the ADA.

---

[21] The ten-step process involves the following steps and personnel:  Step One: Commence the Process (DWPM, OHS); Step Two: Gather Medical Information (DWPM, OHS); Step Three: Evaluate Whether the Employee May Have a Disability (RWPM, ROHM); Step Four: Notify the Employee (DWPM); Step Five: Meet with the Employee (Hold Checklist Meeting) (DWPM, DLRM, OHS); Step Six: Identify Potential Reasonable Accommodations (Complete Written Checklist) (DWPM, DLRM, OHS); Step Seven: Evaluate Appropriate Accommodations (ADA Committee Meets) (RWPM, ROHM, DWPM, DHRM, DLRM, OHS); Step Eight: Bargain with the Union (when an accommodation is identified for a union employee) (RWPM, DLRM, DWPM, BA); Step Nine: Notify the Employee (DWPM, DLRM, BA);Step Ten: Close the File (DWPM, DLRM).  Id. at 42-43.

### (i) Step One: "Commence the Process"

At Step One ("Commence the Process"), according to the Manual, within one week of a request for accommodation, the request should be directed to the DWPM who should open a Request File for the employee.  Id. at 43.  The DWPM then is responsible for sending out a packet of information to the employee that includes a letter acknowledging the request and medical forms to be completed by the employee's physician.  Id.  The applicable Essential Job Functions listings are attached and a consent form for the disclosure of medical information to be signed by the employee is included.  Id.  The DWPM should place copies of all letters in the file and forward the file to the attention of the OHS.  Id.

Plaintiffs, however, argue that UPS may never even open an ADA Request File for some employees with restrictions who seek to return to work with an accommodation because certain UPS managers are not sufficiently trained to identify a request when it is made and to forward it promptly to the DWPM for the purpose of opening an ADA file.  Plaintiffs cite Hohider's and DiPaolo's experiences to show that some requests for accommodation are ignored or summarily denied by district-level management, and therefore that these requests never result in the opening of an ADA file.[22]  See, e.g., Declaration of Eva Nickels ("Nickels Decl.") at ¶¶ 4-7.

### (ii) Step Two: "Gather Medical Information"

At Step Two ("Gather Medical Information"), according to the Manual, the OHS is responsible for securing all medical information from the employee and the employee's

---

[22]Plaintiffs cite Pls.' Dep. App., Tab 12 (Deposition of Mark Hohider)("Hohider Dep.") at 11-12 to show that Hohider's request was ignored.  After reviewing the record before the court, however, deposition testimony was not found that is directly on point, even though pages 10-13 of the Hohider Dep. are part of the appendix.

physician.  Manual at 44.  If the OHS has not received the requested information within two weeks of the date on which the DWPM mailed the acknowledgment letter, the OHS should send a second letter to the employee stating that (a) the process cannot continue until the requested information is returned, and (b) UPS will terminate the process by a certain date, usually within two weeks, unless the OHS receives the information or is contacted by the employee.  Id.  If the OHS does not receive the information by the stated deadline, the OHS should send a letter to the employee stating that the process has been terminated, inform the DWPM, and then close the file.  Id.  If the employee subsequently submits the requested information and renews a request for accommodation the OHS or DWPM must reopen the file and commence the process a second time.  Id.

Once the OHS secures the medical documents, the OHS evaluates whether sufficient information exists from which to determine whether the employee has a condition that could be covered under the ADA.  Id.  If there is insufficient information, the OHS should advise the employee in writing of the specific additional information that is needed to evaluate properly the request and the consequences of failing to provide this information.  Id.  Where necessary, the OHS in consultation with the DWPM also may seek guidance from a company-approved physician or request the employee to submit to a medical evaluation by a UPS certified physician. Id.  The company evaluation must be job-related and limited to an evaluation of the impairments identified by the employee and their impact on the employee's ability to work at UPS.  Id.  Once the OHS certifies that sufficient medical information exists to proceed with the employee's request, the OHS should forward the file promptly to the attention of the ROHM.

Plaintiffs argue that at Step Two, UPS utilizes a "confusing questionnaire" that contains legal terms of art which an employee must have his or her physician complete in order to continue with the ADA process.  See Pls.' Br. at 19; Pls.' Dep. App., Tab 1 (Deposition of Vance Allison, who appears to be a management-level employee at UPS involved in processing reasonable accommodation requests) ("Allison Dep.") at 69, 187-90.  Plaintiffs argue that this form is designed to delay or stop the process of receiving an accommodation because no accommodation request will be processed until the questionnaire is satisfactorily completed and because UPS deems all accommodation requests withdrawn unless the employee's physician returns the form within four weeks.  Plaintiffs argue that this combination of requirements – a confusing form and the rule that a request is deemed withdrawn if the form is not timely returned within a relatively short time frame – are designed to and actually do frustrate an employee's attempt to request and receive an ADA accommodation.

### (iii) Step Three: "Evaluate Whether the Employee May Have a Disability"

At this stage, the information gathered and processed at the district level is forwarded to the regional level.  The RWPM and the ROHM are responsible for evaluating the assembled medical information to determine whether the individual has a condition that may be a disability under the ADA.  Id. at 45.  Upon receipt of the file, the ROHM and RWPM should review the information and use the company's "Guide to Evaluation of Medical Condition" flowchart for guidance to make a preliminary determination regarding whether the employee may have a condition covered by the ADA.  Id.  If they cannot reach a consensus, they should consult with the Corporate Legal Department. Once a consensus is reached, the decision whether the individual may be or is not disabled should be noted in the file.  Id.  The RWPM should notify

46

the DWPM of the decision and return the file to the DWPM.  Id.[23]

### (iv) Step Four: "Notify the Employee"

At Step Four ("Notify the Employee"), if the regional decisionmakers (the RWPM and the ROHM and others they consult) determine that the employee does not have a condition covered by the ADA, the DWPM promptly should send a letter notifying the employee of this decision.  Id. at 46 (emphasis added).  If an employee requests that UPS reconsider its position on this issue, the Corporate Legal Department and the RWPM should be consulted.  Id.  Generally the initial decision should stand unless legal questions arise or the employee introduces new information relevant to the employee's medical status or job capabilities.  Id.  Where the "no disability" determination stands, the DWPM should close the file.  Id.  If the regional decisionmakers determine that the employee may have a condition that qualifies as a disability under the ADA, the DWPM should send a letter to the employee scheduling a preliminary date for a meeting with the employee to identify the desired accommodation (the so-called "checklist meeting").  Id. (emphasis added).  The DLRM and OHS should be copied on this letter.  Id.

### (v) Step Five: "Meet with the Employee (Hold Checklist Meeting)"

At Step Five ("Meet with the Employee (Hold Checklist Meeting")), the DWPM chairs a checklist meeting with the employee and the DLRM and OHS if they are available.  Id. at 47.  In all cases, at least two management employees must represent the company.  Id.  In some circumstances a union employee may request that a BA or steward attend the meeting and the

---

[23]Plaintiffs argue that although in theory the process contains ten steps, the process normally ends after Step Three because regional managers evaluate the paperwork at this stage and can summarily deny requests well before actually engaging an employee in the interactive process required by the ADA.  See Pls.' Br. at 22.

DLRM has the discretion to grant an exception to the general rule that they not be allowed to attend when it is deemed to be appropriate, e.g. when the union initialed the accommodation request.  Id.

The goals of the checklist meeting are to gather information from the employee concerning the desired accommodation; to determine whether it is needed because of the disability; and to assess the impact of the employee's limitations on the employee's ability to work at particular positions.  Id.  It will often be appropriate to review the essential job functions of the positions at this time.  Id.  Although the DWPM  may provide information to the employee about the UPS decisionmaking process going forward, no manager should make any representations regarding the company's willingness to offer a particular accommodation or the availability of alternate positions at this time.  Id.  At the meeting, the DWPM should complete the employee portion of the accommodations checklist and secure the signature of the employee before concluding the meeting.  Id.  In addition, when a unionized employee is involved, the DWPM should secure the employee's written consent to provide the union with the employee's medical information.  Id. at 47-48.

While the process set forth in the Manual contemplates an interactive process of the kind required by the ADA, plaintiffs argue that even this checklist meeting is a sham where employees are required to identify specific accommodations without dialogue with management.[24]  Plaintiffs cite the Deposition of Paul Kula ("Kula Dep."), who worked as a management-level employee involved in the ADA compliance process, in support of this allegation.  Kula Dep. at 202-04.

---

[24]Plaintiffs cite the Allison Dep. at 243 in support of this argument.  This page of Vance Allison's deposition, however, was not included in the filing with the court.  See Pls.' Dep. App., Tab 1.

Mr. Kula, upon questioning by plaintiffs' counsel about the checklist meeting, assented that it was UPS's policy not to suggest reasonable accommodations at the checklist meeting, but rather to require an employee to fill out a form at the checklist meeting identifying possible accommodations and for UPS managers separately to fill out another form, which is never shared with the employee, but is forwarded to the regional ADA committee. Id.

> **(vi) Step Six: "Identify Potential Reasonable Accommodations (Complete Written Checklist)"**

At Step Six, following the checklist meeting, the DWPM should evaluate the availability of the identified accommodations. Id. at 48. The DLRM should be consulted on issues involving a collective bargaining agreement and the OHS or ROHM should be consulted as necessary on questions concerning an employee's physical or mental abilities in relation to a particular position. Id. If the employee maintains that he or she is capable of performing the current job with a specific accommodation, the DWPM should identify (1) whether that accommodation is available; and (2) where a union employee is involved, whether the accommodation conflicts with a collective bargaining agreement. Id. If the employee is seeking a transfer or reassignment, the DWPM should identify (1) whether there are any current or anticipated openings for the desired position; (2) whether the employee has the requisite education, skills, and experience for the position; (3) whether the essential functions of the new position appear within the employee's medical limitations with or without reasonable accommodation; and (4) when a union employee or bargaining unit position is involved, whether the transfer request conflicts with a collective bargaining agreement. Id. The DWPM then should identify whether any known accommodations not identified by the employee are

available, such as alternative vacant positions or job modifications that would enable the employee to perform the essential functions of his current position. Id. at 48-49. For each potential accommodation identified, the DWPM should collect information and complete the management portion of the checklist, attaching the essential functions list for each position identified to the checklist. Id. at 49. The DWPM should fax copies of the completed checklist and essential job functions lists to the RWPM and ROHM and provide copies to the DLRM, DHRM, and OHS. Id.[25]

### (vii) Step Seven: "Evaluate Appropriate Accommodations (ADA Committee Meets)"

At Step Seven, the ADA Committee (the "Committee"), consisting of management personnel at both the district and regional level, meet or participate in a conference call to review the completed checklist. Id. At this meeting the Committee's task is twofold: (1) to evaluate whether the employee is a "qualified individual with a disability" – that is, capable of performing the essential functions of any available position with or without reasonable accommodation – and (2) to identify what reasonable accommodation, if any, the company is able to offer to the employee. Id. at 49-50.

According to the Manual, in determining whether an individual is qualified, the employee's capabilities with respect to the current position generally should be evaluated first, and if there is no identified accommodation that would enable the employee to continue in this position, or the employee has specifically identified reassignment or transfer as the desired accommodation, the Committee should also evaluate the employee's abilities with respect

---

[25]It is not readily clear from the record whether the employee requesting accommodation receives a copy of these lists.

to potential alternate positions.  Id. at 50.  The Committee may consider positions identified by

the employee, the DWPM, or any other position the Committee deems appropriate.  Id.  When

considering alternative positions, the Committee first should determine whether the employee is

capable of performing the essential functions of the position with or without reasonable

accommodation.  Id.  If the employee is deemed capable of performing a new position with or

without reasonable accommodation, the Committee next must determine whether that position is

"open" or "available."  Id.  Under the policy identified in the Manual, if a position is not open or

available, it is not a reasonable accommodation.  Id. at 50-51.  Further, the Manual states that the

company is never required to create a new position or to bump another employee in order to offer

a reasonable accommodation.  Id. at 51.  If the Committee identifies more than one potential

reasonable accommodation, it must determine which accommodations will be offered to the

employee.  Id.

### (viii) Step Eight: "Bargain with the Union"

If the Committee determines that an accommodation will be offered to a union employee,

the DLRM communicates with the BA to discuss and negotiate with respect to the company's

offer.  Id. at 52-53.  If the BA agrees to one of the offered accommodations, the DLRM should

prepare a written accommodation agreement.  Id. at 53.  The DLRM should notify the RWPM,

DHRM, and DWPM of the results of the meeting.  Id.

### (ix) Step Nine: "Notify the Employee"

When no accommodation is offered because the Committee has determined that the

employee is not qualified for any position, that no reasonable accommodation exists, or that no

reasonable accommodation is available, the DWPM is responsible for notifying the employee of

the outcome in writing.  Id. at 53-54.  When an accommodation is offered, the DWPM is

responsible for writing a letter inviting the employee and his or her BA, if any, to a meeting to

discuss the company's offer.  Id. at 54.  At least two management employees must attend.  Id.  If

the employee rejects all proposed offers or a union employee rejects the only offer agreed upon

by the union and the company, the DWPM should document the offer and the discussions with

the employee in a memorandum to the file and a letter to the employee which notes the date on

which the employee should report to duty in the new or modified position.  Id. at 54-55.  If the

employee fails to report for work, the DWPM may terminate the employee for job abandonment

where appropriate and consistent with applicable law.  Id. at 55.  If the employee accepts the

accommodation, the DWPM or DLRM is responsible for memorializing the agreement in a

letter.  Id.

### (x) Step Ten: "Close the File"

Once the process terminates for any reason, with the exception of insufficient medical

information, the DWPM is responsible for closing the Request File.  Id.  The file should contain:

(1) a completed activity log; (2) all medical information received from the employee; (3) the

completed accommodations checklist, where applicable; (4) copies of all correspondence relating

to the accommodation request; and (5) any memorandum or documentation arising out of the

accommodation process.  Id. at 55-56.  All information contained in the file is considered to

be confidential and must be maintained separately from the employee's personnel and other files

in a secure filing cabinet maintained by the DWPM.  Id. at 56.  In addition, the DWPM also

should maintain a copy of any accommodation agreements reached with the union  Id.

52

### c. Miscellaneous Manual Issues

The Manual further notes that there is a process for appeals for union employees; no manager has the authority to grant exceptions to the company's policy that no job-related accommodations will be granted other than to employees covered by applicable law without prior approval of the Corporate Legal Department, and only in rare circumstances; and that all employees at UPS are responsible for ensuring compliance with the ADA.  Id.  The Manual provides that UPS will not tolerate violations of the compliance program.  Id.  Attached to the Manual are sample forms related to the process.  Id. at 59-88.

### d. Other ADA Training Materials

UPS provided to the court other training materials for management personnel concerning its ADA procedures.  Lee Decl. ¶14.  UPS submits, in fact, that there has been extensive training of management personnel on the UPS ADA procedure.  Id.  For example, UPS submitted for the court's consideration its 2001 follow-up training materials, Lee Decl. ¶14, Ex. J.  These appear to be copies of slides from a powerpoint presentation or handouts to employees used as part of a two-day training program in 2001 covering the ADA and the Family Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq. (the "FMLA").  As a part of this training, employees evidently reviewed the ADA and the FMLA as well as UPS's procedures for dealing with requests for accommodations.  See id.  In particular, it appears that (1) employees discussed substantive hypotheticals, although these hypotheticals were not included in what was filed with the court, id. (UPS's App. at 852); (2) employees reviewed the ten-step process detailed in the Manual, id. (UPS's App. at 863-64; 863-85); and (3) employees discussed procedural hypotheticals, although these hypotheticals were not included in what was filed with the court, id. (UPS's App. at 888).

53

Finally, it appears that employees reviewed UPS's on-line compliance web.  Id. (UPS's App. at 890).

In addition, UPS submitted supplemental training materials which also appear to be copies of slides from a powerpoint presentation or handouts to employees used as part of a training program.  Lee Decl., Ex. K. These materials appear to echo the ADA compliance procedures set forth in the Manual.  The materials are suggestive, though certainly not definitive, evidence that some employees were trained in the formal ADA compliance procedures developed by UPS at some point.  Without more, however – for example, without the substantive and procedural hypotheticals or evidence of the actual discussion and guidance that was delivered concerning hypothetical situations faced by employees concerning ADA compliance, and without any indication of how many managerial employees received this kind of training, when, and how frequently – these materials add little to the court's understanding of an ultimate issue for the merits stage of this case: Whether there existed an informal or unwritten pattern-or-practice of dealing with employees at UPS that violated the ADA notwithstanding the existence of the formal compliance policy.

### e. Notice to Employees

UPS submits that as part of its ADA compliance program, UPS gives applicants an opportunity to request accommodation and that, prior to the recent use of an electronic application, the UPS application form itself stated that UPS will provide reasonable accommodation if an accommodation is requested by an applicant or employee.  Lee Decl. ¶16.  UPS submits that the form itself invites applicants voluntarily to identify accommodations that may be required.  Id.  Further, UPS submits that bargaining unit employees have access to

54

grievance procedures concerning reasonable accommodations.  Id.

UPS submits that in compliance with applicable law, each UPS facility is required to post – and it is UPS's policy to post – government required signage along with the UPS Equal Opportunity Statement on bulletin boards that are accessible and visible in the facility.  Id.  UPS attached a copy of an "EEO Multi-Part Posting" to the Lee Decl., Ex. L.  It is unclear from the face of the example submitted to the court at what date or in what location or locations it was used.  Though difficult to read due to the size of the font and the quality of the photocopy, this posting appears to advise viewers about applicable federal laws including the FMLA and the Rehab Act, as well as UPS's equal opportunity statement.  Id.  It is unclear if this posting, or others like it, explicitly address the ADA.  Id.  While there is mention of "individuals with disabilities," the court, perhaps in part due to the size of the font, was unable to locate an explicit reference to the ADA on the copy supplied to the court.  Id.  UPS asserts that this posting includes an invitation to self-identify under UPS's affirmative action plan pursuant to the Rehab Act.  Id. ¶17, Ex. L (posting).

## C.  ADA and Other Kinds of Accommodations in the Sample Districts

### 1. ADA Accommodations

UPS presents data about ADA accommodations made at UPS gathered from UPS's ADA Request Files and from human resource managers in the five sample districts.[26]  Williams Decl. ¶¶ 3-6.  This data shows that in the five sample districts during the relevant time period of approximately four and one-half years UPS received 481 requests for accommodation that

_____

[26]It appears, although the briefing and submissions are not crystal clear, that this data was gathered from files created based upon requests made after May 10, 2000, and before Fall and Winter 2004.  See Williams Decl. ¶5.

resulted in the opening of a Request File.  Id. ¶6.  Of these 481 requests, UPS submits that 233 requests (approximately 48%) were considered withdrawn; 47 requests (approximately 10% of the total number of requests and approximately 19% of the 248 requests not deemed to be withdrawn) resulted in the offer of an ADA accommodation; and, by inference, 201 requests (approximately 42% of the total number of requests and approximately 81% of the requests not deemed to be withdrawn) did not result in the offer of an ADA accommodation.  Id. ¶¶6-7; see id., Exs. A-D.

Of the 233 requests that were deemed to be withdrawn, UPS submits that 167 were deemed withdrawn because an employee failed to submit the required medical information; six were deemed withdrawn because an employee failed to appear for a the checklist meeting; thirty-one were deemed withdrawn because employees returned to regular job duties during the pendency of the request, rendering their requests moot; three were deemed withdrawn because employees submitted medical information permitting a return to regular job duties; seven were deemed withdrawn because employees entered into alternative settlement procedures and resigned, rendering their requests moot; seven were deemed withdrawn because employees retired or self-terminated while their request was pending; eleven were deemed withdrawn because employees requested that their request be withdrawn; and one was deemed withdrawn because one employee was terminated for submitting false information.  See Williams Decl., Ex. B.

### 2. Other Accommodations

UPS also presents data about accommodations made to employees at UPS based upon avenues outside of the formal ADA compliance protocol.  See Williams Decl. ¶¶ 8-18; Lee Decl.

¶¶ 18-22.  For example, UPS submits that during the relevant time period UPS provided 44

accommodations in three of the five sample districts through its "Alternative Work

(Alcohol/Controlled Substance)" program for employees who lost their license for driving under

the influence of alcohol or a controlled substance (provided for in Article 16, Section 3.3 of the

National Master Agreement) or its "Disqualified Driver - Alternative Work" program for

employees who have been deemed medically unqualified to drive (provided for in Article 20,

Section 4 of the National Master Agreement);[27] UPS provided "hundreds" of short-term

accommodations through its "Temporary Alternate Work" ("TAW") program for employees

unable to perform their normal work due to on-the-job injury (provided for in Article 14, Section

2 of the National Master Agreement);[28] UPS provided 61 accommodations nationwide pursuant

to its Diabetes Protocol and Vision Protocol according to a survey conducted in July 2003;[29] UPS

provided 76 accommodations in the five sample districts pursuant to its hearing disability

---

[27]See UPS's Opposition to Plaintiffs' Motion for Class Certification ("UPS's Opp. Br.") (Doc. No. 182) at 24; Williams Decl. ¶¶9-12; Williams Decl., Ex. E (table of 27 individuals by first name and last initial); Williams Decl., Ex. R (table of 17 individuals by first name and last initial).

[28]See UPS's Opp. Br. at 24; Williams Decl. ¶¶13-15; Williams Decl., Ex. G (TAW registers by location for the Laurel Mountain district from January 1, 2000 to December 31, 2003 (607 total); for the Georgia district from May [1], 2000 to December 31, 2004 (2274 total); for the Northern Illinois district from May [11], 2000 to [December 31], [2004] (2543 total); and for the Southeast California district from May 10, 2000 to August 31, 2004 (2622 total)). (Note that the dates in the affidavit do not match the dates in the attached exhibits.)  The parties have not, and the court has not, further analyzed the data contained in the TAW registers claim-by-claim, or employee-by-employee, to cross-check for multiple accommodations per employee or to extrapolate more detailed results from the data.

[29]See Lee Decl. ¶20, Ex. O (Diabetes Protocol) and Ex. P (Vision Protocol).

program;[30] UPS provided 89 accommodations in the five sample districts pursuant to its Residual

Disability/Return to Work program for non-bargaining unit employees;[31] and UPS through its

managers provided at least 47 accommodations on an informal basis for employees in the Laurel

Mountain district where Hohider and DiPaolo worked.[32]

      UPS further submits that, in addition to accommodations for workers with medical

accommodations, the record reflects hundreds of employees in the five districts working with

permanent disability ratings as determined by applicable state workers' compensation agencies.

Declaration of Kenneth Rittman ("Rittman Decl.") (UPS's App., Tab 2 at 452-54).  A review of

UPS's business records identified 507 employees working in the five sample districts as of April

2005 who had sustained a work-related injury after May 1, 2000 and returned to work with a

permanent disability or permanent partial disability rating.  Id. ¶4.  Of these 507 employees, 15

(approximately 3%) had a permanent disability percentage greater than 40%; 36 (approximately

7%) had a permanent disability percentage between 30%-39%; 103 (approximately 20%) had a

permanent disability percentage between 20%-29%; 145 (approximately 29%) had a permanent

disability percentage between 10%-19%; 108 (approximately 21%) had a permanent disability

percentage between 5%-9%; and 100 (approximately 20%) had a permanent disability percentage

---

[30]See Williams Decl. ¶16, Ex. H (table summarizing individuals by first name and last initial who received accommodations for known hearing disabilities).

[31]See Williams Decl. ¶17, Ex. I (table summarizing individuals by first name and last initial who received accommodations through the Residual Disability/Return to Work program).

[32]See Williams Decl. ¶18, Ex. I (table summarizing individuals who received informal accommodations from UPS managers outside of the ADA Compliance program, the collective bargaining agreement, or a specific UPS program; noting the nature of the request and the accommodation).

between 1%-4%.  Id. ¶7.  Moreover, UPS submits that 2,155 employees in the sample districts who had sustained a work-related injury after May 1, 2000 and were absent from work for greater than 30 days as a result of the injury returned to work and were current, active employees at UPS as of April 2005 although they received additional medical care after returning to work.  Id. ¶8.

**D.  Other General Evidence Submitted by UPS**

UPS submits to the court as further general evidence of its compliance with the ADA evidence of its corporate citizenship and general business excellence, see Lee Decl. at 8-10, and evidence of disability awards or commendations received by UPS, see Lee Decl ¶23.  In addition, UPS submits that under the National Master Agreement the parties agreed to abide by the ADA and employees can pursue grievance proceedings if they disagree with UPS's handling of a request for accommodation, see Declaration of David C. Killoran ("Killoran Decl.") ¶¶2-3 (quoting Article 14, Section 3 ("Permanently Disabled employees") of the National Master Agreement and discussing "Article 14.3 grievances" generally).  Pursuant to these grievance proceedings, sixty-four grievances were decided by the national grievance committee between May 2000 and December 2004.  Id. ¶4.  Of these sixty-four grievances, UPS prevailed in forty-seven grievances, the union prevailed in three of them, and the national committee deadlocked in fourteen of them or referred the grievance back to the parties.  Id. ¶5.[33]  UPS argues that these

_____

[33]UPS submitted declarations from various labor relations managers in the sample districts to the effect that the practice in the districts, and indeed an explicitly bargained part of certain supplemental agreements, is to permit employees who are absent from work on leave, including those absent due to workers' compensation and disability leave, to bid for bargaining unit jobs.  See Declarations of William E. Zbieszkowski, Mike Rosentrater, and Tom Haefke (UPS's App., Tabs 7-9).

statistics support an inference that denials for accommodations are  routinely upheld by a neutral

forum.

**E. Challenged Policies**

      Plaintiffs generally do not dispute the <u>existence</u> of UPS's formal ADA compliance policies

including the "ten-step process" and other procedures set forth in the Manual.  Instead, plaintiffs

allege that unwritten, informal policies and procedures exist at UPS with respect to how requests

for accommodation under the ADA are handled, and that the informal policies and procedures

constitute patterns or practices violative of the ADA and issues relating to these matters are

susceptible to classwide adjudication.  In addition, plaintiffs argue that the <u>implementation</u> of

UPS's formal, written policies violates the ADA and is susceptible to classwide adjudication.

      **1. The Alleged "100% Healed Policy"**

      **a. Evidence from Managers and Former Managers Concerning the Existence of the "100% Release" or "No Restrictions" Policy**

      Plaintiffs argue that the evidence accompanying their brief establishes beyond

peradventure that, notwithstanding its formal written policies, UPS has a de facto policy of

requiring employees who have been off the job because of injury or long-term illness to present

UPS with a full medical release, showing no permanent medical restrictions, before the employee

will be permitted to return to work in any job in UPS's workforce.  Plaintiffs submit declarations

from UPS managers and former managers in support of the existence of this so-called "100%

healed policy."  <u>See</u> <u>generally</u> Pls.' Decl. App.  For example, plaintiffs submit the declaration of

Patrick D'Angelo, who worked at UPS for approximately fifteen years, from 1987 through 2003,

and spent several of those years in supervisory or management positions, including fourteen

months as Charleston Center Manager, in support of the existence of the unwritten rule that

nobody returns to work at UPS without a "100% medical release":

> **UPS maintains an institutionalized policy of requiring a
> "100% medical release" or "full medical release without
> restrictions" from every injured employee before allowing
> them to return to their employment with the company.  This
> unwritten policy was stressed over and over throughout my
> tenure as a UPS manager**. This policy not only was in place and
> followed but was common knowledge among all employees and
> managers in every facility I worked at in South Carolina during my
> fifteen years with the company. **To my knowledge, no one was
> ever allowed to return to work at UPS, once injured, without
> first providing this full release.**
>
> During our monthly manager meetings, attended by all of the
> managers and supervisors in our facility, where safety and the
> current list of injured employees was discussed, this "full release"
> policy was repeated and reinforced over and over. **We were
> instructed that absolutely no employee would be allowed back
> to work without a full release.**  Additionally, I spoke several
> times to . . . the South Carolina District Safety Manager regarding
> the individual cases of injured employees. [He] also has attended
> our manager meetings on occasion. He repeated and stressed over
> and over that "Nobody comes back to work at UPS without a full
> release."

Declaration of Parick D'Angelo ("D'Angelo Decl.") ¶¶2-4 (emphasis added).  The declarations of

other managers or former managers further support this statement.  See, e.g., Declaration of David

Balsis ("Balsis Decl.") ¶2 ("During my [16 years as supervisor, 12 years as a manager], I had

heard from my superiors repeatedly that a worker had to be 100% before he could come back.");

Declaration of John (Layne) Budd ("Budd Decl.") ¶4 ("The policy I was trained to communicate

to people requesting a change in their job duties due to a medical condition or problem was if you

don't have a 100% release then you don't have a job until you get a full release. . . . The company

trained management that, as a supervisor, you didn't want anyone to be accommodated because it

would lead to other accommodations and then you'd have all these new jobs."); Declaration of Jim Fields ("Fields Decl.") ¶5 ("I was personally told that I had to be 100% or else there was no work for me, and I have witnessed countless workers being told by their managers that this was UPS's policy, and I did receive training on the UPS ADA program, but nobody that I am aware of has ever told me or any other manager not to tell workers about the 100% release policy.").

In addition, some managers submit that they were not aware of the formal ADA accommodation process or not adequately trained in it. See, e.g., Balsis Decl. ¶2 ("I was a UPS supervisor for 16 years . . . . During the time that I worked there, I never even heard of any accommodation process, ten-step or otherwise, and I don't know of anybody that ever got anything under the ADA."); Fields Decl. ¶5 ("Even the existence of the ten-step accommodation process is not known by the vast majority of the union workers and first line managers."). In addition, some managers declare that they were coached to discourage employees from seeking accommodations through the ADA. See, e.g., Budd Decl. ¶ 5 ("This policy of 100% release was communicated via phone calls or in face-to-face business meetings. Often your safety manager or supervisor would contact you to discuss an employee's upcoming return, in which you were coached to specific situations on how to avoid the ADA on a case-by-case basis."). Some managers further declared that they believed the formal procedures were not designed actually to accommodate people, but rather were designed to make an employee believe that the company was complying with the law while discouraging the employee from seeking accommodations. See, e.g., Budd Decl. ¶7.

**b. Evidence from Employees and Former Employees Concerning the Existence of the "100% Release" or "No Restrictions" Policy**

Plaintiffs submit numerous declarations from UPS employees and former employees as evidence of the existence of the 100% healed policy.  See, e.g., Cowley Decl. ¶3 ("UPS refused to permit me to return to work, telling me that I had to be "100%" healed to return and that I could not come back unless I had a "full-duty release" allowing me to lift 70 pounds or more.")(Alabama); Sanchez Decl. ¶6 ("In July 2001, feeder supervisor . . . told me I could not work unless I was 100%.")(Arizona); Weber Decl. ¶5 ("UPS has refused to allow me to return . . ., applying UPS's long-standing rule that if you are not 100%, you cannot come back to work.")(California); see generally Pls.' Decl. App.  These declarations arise in a wide variety of circumstances.  Common to many, however, is the idea that there was a general understanding among a sizable number of UPS employees that they could not return to work after an injury unless they were "100% healed" or had no restrictions.  Another recurring theme in the numerous declarations submitted to the court is the lack of awareness of or understanding about the formal ADA Compliance process among a sizable number of employees.  See, e.g., Burke Decl. ¶6 ("I have never seen any notices about the Americans with Disabilities Act posted anywhere on UPS premises.").[34] In addition, multiple UPS employees declared that although they had communicated a request for an accommodation, they were not taken through the ten-step process set forth in the Manual.  See, e.g., Lugo Decl. ¶¶18-21.  Some employees reported resorting to imploring their

---

[34]Mr. Burke, however, declared that his District Health & Safety Manager advised him about his rights under the ADA and encouraged him to apply for an accommodation.  Id. ¶6.

63

doctors to give them a full medical release regardless of continuing symptoms due to their understanding of UPS's 100% release policy.  See, e.g., id. ¶¶7-8.[35]

### c. Evidence from UPS's Internal Emails

Plaintiffs submit to the court certain UPS internal emails which plaintiffs argue evidence the existence of the 100% healed policy.  Plaintiffs argue in their brief that these emails contain admissions that UPS managers nationwide enforce the 100% release policy, share medical information and strategy with disability claims adjusters, and otherwise pursue all possible avenues to prevent anyone with permanent restrictions from attempting to return to work. Plaintiffs point to no single "smoking gun" email evidencing a clear, unambiguous intent to stonewall UPS employees seeking accommodations.  Plaintiffs, however, cite language from emails concerning Hohider's request for accommodation, Pls.' Ex. App., Tab 16, and the requests of other employees, Pls.' Ex. App., Tabs 18, 20, 21, 23, which plaintiffs argue show an intent by UPS managers to use the ADA process to stonewall employees seeking accommodations.

For example, plaintiffs quote excerpted language from emails about checklist meetings for employees who have made requests and argue that these emails evidence attempts by UPS to "run

---

[35]The record is replete with declarations from UPS managers and employees.  The court reviewed these declarations for their general content.  Defendant offers rebuttal documents related to some, but not all, of the individual declarants and documents.  See UPS Opp. App. at 1755-1896; UPS's Opp. Br. at 32-34.  At this stage in the proceedings, the parties and the court cannot substantiate or impeach the truth or falsity, or degree of credibility, of every declaration before the court.  The court will not summarize the entirety of the allegations.  It is sufficient for the purpose of deciding whether class certification is appropriate to note the production by plaintiffs of the declarations making the above-referenced general allegations and to note UPS's opposition to the credibility of some of the assertions within the declarations.  See Part I infra discussing the appropriate standard of review for deciding whether the Rule 23 requirements have been met.  The legal effect of the existence of varying individual circumstances will be discussed in more detail later in this memorandum opinion.

people through" the ADA process without the requisite good faith the ADA requires.  See Pls.'
App. Ex., Tab 13-14 ("Let me know if that changes anything" and the response "Yes. Please call
for further discussion").  Plaintiffs point to a string of email communications between Liberty
Mutual claims adjuster Albert Sarokin and UPS managers about Hohider's application which
plaintiffs argue demonstrate that UPS predetermined that it would not permit Hohider to return to
work in any capacity although they would "put Mr. Hohider through the ADA process" in an
attempt to force him to settle his workers' compensation claim.  See Pls.' Ex. App., Tab 16.[36]

Plaintiffs also submit to the court other emails produced by UPS which plaintiffs
characterize as "frank communication about the true policy of non-accommodation" at UPS.  See
Pls.' Br. at 13.  These emails apparently discuss individual cases of UPS employees seeking
accommodations under the ADA.  For example, one email that plaintiffs paraphrase in their brief
stated in part:

> **[Redacted name] says that someone told him since he was not
> 100% he would need to be terminated**. . . . Anyway, he says now
> his restrictions are permanent. . . . **I have no choice but to
> reinstate him and go through the ADA process to be sure we
> cover ourselves for any possible litigation**. . . . I explained to him
> not to get his hopes up for another lighter job but he can go through
> the process. . . . I suggested he start looking for other jobs outside
> UPS – he still wants to go through the ADA. . . .

Pls.' Ex. App., Tab 18 (August 20, 2003 email with names of sender and recipient
redacted)(emphasis added).  In response to that email, the following response was sent:

---

[36]The court could not locate the exact language quoted in plaintiffs' brief and identified as
stated on the "fax cover sheet."  See Pls.' Br. at 13.  An email containing similar, although not
identical, language was submitted to the court as Pls.' Ex. App., Tab 16.  The court could not
locate this "fax cover sheet" in the materials submitted to the court.

> [S]ince he did not work the required time to attain benefits, he is
> unable to file for disability.  He asked a bunch of questions and
> gave me the impression he was going to try to come back to work.
> **I told him that before that could happen he would have to have
> a full release from his Dr.**

Id. (August 26, 2003 3:41 p.m. email with names of sender and recipient redacted)(emphasis

added).  Additionally, a response stated:

> Please put a copy of this e-mail in his file. [Redacted name] is right
> he is probably not eligible for medical or disability benefits (pre-
> senior) **but we have to go through the ADA process** – he can not
> [sic] return without a release from his doctor who has reviewed the
> job functions which is [sic] in the ADA packet. . . .

Id. (August 26, 2003 11:44 p.m. email with names of sender and recipient redacted)(emphasis

added).  Other emails similarly discuss "running employees through the ADA process."  See, e.g.,

Pls.' Ex. App., Tab 20 (September 17, 2004 email with names of sender and recipient

redacted)("All, [name redacted] who is on comp and at MMI, has expressed interest in an easier

job at UPS, including a supervision again. As per previous discussions with [name redacted] I

believe this to be an informal request for an accommodation and hence we should run him through

the ADA process. . . . please call me to discuss further . . . .")(emphasis added); Pls.' Ex. App.,

Tab 24 (September 17, 2004 email with names of sender and recipient redacted)(In response to an

email from Raul Alvarez regarding an employee released from a non-work related injury with

restrictions which stated "if we can't accommodate this employee under this restrictions [sic]

please let me know," "I have coached Raul.  He now understands that this restriction is a possible

accommodation by UPS.  Do not work [the employee] until further instruction or he gets a full

release.")(emphasis added).

### d. Evidence from UPS's Early Training Materials

Plaintiffs submit excerpts from UPS's early training materials which plaintiffs suggest

evidence that UPS admits that a 100% healed policy is illegal.  See Pls.' Ex. App., Tab 5 (the

"Focus on Abilities presentation materials" discussed at note 18 infra) which appears to be

training materials to accompany a live presentation to employees.  These materials are not dated.

UPS submits that these materials predate the 1999 and 2000 ADA procedure, and were

superseded by subsequent training in connection with the ADA procedure.  Lee Decl. ¶¶14-15.

Plaintiffs, however, point the court to language in the Focus on Abilities presentation materials

and other training documents for managers as evidence that UPS used some version of the 100%

healed policy in the past, and recognized that such a policy would violate the ADA:

> Workers' compensation is sometimes seen merely as an extension
> of the termination process.  **Even at UPS, we have, at times,
> declined to return injured employees to the job unless they
> were "100 percent."**  The ADA makes this issue more crucial
> because of the potential for punitive damages (up to $300,000) for
> discriminating against a qualified individual with a disability. . . .
>
> Let's look at an example.  We have an employee who is injured on
> the job.  According to the ADA, the employee's condition is
> significant enough to constitute a permanent disability.  However,
> we don't consider the employee eligible to return to work unless
> fully recovered and medically released.  **By requiring this "all or
> nothing" medical release, we're essentially refusing to discuss
> any reasonable accommodation that might allow this employee
> to work.**
>
> **This is discrimination according to the ADA**. . . .

Pls.' Ex. App., Tab 5 at 2-3 (emphasis added).  In addition, plaintiffs point the court to a one-page

document entitled "Disability Procedures" whose source is unclear.  Plaintiffs aver that document

was submitted to the Equal Employment Opportunity Commission (the "EEOC") by UPS's

employee relations manager for the Laurel Mountain District in August 2001.  Pls.' Ex. App., Tab

7.  This document, which is undated, appears to be a basic explanation of "disability procedures"

at UPS, and states:

> The 10-step "Reasonable Accommodation Process" is initiated
> when an employee claims to have a permanent disability that
> requires an accommodation.  This process involves Human
> Resources, Labor Relations, Occupational Health and the local
> union.  This process takes up to ten weeks and is implemented
> whether or not the employee becomes permanently disabled on or
> off the job.
>
> "Temporary Alternate Work" may be offered to an employee who
> is unable to perform their regular job assignments due to an on-the-
> job injury . . . .
>
> **Employees returning to work to their regular job must have a
> "Return to Work" slip form their treating physician that
> indicates "Full Duty / No Restrictions" or [be] able to perform
> the essential job functions. . . .**

Id. (emphasis added).  Plaintiffs also submit a one-page document entitled "Response to

Additional Questions" which states:

> When an employee is injured on the job (worker's compensation)
> or has a non-work related injury or illness (disability) we require
> them to furnish us with a Return to Work slip from their treating
> physician.  **The Return to Work slip must be received . . . before
> the employee's return to work date.  The Return to Work slip
> should include wording such as "No restrictions, full duty."**

Pls.' Ex. App., Tab 8 (emphasis added).  This form goes on to indicate that "Temporary Alternate

Work" with restrictions may be available in the case of a work-related injury.  Id.  Plaintiffs argue

that even if subsequent training took place after these training materials were phased out, other

evidence of record demonstrates that the 100% healed policy which requires workers to obtain a

full medical release before they can come back to work continued unabated regardless of the

institution of UPS's formal ADA compliance procedures and the publication and dissemination of the Manual.

### e. Evidence from EEOC Determinations

Plaintiffs submit evidence from EEOC investigations into individual charges that employees at UPS cannot return to work unless they are "100%" or have a full release to return to duty. For example, plaintiffs submit an EEOC determination in the case of Michelle D. Miller. Pls.' Ex. App., Tab 12 ("EEOC Miller Determination"). In the EEOC Miller Determination dated January 14, 2002, Eugene V. Nelson, Area Director, on behalf of the EEOC, stated:

> **The evidence revealed that [UPS]**[37] **has a return to work policy, which requires employees to produce a no restrictions "return to work" slip. Policies that require a release to "full duty" without restrictions and that do not consider any type of reasonable accommodation, as here, are pre se violations of the Americans with Disabilities Act (ADA).** Such policies ignore [UPS's] obligation under the ADA to engage in the interactive process with the employee to determine whether it can provide a reasonable accommodation.

Id. at 1-2 (emphasis added). The EEOC Miller Determination further reported:

> Based on this analysis, I have determined that the evidence obtained during the investigation establishes a violation of the Americans with Disabilities Act regarding [UPS's] return to full duty/no restrictions policy.

Id. at 2. The EEOC Miller Determination concluded by informing both parties that the EEOC will contact the parties to discuss conciliation. Id.

Plaintiffs also submit an email from EEOC Investigator Frank E. Rodia to UPS's outside litigation counsel concerning the EEOC Miller Determination. Pls.' Ex. App., Tab 15 ("Rodia

---

[37]The EEOC Miller Determination listed as Respondent "United Parcel Service, 30 Marshall Street, Brentwood, West Virginia 26031."

email").  The Rodia email was sent on Monday, March 4, 2002, and included as an attachment a

draft of the revised conciliation agreement concerning the EEOC's determination and twenty-six

sites in Pennsylvania, West Virginia, and Maryland.  Id.  In the Rodia email, Investigator Rodia

indicated his belief that "there may be a number of potential victims that have been or are being

adversely effected [sic] by the incorrect information provided by these management officials due

to their lack of knowledge of what it means to be a 'qualified individual with a disability' and

their obligation to provide reasonable accommodations."  Id.  Investigator Rodia noted:

> During our investigation a number of witnesses who may have had
> ADA disabilities indicated that they made no attempt to go back to
> work despite their ability to return to work with restrictions
> because they had been advised by management that employees will
> not be considered for a return to work unless they can return to
> "full duty/no restrictions."

Id.

        Plaintiffs also submit other EEOC determinations and a consent decree as evidence that

EEOC investigations and findings confirmed the application of the 100% healed policy in various

UPS districts including the Desert Mountain District covering Arizona and New Mexico and in

Pennsylvania, West Virginia, Illinois, and New York.  Specifically, plaintiffs submit for the

court's consideration the EEOC determinations for plaintiff DiPaolo, Pls.' Ex. App., Tab 26

("EEOC DiPaolo Determination")("Creditable Testimony has determined that [UPS][38] has a

100% full medical release practice, which it has been determined is a per se violation of the

ADA."); plaintiff Hohider, Pls.' Ex. App., Tab 27 ("EEOC Hohider Determination")("Creditable

---

        [38]The EEOC DiPaolo Determination listed as Respondent "United Parcel Service, 521
North Center Avenue, New Stanton, PA 15672."

Testimony has determined that [UPS][39] has a 100% full medical release practice, which it has

been determined is a per se violation of the ADA."); James Fields,  Pls.' Ex. App., Tab 28

("EEOC Fields Determination")("I have determined that the evidence obtained in the

investigation establishes reasonable cause to believe that [UPS][40] failed to provide a reasonable

accommodation to [Mr. Fields] and a class of individuals with disabilities and constructively

discharged [Mr. Fields], in violation of the ADA."); and Edward Ragusa,  Pls.' Ex. App., Tab 29

("EEOC Ragusa Determination")("An analysis of the evidence shows [UPS][41] discriminated

against [Mr. Ragusa]. [UPS] admits that it has a policy that requires an employee to return from

leave and resume full responsibilities without restrictions. . . . [UPS's] actions appears [sic] to be

pretext for disability discrimination.").  In all of these determinations, the EEOC concluded that

the evidence obtained during its investigations established violations of the ADA or established

reasonable cause to believe that there were violations of the ADA.[42]

_____

[39]The EEOC Hohider Determination listed as Respondent "United Parcel Service, 521 North Center Avenue, New Stanton, PA 15672."

[40]The EEOC Fields Determination listed as Respondent "United Parcel Service, 1400 South Jefferson, Chicago, IL 60607."

[41]The EEOC Ragusa Determination listed as Respondent "United Parcel Service, 180 Canal Place, Bronx, NY 10461."

[42]Plaintiffs moved the court for leave to file notice of two other EEOC reasonable cause determinations after the briefing on the class certification motion was submitted which plaintiffs argued were evidence that the EEOC in its investigations of individual cases had made findings concerning the alleged policies and practices challenged in this litigation, including the policy of requiring a 100% medical release.  See (Doc. No. 189-3) (EEOC Sanchez Determination) ("Respondent (1) failed to engage in the interactive process with the Charging Party, (2) required him to be "100 percent" fit for duty, and (3) failed to reasonably accommodate Charging Party's impairment . . . . the evidence of record has also shown that Respondent has continued to engage in a pattern or practice of employment discrimination by maintaining a de facto return to work policy requiring employees who have permanent restrictions to be released 100% with no

In addition, plaintiffs submit the Consent Decree entered into between the EEOC and

UPS with respect to litigation in the United States District Court for the District of Arizona.  Pls.'

Ex. App., Tab 25 ("UPS Desert Mountain District Consent Decree").  The UPS Desert Mountain

District Consent Decree, signed by the United States District Judge on November 2, 2001,

resolved litigation pending between the EEOC and UPS in the Desert Mountain District.  Id. at 1-

2.  It set forth terms of general relief and corrective measures including that UPS was permanently

prohibited from violating Title I of the ADA; that UPS would not retaliate against any person for

participating in the EEOC investigation; that UPS would notify the EEOC before any suspension,

termination, or demotion of a named individual; and that UPS would maintain policies and

practices to assure a work environment free from disability discrimination which allowed

employees to request reasonable accommodation pursuant to the ADA.  Id. at 2-9.  The UPS

Desert Mountain District Consent Decree also prescribed specific corrective actions, for example

that UPS would submit a written ADA policy and a written return-to-work policy to the Phoenix

Office of the EEOC and that UPS would retrain management level employees about the ADA.  Id.

---

restrictions before returning to work.  This policy has been determined to be a per se violation of
the ADA. . . .'"); (Doc. No. 199) (EEOC Nelson Determination) (similar).  UPS opposed
plaintiffs' motions for multiple reasons, arguing that time for class discovery and briefing was
closed, reasonable cause determinations and EEOC investigations are limited and routinely
excluded as evidence, and the EEOC determinations concern inherently individualized
circumstances which should not be considered regarding the existence of a policy susceptible of
classwide adjudication.  (Doc. Nos. 190, 191, 200, 201).  UPS also argued that plaintiffs' limited
submission of EEOC determinations that supported their case inappropriately ignored the
numerous "no probable cause" determinations by the EEOC and other evidence in the very same
districts in issue.  See (Doc. No. 201).  The court need not resolve these evidentiary disputes at
this time because these materials are cumulative of evidence already in the record and the court
can take note of the evidence and UPS's objections to it and give both whatever weight is
appropriate for reaching a decision on certification without making a finding that such evidence
will be competent at the merits stage of the proceedings.

at 6-7.  The UPS Desert Mountain District Consent Decree also set forth specific relief to class members that included the proviso that UPS would send them job announcements and invite them to apply for jobs with UPS and provided monetary relief in the total amount of $375,000 to be distributed among the aggrieved persons listed in Attachment A to the Consent Decree.  Id. at 4-6.

UPS disputes the appropriateness of these EEOC determinations and Consent Decree as evidence in this case.  See note 42 supra.  UPS argues that a representative of the EEOC argued during proceedings in this litigation that the investigations and findings that the EEOC conducts are preliminary and incomplete; that these determinations are routinely excluded as evidence; and that the determinations and the Consent Decree deal with inherently individualized cases and should not be admitted as evidence of a widespread policy.  These objections go to the admissibility and weight of this evidence at the merits stage of the litigation.  The court can take note of the evidence and UPS's objections to it and give both whatever weight is appropriate for reaching a decision on certification without making a finding that such evidence will be competent at the merits stage of the proceedings.

### 2. Other Evidence

In addition to the "100% healed policy," plaintiffs also challenge various aspects of UPS's use or implementation of its formal ADA compliance policy or "ten-step process," UPS's use of uniform job descriptions, UPS's policies concerning an employee's use of union seniority rights, UPS's practice of withdrawing accommodations, and UPS's treatment of persons who request accommodations.  Plaintiffs cite various other evidence of record in support of their position that these related policies and practices violate the ADA and that the issues related to these matters are appropriate for classwide adjudication.  Defendant counters plaintiffs' evidence with its own

rebuttal evidence.  This evidence will be discussed in more detail in the discussion relevant to

those matters.

## V. ADA CLAIMS AND PATTERN-OR-PRACTICE FRAMEWORK

### A. Scrutiny of Specific Legal Claims Is Required to Decide Class Certification

The United States Court of Appeals for the Third Circuit in Wachtel clarified that Rule 23

"requires district courts to include in class certification orders a clear and complete summary of

those claims, issues, or defenses subject to class treatment." 453 F.3d at 184-85; see Beck, 457

F.3d at 297.  In Wachtel, the court of appeals commented that "[c]urrent practice often falls short

of that standard." Id. at 184 (noting that certification orders tend to treat the parameters of the

class itself much more clearly and deliberately than the class claims, issues, or defenses).  While

"district courts often issue memorandum opinions discussing the allegations in the complaint, the

facts of the case, and some combination of the substantive requirements for class certification

found in Rule 23(a) and (b)," and "[s]everal of these substantive provisions may even lead to

discussion of 'common' versus 'individual' issues present in the case," "certification orders and

memoranda are most often devoid of any clear statement regarding the full scope and parameters

of the claims, issues or defenses to be treated on a class basis as the matter is litigated." Id.

Instead of falling prey to the pitfalls of "common practice," a district court following Rule

23(c)(1)(B) and the directive in Wachtel must set forth a clear and complete summary of those

claims, issues, or defenses subject to class treatment.  A court cannot do so in a vacuum –

engaging in superficial analysis of facts and issues and identifying which facts and issues appear

to be, broadly speaking,  "common" versus "individual."  What is required, instead, is scrutiny of

the Rule 23 certification requirements in light of the specific legal claims at issue in the case and what adjudication of those claims would require.[43]

In this case, therefore, the court must determine whether certification is appropriate – that is, whether the Rule 23 requirements are met –  in light of the actual requirements for litigating claims under the ADA.  In addition, because the plaintiffs in this case invoke Teamsters and seek to litigate the claims in this lawsuit pursuant to the "pattern-or-practice" framework articulated in Franks, Teamsters, and Cooper, the court must decide as a threshold matter whether plaintiffs can litigate their claims pursuant to the pattern-or-practice framework.  If the court determines that plaintiffs can proceed under the pattern-or practice framework, the court must analyze the certification issues with that framework in mind.

**B. The Americans with Disabilities Act**

Under the general rule established by Title I of the ADA, employers are prohibited from discriminating against qualified individuals with a disability because of that disability.  Title 42, United States Code, section 12112(a) provides:

> (a) General rule.  No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

---

[43]The difficulty for district courts, however, is that in part due to the recent timing of Wachtel, litigants sometimes do not brief the certification issue with the same clarity and focus required of district courts in issuing memorandum opinions.  Under those circumstances, the burden on the district court to satisfy the dictates of Rule 23 and Wachtel will continue to be great.

42 U.S.C. § 12112(a); see Taylor v. Phoenixville School Dist., 184 F.3d 296, 305-06 (3d Cir. 1999).

A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2)(emphasis added).  Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 188 (3d Cir.1999) (quoting 29 C.F.R. § 1630.2(1)).  A person is  "regarded as disabled" if the person:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation; (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

Williams v. Philadelphia Housing Auth. Police Dept., 380 F.3d 751, 766 (3d Cir. 2004), cert. denied, Philadelphia Housing Auth. v. Williams, 544 U.S. 961 (2005)(citing Taylor, 177 F.3d at 188 (quoting 29 C.F.R. § 1630.2(1))(alteration in original).

The ADA defines unlawful discrimination under the ADA to include specific practices.  See 42 U.S.C. § 12112(b).  Section 12112(b)("Construction") explains that the term "discriminate" under the statute includes the following practices:

> (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

(3) utilizing standards, criteria, or methods of administration--

      (A) that have the effect of discrimination on the basis of disability; or

      (B) that perpetuate the discrimination of others who are subject to common administrative control;

(4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

**(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or**

**(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;**

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

(7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

42 U.S.C. § 12112(b)(emphasis added).  Plaintiffs' policies claims in this case – including the claims relating to the 100% healed policy and the various reasonable accommodation policies  – implicate the statute's prohibition against discrimination in the form of failure to make reasonable accommodations.

**1. Failure to Make Reasonable Accommodations; Failure to Engage in Interactive Process**

Section 12112(b)(5) of the ADA explicitly provides that the term "discriminate" for the purposes of the ADA includes

> (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or (B) denying employment opportunities . . . if such denial is based on the need of such covered entity to make reasonable accommodation . . . .

42 U.S.C. § 2112(b)(5).  In addition, applicable regulations and EEOC guidelines describe the kind of interactive process required under the ADA with respect to requests for reasonable accommodation.  See Taylor, 184 F.3d at 306 (discussing applicable regulations and EEOC interpretive guidelines).

The United States Court of Appeals for the Third Circuit and other United States Courts of Appeals have recognized that discrimination under the ADA can include failing to make reasonable accommodations for a plaintiff's disabilities under certain circumstances.  Williams, 380 F.3d 751; Taylor, 184 F.3d at 306; see Battle v. United Parcel Service, Inc., 438 F.3d 856 (8th Cir. 2006); Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281 (7th Cir. 1996).

> The ADA specifies that an employer discriminates against a
> qualified individual with a disability when the employer does "not
> mak[e] reasonable accommodations to the known physical or
> mental limitations of the individual unless the [employer] can
> demonstrate that the accommodation would impose an undue
> hardship on the operation of the business of the [employer]."

Taylor, 184 F.3d at 306 (quoting 42 U.S.C. § 12112(b)(5)(A)).[44]

In Williams, the court of appeals addressed an individual lawsuit brought pursuant to the

ADA by a former police officer who was determined to be unable to carry a firearm as the result

of a mental condition.  380 F.3d at 755.  The police officer raised retaliation and failure to make

reasonable accommodation claims in his lawsuit.  The court of appeals reviewed the retaliation

claims under the ADA, id. at 758-61, the failure to make reasonable accommodation claims under

the ADA, id. at 761-72, and the concept of being "regarded as" disabled in the context of the right

to a reasonable accommodation, id. at 772-76.

With respect to the elements of an individual claim for failure to make a reasonable

accommodation, the court of appeals noted that:

> To establish a prima facie case of discrimination under the ADA, a
> plaintiff must therefore show "(1) he is a disabled person within
> the meaning of the ADA; (2) he is otherwise qualified to perform
> the essential functions of the job, with or without reasonable
> accommodations by the employer; and (3) he has suffered an
> otherwise adverse employment decision as a result of
> discrimination."

---

[44]The court of appeals in Taylor noted that it previously had left open the difficult issue
whether a "regarded as" plaintiff is entitled to reasonable accommodations.  Taylor, 184 F.3d at
306 n.2.  In Williams, 380 F.3d at 775, the court of appeals, however, held that it was
"inescapable" that "regarded as" employees under the ADA are entitled to reasonable
accommodation in the same way as are those who are actually disabled.

Id. at 761 (quoting Taylor, 184 F.3d at 306 (quoting Gaul v. Lucent Technologies, 134 F.3d 576,

580 (3d Cir.1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir.1996))).  The court of

appeals determined that "[a]dverse employment decisions in this context include refusing to make

reasonable accommodations for a plaintiff's disabilities."  Id.[45]  The court of appeals explained

that "reasonable accommodation" "includes the employer's reasonable efforts to assist the

employee and to communicate with the employee in good faith," id. (quoting Mengine, 114 F.3d

at 416), under what has been termed a duty to engage in the 'interactive process'. . . ."  Id.

The court of appeals therefore analyzed the elements of proof required to establish an

individual claim for failure to make a reasonable accommodation in Williams pursuant to the

general elements of a prima facie case of ADA discrimination, refining the second element –

"qualified status" – and third element – "adverse employment action resulting from

discrimination" – in situations where an individual claim for failure to make a reasonable

accommodation is alleged.  Id. at 768-72.

With respect to "qualified status" in the failure to make a reasonable accommodation

claim context the court of appeals stated:

> The second element of Williams's prima facie case of
> discrimination under the ADA requires him to show that he is a
> "qualified individual." See [Deane v. Pocono Medical Center, 142
> F.3d 138, 145 (3d Cir. 1998)]. As previously noted, a qualified
> individual is one "who, with or without reasonable
> accommodation, can perform the essential functions of the

---

[45]"The ADA specifically provides that an employer 'discriminates' against a qualified
individual with a disability when the employer does ' "not mak[e] reasonable accommodations to
the known physical or mental limitations of the individual unless the [employer] can demonstrate
that the accommodation would impose an undue hardship on the operation of the business of the
[employer]."'"  Williams, 184 F.3d at 761 (quoting Taylor, 184 F.3d at 306 (quoting 42 U.S.C. §
12112(b)(5)(A)) (alterations in original))

> employment position that such individual holds or desires." 42
> U.S.C. § 12111(8). "[A] disabled employee may establish a prima
> facie case under the ADA if s/he shows that s/he can perform the
> essential functions of the job with reasonable accommodation and
> that the employer refused to make such an accommodation."
> Skerski v. Time Warner Cable Co., 257 F.3d 273, 284 (3d
> Cir.2001).

Id. at 768. In Williams, the police officer was seeking an accommodation in the form of a

reassignment to a vacant position. Id. (citing 42 U.S.C. § 12111(9)(B)). In light of his "actual"

and "regarded as" disability claims, the court of appeals held that to meet his litigation burden, he

needed only to show that "(1) that there was a vacant, funded position; (2) that the position was at

or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform

the essential duties of this job with reasonable accommodation." Id. at 770 (quoting Donahue v.

Consol. Rail Corp., 224 F.3d 226, 230 (3d Cir.2000)).[46]

The court of appeals noted that "[i]f the employee meets his burden, the employer must

demonstrate that [accommodating the employee in the form of a requested transfer] would cause

unreasonable hardship." Id. In that case, the court of appeals held that the record supported a

finding that a transfer to the radio room was available, that the position was at or below his level,

and that the plaintiff was qualified to perform the essential duties of that job with no further

accommodation. Id. The court of appeals held that the plaintiff in Williams had established that

---

[46]See Armstrong v. Burdette Tomlin Memorial Hosp., 438 F.3d 240, 246 (3d Cir. 2006)
("In order to prevail on his failure to accommodate claim . . ., [the plaintiff] had to establish four
elements: (1) he was disabled and his employer knew it; (2) he requested an accommodation or
assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been
reasonably accommodated.")(citing Taylor, 184 F.3d at 317-320; Tynan v. Vicinage 13, 798
A.2d 648, 657, 659 (N.J. Super. Ct. 2002)). In Armstrong the court of appeals analyzed New
Jersey's discrimination statute which is interpreted in accordance with the ADA. Id. n.12.

there was a material dispute of fact as to whether he was a "qualified individual" under the ADA with respect to his failure to accommodate claim.  Id.

   With respect to the third element of proof – "adverse employment action resulting from discrimination"– in the failure to make a reasonable accommodation claim context the court of appeals explained its prior holdings that a failure to make a reasonable accommodation for a disabled and qualified employee constitutes discrimination under the ADA.  Moreover, the court of appeals explained that an employer has a duty under the ADA to engage in an "interactive process" of communication with an employee requesting an accommodation so an employer will be able to ascertain whether there is a disability and, if so, the extent of the disability, and to thereafter assist in identifying reasonable accommodations if appropriate.  Id. at 771 (citing, inter alia, 29 C.F.R. § 1630.2(o)(3); Taylor 184 F.3d at 306; Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000)).

   In Taylor, the United States Court of Appeals for the Third Circuit addressed in detail the kind of interactive process the ADA regulations require with respect to requests for reasonable accommodations.  Id. at 311-15.  The court of appeals in Taylor recognized that an employer has an obligation to participate in the interactive process once it has notice that an employee may have a disability.  Id. at 314.  The court of appeals noted:

> The ADA's regulations state that: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations."

Id. at 311 (quoting 29 C.F.R. § 1630.2(o)(3))(alterations in original).  The court of appeals continued:

> Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability."

Id. (quoting 29 C.F.R. Pt. 1630, App. § 1630.9 at 359)(alteration in original).[47]

The court of appeals in Taylor reiterated its previous holding that "[b]ased on the regulation and interpretive guidelines, . . . 'both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.'" Id. (quoting Mengine, 114 F.3d at 419-20).[48]  In Taylor, the court of appeals also indicated its agreement with the decision of the United States Court of Appeals for the Seventh Circuit in Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281 (7th Cir. 1996), with respect to the responsibility of both an employee and an employer to participate in good faith in a process to determine whether specific accommodations are necessary:

> An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer.

---

[47]The court of appeals noted its previous determination that this regulation and the EEOC's interpretive guidelines applied to a claim under the Rehab Act.  Taylor, 184 F.3d at 312 (citing Mengine v. Runyon, 114 F.3d 415, 419-20 (3d Cir.1997); Deane v. Pocono Medical Center, 142 F.3d 138, 149 (3d Cir.1998)(en banc)).

[48]The court of appeals noted in Mengine and in Taylor that other courts of appeals have taken this view.  Id. at 312; see, e.g., Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir.1996)("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."); Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 165 (5th Cir.1996)(The "employee's initial request for an accommodation . . . triggers the employer's obligation to participate in the interactive process. . . .").

> . . [B]oth parties bear responsibility for determining what
> accommodation is necessary . . . "[N]either party should be able to
> cause a breakdown in the process for the purpose of either avoiding
> or inflicting liability.  Rather, courts should look for signs of
> failure to participate in good faith or failure by one of the parties to
> help the other party determine what specific accommodations are
> necessary.  A party that obstructs or delays the interactive process
> is not acting in good faith.  A party that fails to communicate, by
> way of initiation or response, may also be acting in bad faith.  In
> essence, courts should attempt to isolate the cause of the
> breakdown and then assign responsibility."

Id. 312 (quoting Bultemeyer, 100 F.3d at 1285 (quoting Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996)).

The court of appeals in Taylor (1) clarified what notice must be given to an employer to trigger the employer's obligations under the interactive process; and (2) elaborated on the employee's and employer's duties once the interactive process comes into play.  Id. at 312-18.  In Taylor, an individual ADA case, the court of appeals held that viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could conclude that the employer school district in that case did not meet its burden to participate in good faith in the interactive process.  Id. at 315.

The United States Court of Appeals for the Third Circuit ultimately concluded in Taylor that for an individual employee "[t]o show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.  Id. at 319-20 (citing Mengine, 114 F.3d at 420; Bultemeyer, 100 F.3d at 1285; Taylor,

84

93 F.3d at 165).

It is noteworthy, however, that in <u>Williams</u> the court of appeals stated that "we have also made clear that a 'plaintiff in a disability discrimination case who claims that the defendant engaged in discrimination by failing to make a reasonable accommodation cannot recover without showing that a reasonable accommodation was possible.'"  380 F.3d at 772 (quoting <u>Donohue v. Consolidated Rail Corp.</u>, 224 F.3d 226, 234 (3d Cir. 2000)).  As the court of appeals explained:

> Thus, " 'because employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable *if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations*.' "

<u>Id</u>. (quoting <u>Donohue</u>, 224 F.3d at 234-35 (quoting <u>Taylor</u>, 184 F.3d at 317)(emphasis in original)).[49]  From this, it can be inferred that merely showing that an employer has failed to engage in the interactive process is not sufficient to recover under the ADA for a failure to make a reasonable accommodation claim, although it might bear on the proof of such a claim.  Instead, with respect to an individual claim of failure to make a reasonable accommodation, a plaintiff must additionally show that a reasonable accommodation was possible.  Cf. COMMITTEE ON MODEL CIVIL JURY INSTRUCTIONS, THIRD CIRCUIT, MODEL CIVIL JURY INSTRUCTIONS, available

---

[49]The court of appeals held that the plaintiff in <u>Williams</u> had demonstrated that a fact finder could conclude "that [his employer] knew about his disability, that he requested accommodation, that [his employer's] quite limited response to his training unit assignment request was not made in good faith, that [his employer's] offer of extended unpaid leave was not a good faith response to his request for a radio room assignment, and that [the plaintiff] could have been reasonably accommodated with a radio room or training unit assignment but for [his employer's] lack of good faith."  184 F.3d at 772.  The court of appeals held that "[t]hus, a material dispute of fact exists as to whether [his employer] failed to engage in good faith in the interactive process, thereby failing to reasonably accommodate Williams."  <u>Id</u>.

at http://www.ca3.uscourts.gov/modeljuryinstructions.htm, Chapter 9 (Instructions for Claims

Under the Americans with Disabilities Act") at 13-25.

This issue has important implications in the instant case:  If plaintiffs cannot proceed

pursuant to a pattern-or-practice framework of proof, and instead must make out the elements of

an individual claim of failure to make a reasonable accommodation, this issue "whether a

reasonable accommodation is possible" cuts against certification under the Rule 23(a)

prerequisites of commonality and typicality as well as the Rule 23(b)(2) requirement that the

defendant treated the proposed class members on grounds generally applicable to the class.

### 2. Retaliation

In addition to prohibiting discriminatory adverse employment actions including the failure

to make a reasonable accommodation in certain circumstances, the ADA prohibits retaliation

against any individual who engages in protected activity under the ADA, including an individual

who is not disabled.  As noted in Williams, 380 F.3d at 758-59, "[t]he ADA provides: 'No person

shall discriminate against any individual because such individual has opposed any act or practice

made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA].'"

Id. (quoting 42 U.S.C. § 12203(a)).  "Thus, it is unlawful for an employer to retaliate against an

employee based upon the employee's opposition to anything that is unlawful under the ADA."

Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir.2003).

The court of appeals has made clear that the ADA protects even individuals who are not

disabled from retaliation for engaging in protected activity under the ADA.  See Shellenberger,

318 F.3d at 188 ("At the outset of our discussion, we note that [the plaintiff's] failure to establish

that she was disabled does not prevent her from recovering if she can establish that her employer

86

terminated her because she engaged in activity protected under the ADA.").  "In [Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997)] we stated: 'We hold that a person's status as a "qualified individual with a disability" [under the ADA] is not relevant in assessing the person's claim for retaliation under the ADA.'"  Id. (quoting Krouse, 126 F.3d at 498).  This protection extends to retaliation for requesting a reasonable accommodation.  See Williams, 380 F.3d at 179 n.2.[50]

Individual ADA retaliation lawsuits generally are litigated under the familiar McDonnell Douglas framework, whereby an individual, "[i]n order to establish a prima facie case of illegal retaliation under the anti-discrimination statutes, . . . must show: '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'"  Williams, 380 F.3d at 759 (quoting Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir.2002) (quoting Krouse, 126 F.3d at 500)).  Upon such a showing, the burden shifts to an employer to set forth a legitimate reason for taking the adverse employment action.

---

[50] In Williams, the court of appeals stated:  "Unlike a claim for discrimination under the ADA, an ADA retaliation claim based upon an employee having requested an accommodation does not require that a plaintiff show that he or she is 'disabled' within the meaning of the ADA.  'The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC, and we have already explained that the ADA protects one who engages in the latter activity without regard to whether the complainant is "disabled."'  Thus, as opposed to showing disability, a plaintiff need only show that she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested."  380 F.3d at 179 n.2 (quoting Shellenberger, 318 F.3d at 191).

Id.; see Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir.1994)(discussing this burden-shifting in more detail).[51]

## C. "Pattern-or-Practice" Framework

In this case, plaintiffs characterize their lawsuit as a "pattern-or-practice" lawsuit to be litigated pursuant to the framework articulated in Teamsters. Under this characterization, plaintiffs' claims would not be examined pursuant to the familiar elements required to prove individual ADA discrimination cases. See, e.g., Williams, 380 F.3d at 759, 761-72 (retaliation claims and failure to make a reasonable accommodation claims). Instead, if the court determines that plaintiffs' ADA claims are appropriate for pattern-or-practice treatment, the court must examine those claims in light of the Teamsters pattern-or-practice framework. As indicated above, whether plaintiffs can proceed under the Teamsters pattern-or-practice framework is key to the decision whether class certification is appropriate in this case because it bears directly on the elements of the prima facie case that plaintiffs will have to prove at the liability stage of this litigation. The court must keep those elements in mind when considering the Rule 23 factors including commonality and typicality. The court, therefore, must determine whether the pattern-or-practice framework of proof is available to plaintiffs in this case in order to decide whether to certify a class.

---

[51]Defendant cites Selwood v. Virginia Mennonite Retirement Community, Inc., 2004 WL 1946379 at *3 (W.D.Va. Aug. 31, 2004), a district court decision denying class certification in a proposed "pattern-or-practice" religious discrimination case, for the proposition that, because the key issue in a retaliation claim is whether the motive underlying the adverse employment action is retaliatory, "[r]etaliation claims are generally personal in nature. They do not lend themselves readily to class treatment since they usually involve facts and circumstances unique to the claim of the person against whom retaliation is directed." Id. (citations and internal quotations omitted). This issue will be addressed in more detail in Part VII supra.

To understand the pattern-or-practice framework and its applicability to this case, the court must consider the three seminal Supreme Court decisions that impact the issues before this court: Franks v. Bowman Transportation Company, 424 U.S. 747 (1976), International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977), and Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867 (1984).  This trilogy of decisions appropriately precedes the Rule 23 class certification analysis required in this case because the applicable framework will shape the analysis.[52]

### 1. Franks v. Bowman Transportation Company

While the pattern-or-practice framework often and appropriately is referred to as the "Teamsters  framework" pursuant to the Supreme Court's detailed articulation of its elements of proof in that case, Franks is the precursor to Teamsters and sheds light on the issues in this case concerning equitable relief in a Rule 23(b)(2) class action and the burden of proof in Rule

---

[52]Plaintiffs refer to Teamsters in the briefing and consistently characterize their claims as "pattern-or-practice" claims.  See Pls.' Br. at 2 n.1 ("Following class certification, at the merits stage on liability, Plaintiffs intend to use the pattern or practice method of proof to establish that systemic discrimination in violation of the requirements of the ADA is the "company's standard operating procedure – the regular rather than the unusual practice.") (quoting Teamsters, 431 U.S. at 336)).  Plaintiffs do not in detail, however, analyze the implications of litigating a pattern-or-practice lawsuit with respect to the prima facie proof at the liability stage, other than repeating that individual issues do not arise until the presumed second remedial stage in such a case.  UPS emphasizes the inherently individual proof required to litigate individual ADA claims and contends that plaintiffs' reliance upon Teamsters to escape the inherently individual nature of the claims must fail, arguing that ADA decisions are inherently individualized and unsuitable for pattern-or-practice class action treatment.  UPS distinguishes Bates v. United Parcel Service, Inc., 2004 WL 2370633 (N.D.Cal. Oct. 21, 2004) and the other decision cited by plaintiffs, Fields v. Maram, 2004 WL 1879997 (N.D.Ill. Aug. 17, 2004), because UPS argues that each of these involved identifiable disabilities – deafness in Bates and quadriplegia and other ambulatory disabilities requiring a wheelchair in Fields.  See UPS's Surreply In Further Opposition to Plaintiffs' Motion for Class Certification ("Def. Surr.") (Doc. No. 186) at 4.  This distinction will be discussed below.  The parties do not address in detail Cooper or Franks.

23(b)(2) pattern-or-practice class action cases.  In <u>Franks</u>, the district court certified a Rule

23(b)(2) private-plaintiff class of African-American applicants and employees who sought

employment with the defendant trucking company or a transfer to other departments within the

company and alleged company policies constituted discrimination on the basis of race.  <u>Franks v.</u>

<u>Bowman Transp. Co.</u>, 1972 WL 245 (N.D.Ga. June 29, 1972).[53]  The district court found that

prior to 1968, the defendant company was almost totally segregated by race, with no African-

American person ever having been employed outside of the maintenance department prior to

1968, and with African-American employees consistently frozen into the lower-paying jobs

without possibility of transfer.  <u>Id.</u> at *1-3.  The district court concluded that the evidence in that

case showed a pattern of racial discrimination in the hiring, assignment, transfer, and discharge

policies of the defendant company and that these constituted unlawful employment practices

under Title VII.  <u>Id.</u> at *4 (citing 42 U.S.C. § 2000e-2(a)).[54]  The district court concluded that Rule

---

[53]<u>Franks</u> predated the Supreme Court's seminal <u>Falcon</u> decision discussed in Part III <u>supra</u> which held that district courts must engage in a rigorous analysis of the Rule 23 requirements when deciding whether to certify a class under Federal Rule of Civil Procedure 23.  <u>See</u> <u>General</u> <u>Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147 (1982).  Since <u>Franks</u>, there has been a veritable sea change in the level of detail and rigor required of litigants and district courts at the certification stage.  For this reason, in hindsight, the district court's certification decision in <u>Franks</u> is stark relative to current certification decisions.

[54]42 U.S.C. § 2000e-2(a) generally provides:
    It shall be an unlawful employment practice for an employer –
        (1) to fail or refuse to hire or to discharge any individual, or
        otherwise to discriminate against any individual with
        respect to his compensation, terms, conditions, or privileges
        of employment, because of such individual's race, color,
        religion, sex, or national origin; or
        (2) to limit, segregate, or classify his employees or
        applicants for employment in any way which would deprive
        or tend to deprive any individual of employment
        opportunities or otherwise adversely affect his status as an

23(b)(2) certification was appropriate and ordered injunctive relief for the class that included

credit for departmental seniority prior to the dates the discrimination practices terminated plus

preferential re-application rights for identified applicants for certain positions.  Id.

On appeal, the United States Court of Appeals for the Fifth Circuit affirmed in part,

reversed in part, and remanded.  Franks v. Bowman Transp. Co., 495 F.2d 398 (5th Cir. 1974).

The court of appeals considered the district court's findings concerning the individual claims of

the named plaintiffs and, with respect to the class, considered whether the district court abused its

discretion in not affording greater affirmative injunctive release to all members of the class that

the plaintiffs represented.  Id. at 402.  With respect to the issue of class relief, the plaintiffs sought

"(1) allowance of full company seniority for employees who have been discriminated against, (2)

the temporary use of a mathematical formula to ensure the hiring of more [African-American]

over-the-road drivers in the future and the ordering of public recruitment for [African-American]

over-the-road drivers and for [African-American] office workers, (3) mandatory training programs

to upgrade the skills of [African-American] employees and applicants, and (4) retention of

jurisdiction by the district court to ensure compliance."  Id. at 409.  In addition, the plaintiffs

argued that the district court abused its discretion in refusing to award back pay to non-named

class members.  Id.

The court of appeals ultimately agreed with the plaintiffs that greater equitable relief than

what was ordered by the district court was required.  Id.  The court of appeals held that, with

_____

employee, because of such individual's race, color, religion,
sex, or national origin.

Id.

respect to the exercise of seniority rights, present employees must be allowed to compete for jobs in other departments on the basis of full accumulated company seniority but that constructive seniority could not be created and awarded to applicants who are not employees, id. at 418; that affirmative hiring relief such as recruitment for potential African-American over-the-road drivers was warranted, id. at 420; that the record did not support a determination whether new training methods should be required, but remanded this issue for the district court, id. at 421; that the district court should retain jurisdiction and require periodic reports for a period of two years while remedial policies were implemented, id.; and, with respect to back pay, which the district court had denied to class members, that the district court should reconsider its determination in light of the principles set forth in the opinion, id. at 421-22.

The court of appeals disagreed with the district court's determination concerning back pay as follows:

> **We do not agree that either Rule 23(b)(2) or Title VII prohibits back pay awards to non-named class members.** . . . We vacate its decree insofar as it denies back pay to the class and remand for consideration of this issue.

Id. at 421 (citations omitted)(emphasis added).  The court of appeals explained that Title VII specifically contemplated an award of back pay under certain circumstances:

> The remedies authorized in Title VII specifically include back pay. As indicated above, the purpose of Title VII is to make the discriminatee whole and eliminate the effects of past discrimination as far as possible. Where the discriminatee has suffered economic injury in the form of lost wages, back pay is normally appropriate relief.

Id.  Moreover, the court of appeals concluded that Federal Rule of Civil Procedure 23(b)(2) did not prohibit back pay:

> Nor does Fed.R.Civ.P. 23(b)(2) prohibit back pay awards to
> non-named class members in a class action under that subdivision
> of the rule. . . . It is true that Rule 23(b)(2) refers only to
> "injunctive relief or corresponding declaratory relief" and "does
> not extend to cases in which the appropriate final relief relates
> *exclusively* or *predominantly* to money damages." Advisory
> Committee's Notes, 1966, 39 F.R.D. 69, 102 (emphasis added).
> But this Title VII action cannot be characterized as one seeking
> "exclusively or predominantly money damages."  As we have
> pointed out above, **back pay awards under Title VII** (and under §
> 1981 to the extent that a § 1981 corresponds to a Title VII action)
> **are not damages, as such, but an integral part of the equitable
> remedy**. Even if back pay is considered as equivalent to damages
> under Rule 23, in this case back pay is not the exclusive or
> predominant remedy sought.

Id. at 422 (italics in original, bold emphasis added).  The court of appeals determined that upon

remand the district court should "devise an appropriate procedure for adjudicating the claims of

non-named class members for back pay awards."  Id.

      The Supreme Court granted certiorari in Franks to decide the limited question whether

African-American non-employee applicants who applied for and were denied over-the-road

driving positions with the defendant trucking company because of race could be awarded seniority

status retroactive to the dates of their employment applications.  424 U.S. at 751, 752.  The Court

determined that the court of appeals erred in concluding that, as a matter of law, section 703(h) of

Title VII barred the award of seniority relief to unnamed class members.  Id. at 762.  The Court

also concluded that seniority relief could constitute appropriate equitable relief under the remedial

provisions of Title VII, specifically section 706(g), because one of Title VII's central purposes is

to make persons whole on account of unlawful employment discrimination, and while section

706(g) specifically mentioned only back pay, the federal courts were vested with broad equitable

discretion under Title VII to fashion the most complete relief possible.  Id. at 762-70, 763-64.  The

Supreme Court made clear that its decision in <u>Franks</u> was "not to be understood as holding that an award of seniority status is requisite in all circumstances," <u>id</u>. at 770, but determined that the district court's reasons in <u>Franks</u> were not proper reasons for denying seniority relief to the unnamed class members in that case, <u>id</u>. at 772.

In the course of explaining its disagreement with the district court's reference to the lack of evidence regarding individual unnamed class members, the Supreme Court had the occasion to address the implications of challenging a discriminatory pattern and practice as part of a Rule 23(b)(2) class action and when individual issues would arise in such a case:

> Generalizations concerning such individually applicable evidence cannot serve as a justification for the denial of relief to the entire class. Rather, **at such time as individual class members seek positions as [over-the-road] drivers, positions for which they are presumptively entitled to priority hiring consideration under the District Court's order, evidence that particular individuals were not in fact victims of racial discrimination will be material**.

<u>Id</u>. at 772 (emphasis added)(footnote omitted).[55]   The Supreme Court continued:

> **But petitioners here have carried their burden of demonstrating the existence of a discriminatory hiring pattern and practice by the respondents and, therefore, the <u>burden</u> will be upon <u>respondents</u> to prove that individuals who reapply were not in fact victims of previous hiring discrimination.** <u>Cf</u>. <u>McDonnell Douglas Corp. v. Green</u>, [411 U.S. 792] (1973); <u>Baxter v. Savannah Sugar Rfg. Corp.</u>, 495 F.2d 437, 443-444 (5th Cir.), <u>cert</u>. <u>denied</u>, [419 U.S. 1033] (1974). Only if this burden is met may retroactive seniority if otherwise determined to be an

---

[55]In the accompanying footnote, the Court stated that while the district court order was silent as to whether applicants for the relevant positions who were previously discriminatorily refused employment must be presently qualified for those positions in order to be eligible for priority hiring under that order, the court of appeals made clear that they must be, and the Supreme Court agreed.  <u>Id</u>. at 772 n.31.

> appropriate form of relief under the circumstances of the particular
> case be denied individual class members.

Id. at 772-73 (emphasis added)(footnote omitted).  In the accompanying footnote, the Court extrapolated on the principle that once the plaintiffs carried their burden to establish a discriminatory practice, the burden would shift to the defendant company.  "It is true, of course, that obtaining [relevant individual evidence] presents great difficulty.  No reason appears, however, why the victim rather than the perpetrator of the illegal act should bear the burden of proof on this issue."  Id. at 772 n.32 (emphasis added).

### 2.  International Brotherhood of Teamsters v. United States

In Teamsters, the United States brought an employment discrimination lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., against an employer and a union alleging that the employer had engaged in a pattern or practice of racial and ethnic discrimination and that the union had agreed to create and maintain a seniority system that perpetuated the effects of that discrimination. Teamsters, 431 U.S. at 328.[56]  The case went to trial and the district court found that the government had shown by a preponderance of the evidence that the company was engaged in a pattern and practice of discrimination in violation of Title VII and that the union violated Title VII because it operated to impede hiring of minority groups into the company.  Id. at 330-31.  The district court also found that the seniority system violated Title VII because it "operate[d] to imped the free transfer of minority groups into and within the company."  Id. at 331

---

[56]At the time Teamsters was litigated, the statute provided that the Attorney General had the authority to bring "pattern-or-practice" lawsuits against private sector employers.  Teamsters, 431 U.S. at 328 n.1.  The statute later was amended to provide that the EEOC rather than the Attorney General has the authority to bring such lawsuits.  Id. (citing 42 U.S.C. § 2000e-6(d)); see 42 U.S.C. § 2000e-6(c).

(quoting district court, alterations in original).  The district court enjoined both defendants from

further violations of Title VII.  Id.  The district court also awarded individual relief to the line-

drivers who were affected by the discrimination, dividing the individuals into three subclasses

based upon the degree of injury that they suffered.  Id. at 331-32.[57]  The largest subclass consisted

of individuals for whom the district court indicated that there was "no evidence to show that these

individuals were either harmed or not harmed individually."  Id. at 332.  The district court ordered

that these individuals be considered for line driver jobs ahead of members of the general public

but behind the other two subclasses (for whom there was individual evidence).  Id.  The district

court, however, did not award these individuals retroactive seniority relief.  Id.

The United States Court of Appeals for the Fifth Circuit upheld the district court's finding

that the company and the union had violated Title VII; the court of appeals, however, (1) rejected

the district court's attempt to divide the class into subclasses; (2) ordered retroactive seniority

relief based upon a qualification date formula; and (3) modified the district court's order regarding

---

[57]Following receipt of evidence but before decision, the parties in Teamsters entered into a "Decree in Partial Resolution of the Suit" with respect to the injunctive relief that plaintiffs would obtain if the court determined that unlawful discrimination had occurred.  431 U.S. at 330 n.4.  The decree provided that the company would undertake a minority recruitment program, accept applications from minority applicants even if no vacancies existed, keep the applications on file and notify the applicants about any openings, keep and submit records, and adhere to uniform hiring and promotion qualifications.  Id.  In addition the decree provided that future vacancies would be filled first by individuals found by the court to be discriminatees, that the company would hire one minority individual for every non-minority individual until the percentage at the terminal equalled the percentage in the population, and that the company would pay a lump sum of $89,500 in full settlement of any back pay obligations – of this, individual payments not to exceed $1,500 were to be paid to individuals identified by the government-plaintiff.  Id.  The district court was left to decide whether unlawful discrimination occurred; if so, to decide which individuals were entitled to fill future job vacancies; and whether the seniority system was valid and whether discriminatees should be awarded additional equitable relief as retroactive seniority.  Id.

the rights of class members to fill future vacancies and compete with laid-off employees.  Id. at 333-34.  The court of appeals remanded the case to the district court for evidentiary hearings on the remedial principles set forth in its opinion.  Id. at 334.  The Supreme Court granted the company's and the union's petitions for certiorari to resolve multiple questions presented in the lawsuit.  Id.

Relevant to the case at hand, in Teamsters the Supreme Court articulated the pattern-or-practice framework to establish a prima facie case of discrimination under Title VII which has since been expanded to discrimination in other contexts.  See, e.g., Davoll v. Webb, 194 F.3d 1116 (10th Cir. 1999); EEOC v. Murray, Inc., 175 F.Supp. 2d 1053, 1060 (M.D. Tenn. 2001)(noting the Court of Appeals for the Tenth Circuit's approval in Davoll of a district court's use of the Teamsters framework for an ADA pattern-or-practice case; "Although the court can find no other Courts of Appeals cases addressing this issue directly, the court is persuaded that the Teamsters framework is appropriate for pattern-or-practice claims under the ADA.").  Since Teamsters was decided, the pattern-or-practice method of proof it articulated has been held to apply in the context of private class action lawsuits as well as lawsuits brought by a government plaintiff.  Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 876 n.9 (1984) ("Although Teamsters involved an action litigated on the merits by the Government as plaintiff under § 707(a) of [Title VII], it is plain that the elements of a prima facie pattern-or-practice case are the same in a private class action.") (citing Teamsters, 431 U.S. at 358-360; Franks, 424 U.S. 747) (emphasis added).[58]

_____

[58]Perhaps in the case of a private-plaintiff class action, the Teamsters approach is more aptly named the Franks approach pursuant to the precursor to Teamsters which was a private-plaintiff class action lawsuit.  As discussed above, Franks was a private-plaintiff Rule 23(b)(2)

In <u>Teamsters</u> the Supreme Court specifically held that a government plaintiff in a Title VII pattern-or-practice case need not follow the familiar <u>McDonnell Douglas</u> order and allocation of proof used in a private, non-class action challenging employment discrimination.  <u>Id</u>. at 357-58. In so doing, the Supreme Court rejected the company's and union's contention in that case that the <u>McDonnell Douglas</u> framework was the only means of establishing a prima facie case; and noted instead that "[t]he importance of <u>McDonnell Douglas</u> lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act."  <u>Id</u>. at 358.[59]

The Supreme Court then favorably cited and relied upon its earlier decision in <u>Franks</u>, 424 U.S. 747, discussed above, as "illustrat[ing] another means by which a Title VII plaintiff's initial burden of proof can be met."  <u>Id</u>. at 359.  The Court stated:

> **The <u>Franks</u> case thus illustrates another means by which a Title VII plaintiff's initial burden of proof can be met.**  The class there alleged a broad-based policy of employment discrimination; **upon proof of that allegation there were reasonable grounds to infer that individual hiring decisions were made in pursuit of the discriminatory policy and to require the employer to come forth with evidence dispelling that inference**.

---

class action lawsuit, albeit litigated pursuant to Title VII.

[59]The Supreme Court stated in <u>McDonnell Douglas</u> that "[t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie cade of racial discrimination" and "[t]his **may** be done by showing" the now-familiar <u>McDonnell Douglas</u> elements of proof in individual cases.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)(emphasis added).  The Court in <u>McDonnell Douglas</u> itself recognized in a footnote that "[t]he facts necessarily will vary in Title VII cases, and <u>the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to different factual situations</u>."  <u>Id.</u> at 802 n.13 (emphasis added).

Teamsters, 431 U.S. at 359 (emphasis added)(footnote omitted).  In the footnote immediately

following that passage, the Court discussed the rebuttable presumption created in pattern-or-

practice cases:

> **The holding in Franks that proof of a discriminatory pattern
> and practice creates a rebuttable presumption in favor of
> individual relief is consistent with the manner in which
> presumptions are created generally.**  Presumptions shifting the
> burden of proof are often created to reflect judicial evaluations of
> probabilities and to conform with a party's superior access to the
> proof. . . .  These factors were present in Franks.  Although the
> prima facie case did not conclusively demonstrate that all of the
> employer's decisions were part of the proved discriminatory
> pattern and practice, it did create a greater likelihood that any
> single decision was a component of the overall pattern.  Moreover,
> the finding of a pattern or practice changed the position of the
> employer to that of a proved wrongdoer.  Finally, the employer was
> in the best position to show why any individual employee was
> denied an employment opportunity.  Insofar as the reasons related
> to available vacancies or the employer's evaluation of the
> applicant's qualifications, the company's records were the most
> relevant items of proof.  If the refusal to hire was based on other
> factors, the employer and its agents knew best what those factors
> were and the extent to which they influenced the decision-making
> process.

Id. at 359 n.45 (citations omitted)(emphasis added); see Franks, 424 U.S. at 772 n.32.

In Teamsters the Court noted that "[a]lthough not all class actions will necessarily follow

the Franks model, the nature of a pattern-or-practice suit brings it squarely within our holding in

Franks."  Id. at 360.  The Court articulated the following framework for a pattern-or-practice

lawsuit brought by the government under Title VII:

> The plaintiff in a pattern-or-practice action is the Government, and
> its initial burden is to demonstrate that unlawful discrimination has
> been a regular procedure or policy followed by an employer or
> group of employers. . . .  **At the initial, "liability" stage of a
> pattern-or-practice suit the Government is not required to**

99

> **offer evidence that each person for whom it will ultimately seek
> relief was a victim of the employer's discriminatory policy. Its
> burden is to establish a prima facie case that such a policy
> existed. The burden then shifts to the employer to defeat the
> prima facie showing of a pattern-or-practice by demonstrating
> that the Government's proof is either inaccurate or
> insignificant.**

Id. (citations omitted)(emphasis added).  The Court highlighted in a footnote that "[t]he point is

that at the liability stage of a pattern-or-practice trial the focus often will not be on individual

hiring decisions, but on a pattern of discriminatory decisionmaking."  Id. at 360 n.46.  The Court

continued, with respect to injunctive relief:

> **If an employer fails to rebut the inference that arises from the
> Government's prima facie case, a trial court may then
> conclude that a violation has occurred and determine the
> appropriate remedy. Without any further evidence from the
> Government, a court's finding of a pattern-or-practice justifies
> an award of prospective relief.** Such relief might take the form of
> an injunctive order against continuation of the discriminatory
> practice, an order that the employer keep records of its future
> employment decisions and file periodic reports with the court, or
> any other order "necessary to ensure the full enjoyment of the
> rights" protected by Title VII.

Id. at 360-61 (emphasis added).

The Court also addressed the issue of individual relief in a pattern-or-practice case as

follows:

> When the Government seeks individual relief for the victims of the
> discriminatory practice, **a district court must usually conduct
> additional proceedings after the liability phase of the trial to
> determine the scope of individual relief**.

Id. (emphasis added).  The Supreme Court rejected the petitioners' contention in Teamsters that if

the plaintiff has not, in the course of proving a pattern-or-practice, already brought forth specific

100

evidence that each individual was discriminatorily denied an employment opportunity, it must

carry that burden at the second, "remedial" stage of trial.  Id. at 361-62.  The Court stated:

> That basic contention was rejected in the Franks case. As was true
> of the particular facts in Franks, and **as is typical of** Title VII
> **pattern-or-practice suits, the question of individual relief does
> not arise until it has been proved that the employer has
> followed an employment policy of unlawful discrimination.**
> The force of that proof does not dissipate at the remedial stage of
> the trial.

Id. at 361-62 (emphasis added).  "The employer cannot, therefore, claim that there is no reason to

believe that its individual employment decisions were discriminatorily based; it has already been

shown to have maintained a policy of discriminatory decisionmaking."  Id. at 362.

Therefore, "[t]he proof of the pattern-or-practice supports an inference that any particular

employment decision, during the period in which the discriminatory policy was in force, was

made in pursuit of that policy."  Id.  Thus, the plaintiff "need only show that an alleged individual

discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved

discrimination."  Id.  "As in Franks, the burden then rests on the employer to demonstrate that the

individual applicant was denied an employment opportunity for lawful reasons."  Id. (citation

omitted).

The Court in Teamsters, clarified that because the Court had determined that the district

court and court of appeals were not in error in finding that the government had proved a

systemwide pattern and practice of racial and ethnic discrimination on the part of the company,

"[o]n remand, therefore, every post-Act minority group applicant for a line-driver position will be

presumptively entitled to relief, subject to a showing by the company that its earlier refusal to

place the applicant in a line-driver job was not based on its policy of discrimination."  Id. at 362

(footnotes omitted).  "Any nondiscriminatory justification offered by the company will be subject to further evidence by the [government-plaintiff] that the purported reason for an applicant's rejection was in fact a pretext for unlawful discrimination."  <u>Id</u>. at 362 n.50 (citing <u>McDonnell Douglas</u>, 411 U.S. at 804-806); <u>see</u> <u>Baxter v. Savannah Sugar Refining Corp.</u>, 495 F.2d 437 (5th Cir. 1974).[60]

It is worth highlighting one significant difference between <u>Franks</u> and <u>Teamsters</u>.  In <u>Franks</u>, the Supreme Court focused on the burden-shifting analysis applicable to individual relief requested by applicants for employment and employees seeking transfer within the company.  In addition to discussing the appropriateness of broad injunctive and declaratory relief, the Court in <u>Franks</u> addressed the shifting of the burden of proof relating to individuals seeking seniority rights

---

[60]In <u>Baxter</u>, a case cited favorably by the Supreme Court in <u>Teamsters</u>, the court of appeals explained that because, as the district court apparently had recognized, the plaintiff had established a prima facie case of class-wide discrimination resulting in severe economic disparities between the earning power of African-American employees and other employees at the refinery at issue, "the district court acted prematurely in requiring individual proof of economic loss and committed error in mandating that an individual establish that he had the prerequisite 'qualifications' for a higher position in the initial proceedings to ascertain the nature of employment practices."  495 F.2d at 443.  The court of appeals explained:

> A Title VII class action suit presents a bifurcated burden of proof problem. Initially, it is incumbent on the class to establish that an employer's employment practices have resulted in cognizable deprivations to it as a class. At that juncture of the litigation, it is unnecessarily complicating and cumbersome to compel any particular discriminatee to prove class coverage by showing personal monetary loss. What is necessary to establish liability is evidence  that the class of [African-American] employees has suffered from the policies and practices of the particular employer. Assuming that the class does establish invidious treatment, the court should then properly proceed to resolve whether a particular employee is in fact a member of the covered class, has suffered financial loss, and thus entitled to back pay or other appropriate relief.

<u>Id</u>. at 443-44.

and back pay, who were applicants for employment and or sought transfer within the company –

both of whom constituted "applicants" seeking some employment opportunity.  See Part V.C.1

supra.  In Teamsters, the Court commented on its holding in Franks:

> We held that the trial court had erred in placing this burden on the
> individual plaintiffs [to show that the individual was qualified for
> the job sought and that a vacancy was available].  By
> "demonstrating the existence of a discriminatory hiring pattern and
> practice" the plaintiffs had made out a prima facie case of
> discrimination against the individual class members; the burden
> therefore shifted to the employer "to prove that individuals who
> reapply were not in fact victims of previous hiring discrimination."

Id. at 359 (quoting Franks, 424 U.S. at 772).   Teamsters addressed an issue not reached in Franks

– whether "nonapplicants," i.e., those individuals who had not even applied for various

employment opportunities, allegedly because of the employment policies charged to be

discriminatory, could be eligible for relief and if so, would the burden of proof shift to the

defendant like in Franks.  Teamsters, 431 U.S. at 362-72.

   In Teamsters, the Court made clear that "nonapplicants," as well as applicants, can be

members of a class; however, nonapplicants are situated differently from "applicants" with respect

to the burden-shifting analysis applicable to individual relief such as seniority rights and back pay.

The Court held:

> We now decide that an incumbent employee's failure to apply for a
> job is not an inexorable bar to an award of retroactive seniority.
> Individual nonapplicants must be given an opportunity to
> undertake their difficult task of proving that they should be treated
> as applicants and therefore are presumptively entitled to relief
> accordingly.

Id. at 363-64.

103

The burden of proof, however, will not shift as it does for applicants.

> A nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices. . . . When this burden is met, the nonapplicant is in a position analogous to that of an applicant and is entitled to the presumption [shifting the burden of proof to the employer].

Id. at 367-68 (citation omitted).  Specifically, that means that the nonapplicant

> must bear the burden of coming forward with the basic information about his qualifications that he would have presented in an application. As in Franks, . . . the burden then will be on the employer to show that the nonapplicant was nevertheless not a victim of discrimination. For example, the employer might show that there were other, more qualified persons who would have been chosen for a particular vacancy, or that the nonapplicant's stated qualifications were insufficient.

Id. at 369 n.53.

If plaintiffs in this case seek individual relief for class members in this class action, see Part VII.B.2 supra, who are akin to "applicants," such as those who can show they attempted to return to work with or without an accommodation and if there is a finding of liability, those individuals arguably will be entitled to a presumption, which UPS can rebut, that they have been discriminated against.  The burden will be on UPS to show that those individuals are not entitled to individual relief; for example, by demonstrating that an individual could not perform a job even with an accommodation.  On the other hand, with respect to "nonapplicants," such as those employees who were absent from work due to medical reasons and did not attempt to return to work or otherwise seek an accommodation, the burden arguably will be on the individual to show that he or she was capable of working with or without an accommodation and that he or she would

have attempted to return to work.  Plaintiffs in this case allege that the existence of the 100%

healed policy, the implementation of UPS's formal ADA compliance procedures, such as the "ten-

step process," and the pretextual job descriptions discourage employees from going through

official channels to seek an accommodation.  It is not clear at this time whether the class was

intended to not only include individuals who in fact attempted to return to work, but also to

include those employees who did not attempt to return to work.  At the remedial stage in the

proceedings if it has been determined that UPS has a discriminatory policy in violation of the

ADA, the parties will need to brief whether those who did not attempt to return to work are akin

to nonapplicants as contemplated by Teamsters and should be included as members of the class.

In other words, it will need to be determined whether the "applicant" versus "nonapplicant"

distinction is actually implicated in this case.[61]

### 3.  Cooper v. Federal Reserve Bank of Richmond

In Cooper the Supreme Court made clear that  "[a]lthough Teamsters involved an action

litigated on the merits by the Government as plaintiff under § 707(a) of [Title VII], it is plain that

the elements of a prima facie pattern-or-practice case are the same in a private class action."

Cooper, 467 U.S. at 876 n.9 (citing Teamsters, 431 U.S. at 358-360; Franks, 424 U.S. 747).  A

closer examination of Cooper is helpful in this case to determine whether plaintiffs can proceed

pursuant to a pattern-or-practice framework, and if so, what consequences follow with respect to

---

[61]The Court in Teamsters, after announcing the implications of its decision in that case, also addressed the task remaining for the district court on remand in that case, which "will not be a simple one."  431 U.S. at 371-77.

plaintiffs' burden of proof at the merits stage of litigation.[62]

In Cooper, the Supreme Court addressed the narrow question whether a judgment in a class action determining that an employer did not engage in a general pattern or practice of racial discrimination against the certified class of employees precluded a class member from maintaining a subsequent civil action alleging an individual claim of racial discrimination against the employer.  467 U.S. at 869.  In that case, the EEOC commenced a civil action against the Federal Reserve Bank of Richmond (the "Bank") alleging that the Bank was violating Title VII by engaging in policies and practices failing and refusing to promote African-American employees because of their race.  Id.  Four individual employees of the Bank subsequently were allowed to intervene as plaintiffs.  Id. at 870.  The district court certified a class and ordered notice.  Id.

The district court subsequently held a trial and found that the Bank had engaged in a pattern and practice of discrimination from 1974 through 1978 by failing to afford African-American employees opportunities for advancement and assignment equal to opportunities afforded white employees in certain pay grades, but found that otherwise there did not appear to be a pattern or practice of discrimination pervasive enough for the court to order relief.  Id. at 871-72.  With respect to the claims of the four intervening plaintiffs, the district court found that the Bank had discriminated against two of the four individuals.  Id. at 872.  The district court deferred decision of matters of individual relief until a further proceeding.  Id.

―――――――――――――――――

[62]Much of defendant's opposition to class certification in this case is fueled by defendant's position that plaintiffs cannot litigate their ADA claims pursuant to the pattern-or-practice framework, and defendant's argument that plaintiffs will not be able to make out the required individual elements of proof for their ADA retaliation claims and their ADA failure to make a reasonable accommodation claims.  That position cannot be sustained under the Franks, Teamsters, and Cooper trilogy of Supreme Court decisions.

106

After the trial, another group of individual plaintiffs moved to intervene, the so-called "Baxter petitioners," alleging that each of them had been denied a promotion for discriminatory reasons.  Id.  With respect to one of the Baxter petitioners, the district court denied the motion because that individual was a member of the class for which relief had been ordered and therefore her rights would be adjudicated in the second stage of proceedings to be held on the question of relief.  Id.  With respect to the other five Baxter petitioners, the district court denied the motion for a different reason, holding that because all of them were employed in jobs above the pay grades deemed at the trial to be problematic, they were not entitled to any benefit from the court's ruling with respect to discrimination in those lower pay grades.  Id.  The district court held that, because it had found no proof of classwide discrimination in these higher pay grades during the Cooper trial, the Baxter petitioners were not entitled to participate in the second stage of proceedings in that case, although the court noted that they could file a separate action.  Id.

These individuals subsequently did file a separate action against the Bank alleging a denial of promotions based upon race (the "Baxter litigation"); the Bank moved to dismiss on the ground that they were bound by the determination in the class action that there was no proof of discrimination in the higher pay grades; and the district court denied the motion to dismiss but certified the decision for interlocutory appeal.  Id. at 872-73. The Bank's interlocutory appeal in the Baxter litigation was consolidated with the Bank's pending appeal in the Cooper litigation.  Id. at 873.

The United States Court of Appeals for the Fourth Circuit reversed the district court's judgment on the merits in the Cooper litigation, concluding that  there was insufficient evidence to establish a pattern or practice of racial discrimination in the pay grades at issue in that case, and

that two of the intervening individual plaintiffs had not been discriminated against on account of

race.  Id. (citing EEOC v. Federal Reserve Bank of Richmond, 698 F.2d 633 (4th Cir.1983)).  The

court of appeals further held that, with respect to the interlocutory appeal in the Baxter litigation,

under the doctrine of res judicata, the judgment in the Cooper class action precluded the Baxter

petitioners from maintaining their individual race discrimination claims against the Bank.  Id.  The

court of appeals thus reversed the order denying the Bank's motion to dismiss in the Baxter

action, and remanded for dismissal of the Baxter complaint.  Id.  The Supreme Court granted

certiorari to review that judgment, noting that its limited grant of certiorari did not encompass

questions raised by the Cooper petitioners concerning the court of appeals determination as to

their case, and reversed.  Id. at 873 n.6.

        In the course of its review of the limited question whether the judgment concerning the

Cooper class action was dispositive of the individual claims pursued by the Baxter individuals, the

Supreme Court reviewed the differences between the "[c]laims of two types" at issue in the

Cooper litigation –  individual discrimination claims and pattern-or-practice class action

discrimination claims.  Id. at 873-80.  The Supreme Court explained that an individual plaintiff

alleging "one instance" of discrimination establishes a prima facie case pursuant to the now-

familiar McDonnell Douglas burden-shifting framework with the ultimate burden of persuading

the trier of fact that the defendant discriminated against the plaintiff in a "particular employment

decision." Id. at 875 (emphasis added).  The Supreme Court, however, explained that in pattern-

or-practice cases alleging discrimination under the framework set forth in Franks and Teamsters a

plaintiff challenges not an individual employment decision but rather makes allegations that an

108

employer engaged in <u>a pervasive pattern of discrimination</u> with respect to various <u>company policies</u>. <u>See id</u>. at 875 (emphasis added).

The Supreme Court in <u>Cooper</u>, citing <u>Franks</u> stated "we held that demonstrating the existence of a discriminatory pattern or practice established a presumption that the individual class members had been discriminated against . . . ." <u>Id</u>. (citing <u>Franks</u>, 424 U.S. at 772).  The Court explained:

> Proving  isolated or sporadic discriminatory acts by the employer is insufficient to establish a prima facie case of a pattern or practice of discrimination; rather it must be established by a preponderance of the evidence that "racial discrimination was the company's standard operating procedure – the regular rather than the unusual practice."

<u>Id</u>. at 875-76 (quoting <u>Teamsters</u>, 431 U.S. at 336).  "While a finding of a pattern or practice of discrimination itself justifies an award of prospective relief to the class, additional proceedings are ordinarily required to determine the scope of individual relief for the members of the class."  <u>Id</u>. (citing <u>Teamsters</u>, 431 U.S. at 361).

The Supreme Court's decision in <u>Cooper</u> is particularly instructive for this case for two reasons.  First, in <u>Cooper</u> the Supreme Court made clear that private plaintiffs could litigate claims of discrimination pursuant to the pattern-or-practice framework set forth in <u>Franks</u> and <u>Teamsters</u>:

> Although Teamsters involved an action litigated on the merits by the Government as plaintiff under § 707(a) of [Title VII], it is plain that **the elements of a prima facie pattern-or-practice case are the same in a private class action**.

<u>Id</u>. at 876 n.9 (citing <u>Teamsters</u>, 431 U.S. at 358-360)(emphasis added).  Second, in <u>Cooper</u> the Supreme Court further elucidated the difference between <u>individual claims of discrimination</u> and

class action claims of a pattern-or-practice of discrimination:

> **The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest.** The inquiry regarding an individual's claim is the reason for a particular employment decision, while "**at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.**"

Id. at 876 (quoting Teamsters, 431 U.S. at 360 n.46; citing Furnco Construction Corp. v. Waters, 438 U.S. 567, 575, n. 7 (1978))(emphasis added).

The Supreme Court explained that this distinction was crucial to its holding in the seminal Falcon case discussed in detail in Part III supra, where the Supreme Court stated that "[c]onceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims." Id. at 876-77 (quoting Falcon, 457 U.S. at 157-58)(internal quotations omitted).  That is, evidence that an individual was subject to discrimination does not necessarily justify the additional inference that this discrimination is typical of an employer's practices.  See id.

The Supreme Court in Cooper, referring to its decision in Falcon, "pointed out that if 'one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential companywide class action.'" Id. at 877 (quoting Falcon, 457 U.S. at 159).  The Supreme Court in Cooper continued:

We further observed:

> In this regard it is noteworthy that Title VII prohibits discriminatory employment practices, not an abstract policy of discrimination. The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer."

Id. (quoting <u>Falcon</u>, 457 U.S. at 159, n. 15).  That is:

> <u>Falcon</u> thus holds that the existence of a valid individual claim does not necessarily warrant the conclusion that the individual plaintiff may successfully maintain a class action. It is equally clear that a class plaintiff's attempt to prove the existence of a companywide policy, or even a consistent practice within a given department, may fail even though discrimination against one or two individuals has been proved. The facts of this case illustrate the point.

Id. at 877-78.  In <u>Cooper</u>, the Supreme Court ultimately concluded:

> The Court of Appeals was correct in generally concluding that the Baxter petitioners, as members of the class represented by the intervening plaintiffs in the Cooper litigation, are bound by the adverse judgment in that case. The court erred, however, in the preclusive effect it attached to that prior adjudication. That judgment (1) bars the class members from bringing another class action against the Bank alleging a pattern or practice of discrimination for the relevant time period and (2) precludes the class members in any other litigation with the Bank from relitigating the question whether the Bank engaged in a pattern and practice of discrimination against [African-American] employees during the relevant time period. The judgment is not, however, dispositive of the individual claims the Baxter petitioners have alleged in their separate action.

Id. at 880.

111

After Cooper, therefore, it is manifest that private plaintiffs are not barred from litigating discrimination lawsuits pursuant to the pattern-or-practice framework articulated in Franks and Teamsters by virtue of being private plaintiffs.  Cooper, 467 U.S. at 876 n.9.  Moreover, the trilogy of decisions comprised of Franks, Teamsters, and Cooper makes clear that the elements of proof for plaintiffs proceeding to litigate class claims alleging a pattern or practice of discrimination pursuant to the Teamsters framework are distinct from the elements of proof in an individual discrimination case.

In this case, if plaintiffs litigate pursuant to the pattern-or-practice framework they must, to establish a prima facie case at the initial liability stage, prove that a discriminatory UPS policy existed – not that each person for whom they are seeking relief was a victim of the allegedly discriminatory policy.  If plaintiffs establish their prima facie case, the burden would then shift to defendant to rebut the existence of the policy.  If defendant were to fail to rebut the prima facie case, broad-based prospective injunctive or declaratory relief potentially would be warranted.  If plaintiffs were permitted to seek individual relief in addition to broad-based injunctive or declaratory relief, the court likely would need to conduct additional proceedings with respect to the propriety and scope of individual relief.

**4. Applicability of pattern-or-practice framework to private-plaintiff ADA lawsuits**

As noted previously, since Franks, Teamsters, and Cooper were decided, the pattern-or-practice method of proof has been held to apply in the context of private class action lawsuits as well as lawsuits brought by a government plaintiff, and beyond the context of Title VII in the context of the ADA.  See Cooper, 467 U.S. at 876 n.9 (private class action); Davoll v. Webb, 194 F.3d 1116 (10th Cir. 1999)(ADA); EEOC v. Murray, Inc., 175 F.Supp. 2d 1053, 1060 (M.D.

Tenn. 2001) (ADA);[63] see also 9 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 156.05 (2d ed. 2006) ("Decisional law involving ADA pattern and practice suits is scant, but where it exists, courts have applied the bifurcated proof structure developed under Title VII in [Teamsters].") (citing United States v. City & County of Denver, 943 F.Supp. 1304 (D. Colo. 1996), aff'd in part, rev'd in part sub nom. Davoll v. Webb, 194 F.3d 1116 (10th Cir. 1999)).  Moreover, the ADA itself explicitly incorporates enforcement remedies available under Title VII.  See 42 U.S.C. § 12117(a)("The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.").

The court notes that UPS has argued throughout this litigation that ADA cases are not appropriate for class action treatment because of the inherently individualized issues that arise under the ADA.  There is some support for this general sentiment:

> In most circumstances, the ADA does not lend itself to class actions by a group of persons with disabilities alleging violations of the statute's employment provisions.  Because the Act emphasizes the individual assessment of the ability of a person to perform a specific job, with or without reasonable accommodation, the focus of the ADA's employment provisions is upon individualized inquiries and determinations.

---

[63] In Murray, the district court noted in a footnote that: "If the EEOC prevails in the liability phase of its claim, it may then seek monetary damages on behalf of qualified individuals with disabilities affected by the discriminatory policy. This would include [the individual the EEOC sued on behalf of], if the EEOC could show either that he had a record of a disability or that he was regarded as disabled."  175 F.Supp.2d at 1060 n.9.

113

5 JONATHAN R. MOOK, LABOR AND EMPLOYMENT LAW § 142.02[7](c) (2007)(citing Sokol v.

New United Motor Manufacturing, 1999 U.S. Dist. LEXIS 20215 (N.D.Cal. Sept. 20, 1995);

Davoll v. Webb, 160 F.R.D. 142, 146 (D.Colo. 1995), aff'd, 194 F.3d 1116 (10th Cir. 1999);

Lintemuth v. Saturn Corp., 1994 U.S. Dist. LEXIS 18601 (M.D.Tenn. 1994))(footnotes omitted).

This same treatise, however, noted:

> The need for individualized determinations, however, has not totally precluded courts from certifying class actions based on claims of disability discrimination. **Where the challenged conduct is a specific policy that allegedly discriminates in a broad-based manner against class members, class certification may be appropriate.**

Id. (citing Hendricks-Robinson v. Excel Corp., 164 F.R.D. 667 (C.D.Ill. 1996); Wilson v.

Pennsylvania State Police Dept., 1995 U.S. Dist. LEXIS 9981 (E.D.Pa. July 17, 1995); Kimble v.

Hayes, 1990 U.S. Dist. LEXIS 2418 (E.D.Pa. March 1, 1990))(footnotes omitted)(emphasis

added).[64]

There is no legal authority supporting a categorical prohibition against litigating ADA

claims pursuant to a Rule 23(b)(2) class action utilizing the Franks, Teamsters and Cooper

pattern-or-practice framework.  Although much of defendant's opposition to class certification is

driven by defendant's general arguments that plaintiffs cannot litigate their ADA claims pursuant

to the pattern-or-practice framework, and that ADA claims are generally inappropriate for class

---

[64]Not surprisingly, plaintiffs rely heavily on Hendricks-Robinson and related cases in their briefing while defendant UPS urges the court to be guided by the reasoning in Sokol and Lintemuth.

resolution, defendant does not identify for the court any legal authority with such broad implications.[65]

Two decisions that deal with some of these issues warrant mention.  First, the parties dispute the importance and applicability of the Bates v. United Parcel Services, Inc. ("Bates") litigation.  See Bates v. United Parcel Service, Inc., 204 F.R.D. 440, 442 (N.D.Cal. 2001)(class certification opinion); 2004 WL 2370633 (N.D.Cal. Oct. 21, 2004)(opinion after the first phase of a bifurcated trial), aff'd in part, rev'd in part, 465 F.3d 1069 (9th Cir. 2006) (court of appeals decision).  Plaintiffs point to Bates as an example of a private-plaintiff Rule 23(b)(2) ADA class action that was litigated pursuant to the pattern-or-practice framework set forth in Teamsters and with the use of bifurcated proceedings.  Defendant argues that Bates is distinguishable and inapplicable to this case because it involved a single, identifiable disability – deafness – and because it involved a single, undisputed written policy or standard unlike this case.[66]

---

[65]Lintemuth and Sokol will be discussed in more detail in Part VII supra with respect to typicality.

[66]The district court in Bates granted certification pursuant to Rule 23(b)(2).  204 F.R.D. 442.  Almost three years later, during the first phase of a bench trial on the merits, the parties in that case settled claims in the case related to accommodations and promotions and the remaining screening claim proceeded to trial.  2004 WL 237 0633 at *2.  The district court ultimately found that UPS's application of the Department of Transportation ("DOT") hearing standard to non-DOT vehicles was not consistent with business necessity and violated the ADA and state law. Id. at *40.  The district court also rejected UPS's undue hardship defense.  Id. at *38-39.  The district court enjoined UPS from using the DOT hearing standard to screen applicants for package-car driving positions; ordered that UPS begin to perform an individualized assessment of an individual's ability to become a package-car driver, including engaging in an interactive process designed to identify specific accommodations that would enable a deaf individual to obtain driving work in vehicles weighing 10,000 pounds or less; and gave the parties in that case time to meet and confer regarding how to proceed with the second phase of the trial addressing damages and the plaintiffs' non-class claims.  Id. at *40-41.
     The United States Court of Appeals for the Ninth Circuit granted UPS's 28 U.S.C. § 1292(a)(1) appeal.  465 F.3d at 1075.  The court of appeals affirmed in part, reversed in part, and

This court does not find the decision by the district court or court of appeals in Bates to be particularly insightful for this case.  While this court has arrived at the same general conclusion as the district court in Bates with respect to the principle that the pattern-or-practice framework of proof set forth in Teamsters is not categorically prohibited in private-plaintiff Rule 23(b)(2) ADA class actions, and for some of the same reasons, this court agrees with defendant that the Bates litigation is not directly on point for this case.  For example, the court of appeals in Bates found there was a facially discriminatory policy alleged to violate the statute's prohibition against discrimination in the form of illegal screening under 42 U.S.C. § 12112(b)(6) involved in that case and there was no need to apply the pattern-or-practice framework.[67]  465 F.3d at 1076-77. Bates is instructive for this case, however, to the extent that it is an example of a private-plaintiff Rule 23(b)(2) ADA class action[68] and to the extent that it recognized that, in such cases, to maintain a class action, the named plaintiffs needed to establish that at least one named plaintiff was "qualified" in order to have statutory standing to bring a lawsuit under the ADA.  465 F.3d at

---

remanded the case to the district court.  Id. at 1094.  The court of appeals affirmed the district court's factual finding that UPS failed to carry its burden and its legal conclusion that UPS therefore violated the ADA, as well as the district court's injunction and its order denying UPS's motion to decertify the class.  Id.  The court of appeals, however, reversed the district court's finding of liability under the California state law at issue, which the court of appeals held did not cover employment discrimination claims.  Id.

[67]The policy in issue in Bates expressly prevented hearing-impaired employees from driving positions for all vehicles even though the DOT hearing standards required that these employees be excluded from operating only vehicles weighing 10,001 pounds or more.

[68]This court notes that the court of appeals commented that, notwithstanding the fact that it affirmed the district court's finding that the policy at issue violated the ADA, it reasoned that the Teamsters pattern-or-practice framework of proof was inappropriate in Bates because the case involved a facially discriminatory policy.  465 F.3d at 1076-77.  The court of appeals, however, did not indicate that pattern-or-practice proof was categorically inapplicable to ADA cases.

116

1077 (citing Melendez v. Ill. Bell Tel. Co., 79 F.3d 661, 668 (7th Cir. 1996)).

Second, although not discussed in detail by the parties, the court notes that in the Davoll line of decisions out of the Tenth Circuit which involved disabled police officers and the City of Denver, the district court and court of appeals in those decisions dealt with many of the same issues concerning the applicability of the pattern-or-practice framework to ADA cases that are present in this case, although subject to a different procedural posture in light of the fact that the litigation on appeal involved consolidated proceedings resulting from a lawsuit initiated by the United States government as a plaintiff against the City of Denver and a lawsuit initiated by a class of former Denver police officers including an individual on whose behalf the government initiated its lawsuit.  Davoll v. Webb, 194 F.3d 1116, 1124 (10th Cir. 1999).

Prior to the consolidated appeal, the district court in Davoll denied the private plaintiffs' motion for certification and bifurcation largely because the district court, without discussing the differences between Rule 23(b)(2) and Rule 23(b)(3) class definitions, found that the proposed class definition was not sufficiently definite for the court to determine membership in the class. Davoll v. Webb, 160 F.R.D. 142, 144 (D.Colo. Feb. 24, 1995).  The district court later denied the City of Denver defendants' motion for summary judgment with respect to the individual private plaintiffs' claims under the ADA.  Davoll v. Webb, 943 F.Supp. 1289 (D.Colo. Oct. 10, 1996). On the same day, the district court issued an opinion denying the City of Denver's motion for summary judgment with respect to the government's lawsuit against it, which was predicated on litigating the ADA claims pursuant to the Teamsters pattern-or-practice framework, noting that, as a matter of first impression concerning the burden of proof in pattern-or-practice lawsuits under the ADA, the burden is the same as in a pattern-or-practice lawsuit under Title VII.  Davoll v.

117

Webb, 943 F.Supp. 1304, 1305 (D.Colo. Oct. 10, 1996).  With respect to this issue, the district

court noted:

> The United States does not quarrel with Defendants' view that a
> highly individualized assessment is necessary in order to determine
> a potential victim's status as a "qualified individual with a
> disability" and that it must show that each person on whose behalf
> it is seeking relief is, in fact, a "qualified individual with a
> disability."  However, it disagrees with Defendants about the point
> in time at which such a showing must be made. **It argues evidence
> that a particular person is a "qualified individual with a
> disability" is necessary not to show liability, but to show that
> such person is among those individuals for whom relief may be
> sought, i.e, is a member of the class of victims of
> discrimination. Such issue, the United States argues, is always
> resolved at the remedial stage of a bifurcated action, not at the
> liability stage**.

Id. at 1309 (citing Teamsters, 431 U.S. at 361)(emphasis added).  The district court found that

although no decision by the United States Court of Appeals for the Tenth Circuit addressed the

issue of the burden of proof in a pattern-or-practice lawsuit under the ADA:

> [T]he Tenth Circuit has followed the distinction between the
> burdens of individual plaintiffs in a Title VII case and the United
> States' burden of proof in a pattern or practice case:
>> In a true "pattern and practice" suit, the government
>> is not required to show individual discrimination
>> with respect to each person for whom it seeks relief
>> when establishing its prima facie case. In seeking to
>> protect the public's interest, it is sufficient that the
>> government show specific evidence of company
>> discrimination regarding some of the employees that
>> it seeks to represent, and that a broad-based policy
>> of employment discrimination existed.

Id. (quoting Coe v. Yellow Freight System, Inc., 646 F.2d 444, 449 n. 1 (10th Cir.1981) (citations

omitted)).   The district court determined that the same burdens would apply in an ADA case.  Id.

Several months later, after a jury verdict in favor of the plaintiffs in that case, the district court

entered an order awarding equitable relief, which included an award of back pay and front pay in lieu of reinstatement.  Davoll v. Webb, 968 F.Supp. 549 (D.Colo. June 25, 1997).  In that same opinion, the district court denied the City of Denver's request for an evidentiary hearing with respect to equitable relief.  Id.

On appeal, the United States Court of Appeals for the Tenth Circuit affirmed in part and reversed and remanded in part elements of those decisions by the district court.  Davoll v. Webb, 194 F.3d 1116 (10th Cir. 1999).   In its comprehensive opinion, the court of appeals reviewed many issues that had arisen in the litigation.  Relevant to the case at hand, the court of appeals reviewed the district court's denial of class certification to the private plaintiffs based upon the finding that the class definition was not sufficiently definite to determine membership in the class. Id. at 1146-47.  The court of appeals noted that the district court has broad discretion to determine whether the class description is sufficiently definite, and that the district court can modify the class definition rather than dismissing the proposed action.  Id. at 1146 (citing 5 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.21[5] at 23-61 (3d ed.1999); Boughton v. Cotter, 65 F.3d 823, 826 (10th Cir. 1995)).  The court of appeals concluded that it was persuaded that the district court acted within its discretion in denying certification in that case, but noted in a footnote that:

> **We understand plaintiffs' concern that by denying their class certification motion and upholding the United States pattern and practice action, this decision may be interpreted as holding that only the government can bring a class-wide ADA employment suit**. **Such an interpretation would be unfounded**. Given the deferential standard by which we review class certification, **it is possible the district court could have certified the class in its discretion, or could have modified the proposed definition so that it was sufficiently definite**.  Of course, we do

119

> not decide those questions as our holding here is limited to the
> issue directly before us.
>
> At the same time, we do note that a pattern and practice action
> brought by the United States pursuant to section 707 of Title VII,
> 42 U.S.C. § 2000e-6, is not subject to the requirements of
> Fed.R.Civ.P. 23.

Id. n.20 (citations omitted)(emphasis added).  The court of appeals thus explicitly left open the

possibility that, in some circumstances, private plaintiffs can bring class-wide ADA employment

lawsuits pursuant to the pattern-or-practice framework of proof, implying that in order to do so

private plaintiffs would need to meet the requirements of Federal Rule of Civil Procedure 23.

In addition, the court of appeals upheld the district court's use of the Teamsters pattern-or-

practice framework in Davoll with respect to the government's ADA pattern-or-practice case. Id.

at 1147-48.  The court of appeals explained:

> Just as [McDonnell Douglas Corp.] sets forth the elements of a
> prima facie case for an individual seeking relief under Title VII,
> White v. York Int'l Corp., 45 F.3d 357, sets forth the elements of a
> prima facie case for an individual seeking relief under the ADA in
> this circuit, id. at 360-61. And, just as the Court recognized that the
> specifics of the McDonnell Douglas framework are inapplicable in
> certain factual situations, including when the government has
> brought a broad-based pattern and practice action, see Teamsters at
> 358-60, 97 S.Ct. 1843, it is clear that White does not articulate the
> elements of a prima facie case when the government "seek[s] to
> protect the public's interest" through a pattern and practice action,
> Coe, 646 F.2d at 449 n. 1. **Teamsters sets forth a logical and
> efficient framework for allocating burdens of proof in pattern
> and practice employment discrimination suits, and we approve
> of the district court's use of that framework in this case**. See
> United States v. Morvant, 843 F.Supp. 1092, 1096 (E.D.La.1994).

Id. at 1148 (emphasis added); see E.E.O.C. v. Murray, 175 F.Supp.2d 1053, 1060 (M.D. Tenn.

2001)(approving of Teamsters framework for pattern-or-practice claims under the ADA in action

litigated by the EEOC).

For all of the reasons set forth above, this court concludes that plaintiffs in this case are not barred from proceeding pursuant to the pattern-or-practice framework set forth in <u>Teamsters</u> because they are private plaintiffs or because they are litigating claims pursuant to the ADA and not Title VII.  Plaintiffs, therefore, will be allowed to litigate their pattern-or-practice claims for injunctive relief pursuant to the elements of a prima facie case set forth in <u>Teamsters</u> and will not be required to make out the elements for an individual ADA claim if some or all of their claims are certified for declaratory and injunctive relief.[69]  Here, plaintiffs to establish a prima facie case of a pattern or practice that is discriminatory under the ADA must show at the initial liability stage that such a policy existed – not that each person for whom they are seeking relief was a victim of the allegedly discriminatory policy.  If plaintiffs do so, the burden then shifts to defendant to defeat this prima facie case.  If defendant fails to rebut this prima facie case that a discriminatory policy existed, broad-based prospective injunctive or declaratory relief may be warranted.  If plaintiffs are permitted to seek individual relief, the court may need to conduct additional proceedings with respect to the scope of individual relief.

Although an issue of first impression, this conclusion is not pathbreaking.  This result is compelled by the Supreme Court's decisions in <u>Franks</u>, <u>Teamsters</u>, and <u>Cooper</u> and because the ADA incorporates the remedies afforded to plaintiffs litigating claims pursuant to Title VII.  42 U.S.C. § 12117(a).  Moreover, the few decisions analyzing government-plaintiff ADA pattern-or-practice lawsuits support this decision.  <u>See</u> <u>Davoll</u>, 194 F.3d at 1146-48; <u>Murray</u>, 175 F.Supp.2d

_____

[69]The court notes that the individual elements of a reasonable accommodation claim may be relevant at the second, remedial stage of proceedings if plaintiffs seek individual relief on behalf of individual class members.

at 1053.  By virtue of being private plaintiffs and not a government plaintiff, however, plaintiffs

will have to meet the Rule 23 requirements in order to litigate their pattern-or-practice claims as a

class action.  Davoll, 194 F.3d at 1146 n.20.[70]  The court now turns to consideration of the class

definition and the Rule 23 analysis in light of the foregoing legal discussion.

## VI. CLASS DEFINITION

A district court has broad discretion to determine whether a class description is

sufficiently definite.  See Davoll, 194 F.3d at 1146 (citing 5 JAMES W. MOORE ET AL., MOORE'S

FEDERAL PRACTICE § 23.21[5] at 23-61 (3d ed.1999)).  "If the court finds that the proposed

definition is not sufficiently definite, it may modify the definition instead of dismissing the

proposed action."  Id. (quoting MOORE'S § 23-21[7] at 23-62.2); see In re Monumental Life Ins.

Co., 365 F.3d 408, 414 (5th Cir. 2004) ("[C]ourts are permitted to limit or modify class

definitions to provide the necessary precision."); Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir.

1993) ("A court is not bound by the class definition proposed in the complaint and should not

dismiss the action simply because the complaint seeks to define the class too broadly."); Harris v.

Gen. Dev. Corp., 127 F.R.D. 655, 659 (N.D. Ill. 1989) (finding that it is within the court's

discretion to redefine the scope of a class); Meyer v. Citizens & Southern Nat'l Bank, 106 F.R.D.

356, 360 (M.D.Ga. 1985) (finding that the court's discretion regarding class certification extends

---

[70]The allegation of a pattern or practice of discrimination requires a court to examine
issues that may overlap with merits issues.  Otherwise, anytime a private plaintiff class alleges a
classwide discriminatory policy and seeks certification under rule 23(b)(2), the mere allegation of
a pattern or practice of discrimination – for example, the allegation of a company-wide policy –
would be suggestive of class treatment simply because the plaintiffs were arguably treated on
grounds generally applicable to the class.  The court must examine whether plaintiffs adduce
sufficient indicia of a classwide policy in order to fulfill its obligation not to certify a class
without making sufficient findings pursuant to Rule 23.

to defining the scope of the class).  For example, the United States Court of Appeals for the Third

Circuit in Chiang v. Veneman, 385 F.3d 256, 268 (3d Cir. 2004), redefined the class at issue in

that case to include all "Virgin Islanders" to remove ambiguity concerning the intersection of race,

gender, and national origin in the district court's certification of a class of individuals who

allegedly had been discriminated against in the administration of loan programs intended to help

low-income rural families obtain homes and make repairs to existing homes.

Defendant argues that plaintiffs' proposed class definition is unworkable because it

requires a host of individualized determinations to determine membership in the class.  For

example, defendant argues that the proposed class definition is untenable because it includes the

criteria, among others, that a class member be "disabled as defined under the [ADA]" and have

been "harmed as a result of UPS's policies, practices and procedures that control reentry into the

workplace or otherwise govern the making of reasonable accommodations under Title I of the

ADA."  In light of defendant's objections to the class definition, the court and the parties at the

hearing on class certification discussed a modified version of the class definition.  See Jan. 27,

2006 Tr. at 34-41, 44-45.  In particular, plaintiffs' counsel agreed that essentially plaintiffs sought

certification of a class comprised of "people who were off work because of medical reasons,

whether Workers' Comp, disability or otherwise, who presented to come back to work and were

refused."  Id. at 38.  The court, therefore, could modify the proposed class definition to exclude

the arguably problematic criteria that class members be individuals who "are disabled as defined

under the Americans with Disabilities Act ("ADA")" and "were harmed as a result of UPS's

policies, practices, and procedures that control reentry into the workplace or otherwise govern the

making of reasonable accommodations under Title I of the ADA to employees in UPS's

123

workforce." This exclusion would make determining membership in the class less problematic by removing the criteria which require what are arguably legal conclusions and may entail individualized inquiries.

It is incumbent on the court in exercising its discretion to modify the class definition, however, to distinguish between class definitions in the context of Rule 23(b)(2), which plaintiffs invoke in this case, and Rule 23(b)(3), where mandatory notice and opt-out procedures entail more stringent standards for the class definition. In Yaffe v. Powers, 454 F.2d 1362, 1366 (1st Cir. 1972), the United States Court of Appeals for the First Circuit reversed a district court's denial of class certification for multiple errors, one of which was failing to distinguish between the requirements for a Rule 23(b)(2) class definition versus a Rule 23(b)(3) class definition:

> The most basic error committed by the district court was in applying the criteria set out in subdivision (b) of Rule 23 cumulatively rather than alternatively. In holding that a class should not be certified because its members had not been sufficiently identified, for example, the court applied standards applicable to a subdivision (b) (3) class rather than to a subdivision (b) (2) class.

Id. The court of appeals explained:

> Although notice to and therefore **precise definition** of the members of the suggested class are important to certification of a subdivision (b) (3) class, **notice to the members of a (b) (2) class is not required and the actual membership of the class need not therefore be precisely delimited**.

Id. (emphasis added). Moreover,

> **[i]n fact, the conduct complained of is the benchmark for determining whether a subdivision (b) (2) class exists, making it uniquely suited to civil rights actions in which the members of the class are often "incapable of specific enumeration".**

Committee's Notes to Revised Rule 23, 3B Moore's Federal
Practice ¶ 23.01 [10-2] (2d ed. 1969).

Id. (emphasis added).

In Rice v. City of Philadelphia, 66 F.R.D. 17 (E.D.Pa. 1974), Judge Fullam explained that

in Rule 23(b)(2) class actions, in which the primary concern is grant of injunctive or declaratory

relief – as opposed to Rule 23(b)(3) class actions, where notice to class members is mandatory –

"the precise definition of the class is relatively unimportant."  Id. at 19.  Judge Fullam reasoned

that, with respect to Rule 23(b)(2) classes, the emphasis of the class definition should be on the

conduct charged to the defendant.  Id. at 20.  In Rice, Judge Fullam limited the proposed class

action to issues involving injunctive relief and modified the definition to include all persons in the

past and the future who would be affected by the charged conduct.  Id. at 21.

Other courts have adopted similar reasoning.  In Midwest Community Council, Inc. v.

Chicago Park District, 87 F.R.D. 457, 459-60 (N.D.Ill. July 29, 1980), the court certified a Rule

23(b)(2) class to challenge policies and practices over objection that the proposed class was too

"nebulous," and noted:  "Moreover, when, as here, defendants' alleged policies and practices

shape the contours of the class, attacks on its definiteness are not entitled to weighty consideration

provided all other requirements for class certification are established."  Id. (citations omitted); see

Bell v. Automobile Club of Michigan, 1980 WL 82004 at *2 (E.D.Mich. January 17, 1980).  In

Robertson v. National Basketball Association, 389 F.Supp. 867, 897 (S.D.N.Y. 1975), the court

held that a Rule (b)(1) class was "neither amorphous nor imprecise" although it contained future

members.  The fact that the class was based upon objective criteria targeting the conduct at issue

made it sufficient for Rule 23(b)(1) certification.  Id. at 897-903.  "When a choice exists between

125

(b)(1) and (b)(3) certification, the court should order that the class proceed under (b)(1) exclusively so that the opt-out privilege is unavailable." Id. at 903.[71]   Courts, therefore, in certifying Rule 23(b)(2) classes, generally approve definitions that focus on the alleged conduct at issue rather than the ease of identifying the class members prior to determinations of liability. See, e.g., Holman v. Califano, 83 F.R.D. 488 (M.D.Pa. 1979)(certifying a Rule 23(b)(2) class of "[a]ll persons in the Commonwealth who are applicants for or recipients of Social Security disability benefits . . .and who do not receive a prompt and thorough final decision . . . on their claim for benefits. . . . ").

While it is clear that a class definition must be sufficient to allow a court to determine the scope of the class and the propriety of class certification, and care should be taken to define a class in objective terms capable of ascertaining membership at some relevant stage, with respect to Rule 23(b)(2) class seeking predominantly injunctive or declaratory relief, ascertaining the precise membership of the class is of less moment at the certification and liability stage where the class is seeking broad declaratory or injunctive relief.  See generally ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 6:14 ("Defining the class") (4th ed. 2002)(hereinafter, "NEWBERG"); MANUAL FOR COMPLEX LITIGATION § 21.222 at 270-72 ("Definition of Class") (4th ed. 2004) (hereinafter, "MAN. COMPL. LITIG.").  That is,

---

[71]Rule 23(b)(1) contemplates class action treatment when "the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." FED .R. CIV. P. 23(b)(1).  A Rule 23(b)(1) class is more like a  (b)(2) class than a (b)(3) class because the notice and opt-out procedures available to putative members of a (b)(3) class are not mandatory for (b)(1) and (b)(2) classes.

[b]ecause individual class members must receive the best notice practicable and have an opportunity to opt out, and because individual damage claims are likely, Rule 23(b)(3) actions require a class definition that will permit identification of individual class members, while Rule 23(b)(1) or (b)(2) actions may not. . . .

. . . . **There is no need to identify every individual member at the time of certification of a Rule 23(b)(2) class action for injunctive relief as long as the court can determine at any given time whether a particular individual is a member of the class**.

MAN. COMPL. LITIG. § 21.222 at 270 (footnotes and citations omitted); see id. § 32.42 ("Employment Discrimination;" "Class Actions") at 584 ("Less precision is required in the definition of a Rule 23(b)(2) class.").  With respect to Rule 23(b)(2) classes seeking declaratory or injunctive relief, therefore:

**Generally speaking, then, the plaintiffs' counsel may rely on the rule of thumb that it is proper and desirable to define a class, in an action seeking to enforce a legal duty owed by the defendant to a class of persons generally, to encompass the entire class of persons affected.**  If in doubt concerning specific language, it is proper to generalize the class definition by referring to a common class characteristic possessed by the named plaintiff with respect to the legal issues in the controversy, and by alleging that the action can be brought on behalf of those similarly situated. **Amorphous class definitions, in an action seeking declaratory or injunctive relief, may properly be utilized to describe the class of affected persons.**

NEWBERG § 6:15 ("Class definitions in suits for declaratory or injunctive relief")(footnotes and citations omitted) (emphasis added).

The difference between class definitions for class actions seeking predominantly declaratory or injunctive relief under Rule 23(b)(2) and those seeking money damages under Rule 23(b)(3), therefore, depends upon the conduct alleged and the relief sought as well as the notice and opt-out procedures, if any, that follow from that alleged conduct and relief.  In this case, with

127

respect to the relief that plaintiffs seek in the form of broad injunctive or declaratory relief,

plaintiffs' proposed class definition can be modified as follows to address defendant's objections

and to focus on objective standards related to the alleged discriminatory conduct at issue:

> Those persons throughout the United States who:
>
>> (i) according to the records of UPS, its agents and contractors, have been employed by UPS at any time since May 10, 2000, including those employees who were absent from work and were receiving either workers' compensation or short or long term disability insurance benefits; and
>>
>> (ii) have been absent from work because of medical reasons; and
>>
>> (iii)(A)  did not return to work by reason of UPS's alleged 100% healed policy; or
>>
>>> (B)  did not return to work by reason of UPS's allegedly discriminatory implementation of its formal ADA compliance policy; or
>>>
>>> (C)  did not return to work by reason of the allegedly discriminatory use by UPS of uniform pretextual job descriptions.
>
> Excluded from the Class are all presently working UPS management employees with supervisory authority over the formulation or implementation of the UPS policies and practices alleged in this action to violate the ADA.

This class definition includes three putative subclasses, as set forth in (iii)(A) – (C) above.[72]  The

modified class definition is sufficiently precise to submit for Rule 23(b)(2) class adjudication if

---

[72]These subclasses correspond to the three claims which this court determines to be appropriate for Rule 23(b)(2) classwide adjudication as discussed below.  The court notes that there may be overlap among the subclasses with respect to the evidentiary support for or against these claims and with respect to membership in the subclasses.

the other requirements of a Rule 23(b)(2) class action are met.  In addition, if upon further

information the parties successfully argue that the class definition must be modified, the court has

the discretion to do so.  See Rule 23(c)(1)(C) ("An order under Rule 23(c)(1) may be altered or

amended before final judgment.").[73]

---

[73]If plaintiffs are allowed to proceed as a class action and seek individual relief for class members, then this court can adopt a variety of different approaches to deal with adjudicating requests for individual relief:

> Rule 23(c)(4) permits maintaining an action as a class action with respect to particular issues.  Several courts have suggested a "hybrid" approach in discrimination cases to deal with the problems created by the enhanced-damages provision of the Civil Rights Act.  Hybrid options include a Rule 23(b)(2) class with respect to the injunctive aspects of the suit and a Rule 23(b)(3) class to consider the claims for monetary relief.  Other alternatives include certification of a Rule 23(b)(2) class for class-wide damages and severing the issue of individual damages to be considered later in the suit.  Consider whether one of these approaches would be useful and, specifically, whether a Rule 23(b)(3) or (b)(2) class should be certified for bifurcated adjudication of a common issue (Phase I), to be followed by separate trials (coordinated or consolidated as may be appropriate) to adjudicate individual damage claims (Phase II).  Once there has been a finding in Phase I of a class-wide violation, "the court should decide the issue of class-wide relief, typically in the form of an injunction prospectively prohibiting the discriminatory practice."

See MAN. COMPL. LITIG. § 32.42 at 581-82 (quoting GEORGE RUTHERGLEN, MAJOR ISSUES IN THE FEDERAL LAW OF EMPLOYMENT DISCRIMINATION 102 (Federal Judicial Center 3d ed. 1996)).

> There are cases, however, where injunctive relief would not remedy the challenged employment practice, such as where the practice has been discontinued or the plaintiff is no longer employed by the defendant.  The court can then determine what individual relief is appropriate for class members.

Id. at 582 (citing in a footnote, inter alia, Cardenas v. Massey, 269 F.3d 251, 265 (3d Cir. 2001), for the holding that injunctive relief would not remedy the plaintiff's wrongful treatment where the defendant no longer employed the plaintiff).  See MAN. COMPL. LITIG. § 32.45 ("Employment Discrimination;" "Trial") at 592-95 (discussing bifurcated proceedings and individual relief in employment discrimination class actions).

## VII. CLASS CERTIFICATION REQUIREMENTS

### A. Rule 23(a) Prerequisites

The court finally will consider the Rule 23 requirements in proper focus in light of the factual and legal landscape surveyed above.  As previously stated, to be certified, a class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  FED.R.CIV.P. 23(a).  Rule 23(a) specifically provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED.R.CIV.P. 23(a).  The United States Court of Appeals for the Third Circuit Court has explained that the requirements of Rule 23(a) are meant to ensure that class action treatment is necessary and efficient and that it is fair to absentees under the particular circumstances of a case.  Baby Neal, 43 F.3d at 55.  Numerosity addresses the first of these concerns (i.e., the necessity of class action treatment) while commonality, typicality, and adequacy address whether the class action can be maintained in a fair and efficient manner.  Id.

------

_____Plaintiffs in this case have moved for class certification pursuant only to Rule 23(b)(2). Plaintiffs, however, previously moved for bifurcation of the trial into two phases – one for liability and one for damages.  These issues will be addressed in more detail below with respect to the propriety of class certification with respect to some or all of the claims in the case.

### 1. Numerosity

Rule 23(a)'s numerosity requirement focuses on the necessity of class action treatment where the class is so numerous that joinder of all members is impracticable.  See Fed.R.Civ.P. 23(a)(1).  It is difficult to predict definitively the size of the proposed class.  At the hearing on class certification, plaintiffs asserted that UPS produced in discovery computer runs that it shares with the Liberty Mutual Insurance Company, its workers' compensation insurance carrier, which show that between May 1, 2000, and February 1, 2005, there were 3,629 employees absent from work for more than thirty days on workers' compensation in the five sample districts.  See January 27, 2006 Tr. at 19.  Because these five sample district represent approximately 10% of UPS's domestic workforce, plaintiffs extrapolated from this data that there are potentially 36,290 class members, although there could be more or less than that number.  Id.

In addition, UPS itself presented data about ADA accommodations made at UPS which was gathered from UPS's ADA Request Files and from human resource managers in the five sample districts.  Williams Decl. ¶¶ 3-6.  This data shows that in the five sample districts during the relevant time period of approximately four and one-half years UPS received 481 requests for accommodation that resulted in the opening of a Request File.  Id. ¶6.  Of these 481 requests, UPS submits that 233 requests (approximately 48%) were considered withdrawn; 47 requests (approximately 10% of the total number of requests and approximately 19% of the 248 requests not deemed to be withdrawn) resulted in the offer of an ADA accommodation; and, by inference, 201 requests (approximately 42% of the total number of requests and approximately 81% of the requests not deemed to be withdrawn) did not result in the offer of an ADA accommodation.  Id.

¶¶6-7; see id., Exs. A-D.[74]  From this data as well it can be extrapolated whether the proposed

class will be sufficiently numerous that joinder will be impracticable.

　　　　While no number definitively establishes numerosity, a proposed class as large as this one,

under either party's calculus, is sufficiently numerous for joinder to be impracticable.  As the

United States Court of Appeals for the Third Circuit has explained:

> On the subject of how many is enough, Professor Moore has
> written "While the attitude taken towards a given number may
> vary, each opinion reflects a practical judgment on the particular
> facts of the case. Thus no hard and fast number rule can or should
> be stated, since 'numerosity' is tied to 'impracticability' of joinder
> under the specific circumstances. Nevertheless, some general
> tendencies can be observed. While there are exceptions, numbers
> under twenty-one have generally been held to be too few. Numbers
> between twenty-one and forty have evoked mixed responses and
> again, while there are exceptions, numbers in excess of forty,
> particularly those exceeding one hundred or one thousand have
> sustained the requirement."

Weiss v. York Hosp., 745 F.2d 786, 808 n.5 (3d Cir.1984) (citing 3B J. MOORE, MOORE'S

FEDERAL PRACTICE ¶ 23.05[1], at 23-150 (2d ed. 1982) (footnotes omitted)).

　　　　UPS's argument that plaintiffs cannot meet their burden to show numerosity consists of a

reiteration of their argument that the class definition, as initially proposed, is fatally flawed.  That

is, defendant argues that the proposed class is not readily ascertainable and is thus unworkable.

UPS reasons that therefore plaintiffs cannot meet their burden to show numerosity – i.e., that

joinder is impracticable.  This argument, however, is a non sequitur in light of the requirements

---

[74]UPS also presents data about accommodations made to employees at UPS based upon
avenues outside of the formal ADA compliance protocol — such as accommodations through its
alcohol and controlled substance program, its disqualified driver program, its TAW program, its
Diabetes Protocol and Vision Protocol, its hearing disability program, its Residual
Disability/Return to Work program for non-bargaining unit employees, and accommodations
made on an informal basis.  See generally Williams Decl. ¶¶ 8-18; Lee Decl. ¶¶ 18-22.

for Rule 23(b)(2) classes and the modified class definition discussed at the hearing on class certification and adopted, with certain additional modifications, in this opinion.

In addition to the computer runs, plaintiffs adduced evidence in the form of declarations, deposition testimony, and documentary evidence including letters and emails all of which contain testimonials and other evidence that suggests that numerous individuals are potential members of the class.  UPS itself has produced evidence showing numerous formal ADA requests were denied after a Request File had been opened, and plaintiffs allege that in many cases no formal Request File was opened in the first place.  In light of the record before the court, plaintiffs have presented sufficient evidence for this court to conclude that joinder is impracticable and that the numerosity prerequisite to certification is met in this case.  This finding with respect to numerosity applies to all of the claims alleged by plaintiffs.[75]

### 2. Commonality

The commonality requirement set forth in Rule 23(a) is satisfied if the named plaintiff shares at least one question of fact or law with the grievances of the prospective class.  Baby Neal, 43 F.3d at 56 (citations omitted).  As the United States Court of Appeals for the Third Circuit has noted, the commonality requirement "is not a high bar."  Chiang, 385 F.3d at 265; see Baby Neal, 43 F.3d at 56 ("Because the requirement may be satisfied by a single common issue, it is easily

---

[75]Much of the evidence produced in plaintiffs' appendices relates to the 100% healed policy and the implementation of UPS's formal ADA compliance policies claims.  The evidence also includes multiple references, however, to the job descriptions – most frequently with reference to lifting requirements which plaintiffs at times dispute are actual requirements of certain jobs.  See, e.g., Declaration of Todd Collins ¶12; Declaration of Robert Ducheneau ¶11; Fields Decl. ¶6.  While UPS disputes the use of the uniform job descriptions as pretextual, it does not seriously dispute the numerosity of employees subject to the job descriptions.  Therefore, numerosity is satisfied for each of the three claims which the court concludes are appropriate for certification.

met. . . .").  Furthermore,"class members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice."  Id. (emphasis in original) (citations omitted).

In this case, much of the dispute between the parties focuses on whether plaintiffs can meet commonality.  Plaintiffs argue generally that commonality is met because they have presented evidence of uniform courses of conduct that UPS subjected all class members to and these are subject to common proof in a single trial, primarily relying upon the holding of the United States Court of Appeals for the Third Circuit in Chiang.  See Chiang, 385 F.3d at 266 (discussed infra).  Defendant argues that plaintiffs cannot meet commonality because the real issues that control disposition of the case are highly individualized inquiries into the implementation of UPS's interactive process.  Defendant further argues that commonality cannot be met because the record does not support a finding of standardized conduct.  Finally, defendant argues that plaintiffs cannot shift the focus of their complaint with UPS from the alleged de facto 100% healed policy to the implementation of the formal written compliance policy in order to meet commonality because, essentially, UPS argues that individual issues still dominate and the formal written ADA compliance policy is valid and legal.  It is necessary to examine plaintiffs' claims claim-by-claim in order to determine whether commonality is met with respect to some, all, or none of them.

### a. 100% Healed Policy Claim

The court finds that plaintiffs met Rule 23(a)'s commonality requirement with respect to the 100 % healed policy claim.  While the court need not make a finding that the alleged 100% or full release policy exists for merits purposes, the court finds that sufficient evidence has been

adduced by plaintiffs to support the finding that the named plaintiffs share at least one question of fact or law with the grievances of the prospective class with respect to the alleged 100% healed policy.  For example, whether the alleged 100% or full release policy exists at all is a common question that can be proved or disproved by common proof at the merits stage of the case.

Plaintiffs have adduced during class discovery evidence from managers and former managers at UPS concerning their direct knowledge of the existence of the 100% medical release or full medical release policy, see e.g., D'Angelo Decl. ¶¶ 2-3, Balsis Decl. ¶2, Budd Decl.¶4, and their varying degrees of awareness about the formal ADA compliance process at UPS, see e.g., Balsis Decl. ¶2, Fields Decl. ¶5; evidence from numerous employees and former employees at UPS concerning their experiences being told variations on the theme that they could not come back to work unless they were "100%" or had full medical release, see e.g., Cowley Decl. ¶3, Sanchez Decl. ¶6, Weber Decl. ¶5; evidence from UPS's early training materials; evidence from various EEOC investigations into individual charges of discrimination which include commentary or findings relating to the alleged 100% healed policy at UPS; and other evidence challenging the implementation of UPS formal ADA compliance policy.  See Part IV supra.  Evidence of this nature, although sometimes anecdotal and necessarily related to individual experiences and circumstances, is relevant to whether there exists a widespread policy of requiring returning employees to obtain a 100% or full release before returning to work – notwithstanding the formal procedures requiring the opening of a Request File and everything that follows as part of the ten-step process.[76]

_____

[76]It is worth noting that the "100%" or full release policy as alleged by plaintiffs does mean that UPS required 100% or full medical release 100% of the time.  Rather, the policy as alleged by plaintiffs is that UPS has a de facto policy of requiring employees attempting to return

Defendant also can point to common proof to <u>disprove</u> plaintiffs' allegation that the 100% healed policy exists at the merits stage of the litigation.  For example, defendant already adduced considerable evidence during class certification discovery concerning development, implementation, and training related to its formal compliance procedures; evidence that these procedures are being followed; evidence that ADA accommodations and other avenues of accommodation are being pursued at UPS; and other evidence bolstering its position that it has developed formal procedures, and implements these procedures in good faith, to accommodate employees returning from injury or medical leave.  <u>See</u>, <u>e.g.</u>, Williams Decl. ¶¶4-7, Exs. A-J (summarizing evidence of ADA and other accommodations at UPS); Lee Decl. ¶¶ 11-17, Exs. G-L (discussing evidence of UPS's formal ADA compliance procedures, training for management personnel, and notice to employees).  UPS also relies upon evidence adduced during class certification discovery that numerous individuals <u>have</u> received accommodations in some form to disprove the alleged 100% healed policy claim.  <u>See</u> Williams Decl. ¶¶4-7, Exs. A-J; Lee Decl. ¶¶ 18-22 (summarizing other avenues of accommodation).  The court acknowledges this evidence. This evidence may be used to refute plaintiffs' allegations at the liability stage of the trial, but it

---

to work to provide a 100% or full release with no restrictions.  Allegedly, requiring 100% or full medical release at UPS is not the rare exception but instead is a widespread policy.  <u>See</u> <u>Teamsters</u>, 431 U.S. at 336 (alleging a pattern or practice of discrimination requires proving "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts" but instead proving that discrimination "was the company's standard operating procedure —  the regular rather than the unusual practice.").  Defendant cannot avoid liability on this theory merely by showing a nominal amount of cases where an individual was not required to come back at 100% if plaintiffs can prove the existence of a de facto policy of decisionmaking that requires 100% or full medical release as the company's "standard operating procedure."  At the same time, defendant quite appropriately can refute the allegation of a widespread policy by showing through multiple individual circumstances that the alleged policy was not its standard operating procedure.

does not preclude a finding of commonality with respect to the 100% healed policy claim at the certification stage.[77]

Defendant's argument that plaintiffs have failed to show commonality with respect to the alleged 100% healed policy because the real issues that control disposition of the case are individualized inquiries with respect to whether each class member was disabled, was entitled to a reasonable accommodation, et cetera, fails in light of the court's determination that plaintiffs can litigate their claims pursuant to the Franks, Teamsters and Cooper pattern-or-practice framework. As explained in detail above, under the pattern-or-practice framework plaintiffs will seek to establish their prima facie case without resorting to putting on proof of the individual elements of every class member's potential individual failure to accommodate claim at the liability stage. Instead, the focus will be on the challenged company-wide policies at UPS. UPS's assertions that there will be some individualized issues regarding plaintiffs' claims do not prevent these claims from being litigated by common proof at the liability stage of this case. Indeed, the only way to prove or disprove a policy is to examine multiple individual circumstances in context, pursuant to statistical, anecdotal, or other acceptable forms of evidence; Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 688 (7th Cir. 1998) (noting the plaintiff class was certified "on the ground that it was attacking [the employer's] medical layoff policy and was not pursuing the plaintiffs' individualized claims.").[78]

---

[77]This conflicting evidence also implies that genuine issues of material fact exist that would necessitate a jury trial.

[78]See Baby Neal, 43 F.3d at 59 ("Certainly, the plaintiffs will have different stories to tell. However, it is apparent from the pleadings that plaintiffs [sic] legal claims are based on a common factual predicate: the defendants alleged failure to fulfill their duties in providing for a coordinated system that protects the welfare of class members. The individual treatment of

Another common issue that exists with respect to the 100% healed policy claim is whether the alleged policy, if it exists, constitutes a per se violation of the ADA.  Plaintiffs argue that if they can establish the existence of the alleged 100% healed policy, no further proof would be needed to establish liability under the ADA because plaintiffs argue that 100% healed policies are per se unlawful under the ADA.  Specifically, plaintiffs argue that it is well established that the ADA requires employers to engage in good faith in an interactive process with an employee who seeks an accommodation, and that failure to make a reasonable accommodation under some circumstances constitutes unlawful discrimination under the ADA.  See Taylor,184 F.3d 296; Williams, 380 F.3d at 761-72.  Plaintiffs rely on various decisions where courts have commented or held that "100% healed" policies are per se illegal under the ADA.

For example, plaintiffs direct the court to McGregor v. National R.R. Passenger Corp., 187 F.3d 1113, 1116 (9th Cir. 1999).  In McGregor the court of appeals commented that:

> **[The Plaintiff] is correct in noting that "100% healed" policies are per se violations of the ADA.**  A "100% healed" or "fully healed" policy discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified individual is "100% healed" from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation.

Id. at 1116 (citing Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 699 (7th Cir.1998); Weigel v. Target Stores, 122 F.3d 461, 466 (7th Cir.1997); Norris v. Allied-Sysco Food Servs., Inc., 948 F.Supp. 1418, 1437 (N.D.Cal.1996); Heise v. Genuine Parts Co., 900 F.Supp. 1137, 1154 & n.10

--------

handicapped youths, while important and crucial to plaintiffs' case, only serves to support a larger inquiry into the functioning of the state structure appropriated for administering programs that serve the handicapped.")(quoting Jane T. v. Morse, No. S-359-86 WnC, slip op. at 4, (Vt.Super.Ct., June 12, 1987)).

(D.Minn.1995); <u>Hutchinson v. United Parcel Serv., Inc.</u>, 883 F.Supp. 379, 397 (N.D.Iowa 1995); <u>Sarsycki v. United Parcel Service</u>, 862 F.Supp. 336, 341 (W.D.Okla.1994)).[79]  <u>McGregor</u> is similar to this case because it involved allegations of a "100% healed policy" as a <u>per se</u> violation of the ADA.  <u>McGregor</u>, however, was litigated as an individual and not a class action.

In <u>Hendricks-Robinson v. Excel Corp.</u>, 154 F.3d 685 (7th Cir. 1998), the United States Court of Appeals for the Seventh Circuit, however, considered a <u>class action</u> of former production workers at a meatpacking plant who challenged their employer's medical layoff policy for failure to provide reasonable accommodations, and in particular, failure to engage in the requisite interactive process with employees to identify possible reasonable accommodations.[80]  In that case, the plaintiff class was certified, summary judgment was granted in favor of the employer, and the "central issue [on] appeal [was] whether [the employer's] layoff policy, as it was implemented, violated the ADA." <u>Id</u>. at 692.  The court of appeals in <u>Hendricks-Robinson</u> ultimately reversed and remanded the district court's grant of summary judgment in favor of the defendant employer after class certification, holding that issues of fact existed with respect to

---

[79]In <u>McGregor</u>, the court of appeals reversed the district court's grant of summary judgment because whether the employer in that case had a "100% healed" policy or its functional equivalent was a disputed issue of material fact which made granting summary judgment on that issue inappropriate.  <u>McGregor</u>, 187 F.3d at 1116.

[80]In <u>Hendricks-Robinson</u>, unlike this case, however, the question whether the plaintiffs were qualified individuals with disabilities was not in issue – the parties in that case accepted without argument that the plaintiffs were "otherwise qualified disabled employees" who were either disabled or perceived by the defendant employer to be disabled.  154 F.3d 688 n.3.  The court of appeals noted that "this is a class action focusing on <u>the employer's policy</u> rather than <u>the employees' qualifications</u> under the ADA." <u>Id</u>. (emphasis added).  "The question of whether plaintiffs are qualified individuals with a disability is not before us. . . . The issue is whether [the employer's] policy discriminated against the plaintiffs by failing to make reasonable accommodations for them as disabled individuals." <u>Id</u>. at 692.

whether the employer's policy violated the ADA.[81]

The court of appeals in Hendricks-Robinson noted the line of decisions which plaintiffs point to in this case in support of their argument that "100% healed" policies are per se violative of the ADA's requirement that employers engage in an individualized assessment whether an employee can be reasonably accommodated and return to work.  Id. at 699 (citing 29 C.F.R. § 1630.7; Weigel v. Target Stores, 122 F.3d 461, 466 (7th Cir.1997); Heise v. Genuine Parts Co., 900 F.Supp. 1137, 1154 & n. 10 (D.Minn.1995); Hutchinson v. United Parcel Serv., Inc., 883 F.Supp. 379 (N.D.Iowa 1995)).  The court of appeals noted that it was "troubl[ed]" by the possibility that "physical fitness" was used as an independent general criterion to determine whether employees were eligible for certain jobs.  Id.  For this and other reasons, because "the record [did] not permit the conclusion that the ADA requirement of a flexible, interactive process that requires both the employer and the disabled employee to investigate cooperatively whether it is possible to accommodate the employee's disability [had] been fulfilled as a matter of law," the court of appeals reversed and remanded the district court's grant of summary judgment.

> A reasonable trier of fact could determine that, once an employee's medical restrictions are determined to be permanent, [the employer's] methodology – the nurse's evaluation, the employee's meetings with the nurse and others, the plant tour, then layoff –

---

[81]The court of appeals in Hendricks-Robinson characterized the lawsuit as a lawsuit challenging the company's policy as per se violative of the ADA and not as a lawsuit pursuing individual claims under the ADA, commenting that the plaintiff class was certified "on the ground that it was attacking [the employer's] medical layoff policy and was not pursuing the plaintiffs' individualized claims."  Id. at 688 (emphasis added).  On appeal, the grant of summary judgment was reviewed subject to the same qualification: the court of appeals examined "whether [the employer's] policy discriminated against the plaintiffs by failing to make reasonable accommodations for them as disabled individuals."  Id. at 692 (emphasis added).  As in this case, the focus of the litigation was the employer's policy, not individual cases of discrimination.

> was directive, not interactive. The record is also susceptible to the reading that the breakdown in the process cannot be attributed to the plaintiffs. . . . There are genuine issues of material fact concerning the lack of interaction in this case that preclude summary judgment. With all the information in the hands of [the employer], this was not the kind of interactive process envisioned by our case law.

Id. (citations omitted).

Plaintiffs, therefore, rely on McGregor, Hendricks-Robinson, and related cases for the theory that "100% healed" policies such as the de facto 100% healed policy alleged in this case are per se unlawful under the ADA.  These decisions provide some support for plaintiffs' argument that the existence of the alleged 100% healed policy, if proven, could establish a per se violation of the ADA's requirement that employers engage in an interactive process with individual employees to investigate reasonable accommodations.  See McGregor, 187 F.3d 1113; Hendricks-Robinson, 154 F.3d 685; see also Henderson v. ARDCO, Inc., 247 F.3d 645 (6th Cir. 2001)(Kentucky state statute tracking ADA); Lenker v. Methodist Hosp., 210 F.3d 792 (7th Cir. 2000); Edwards v. Ford Motor Co., 218 F.Supp.2d 846 (W.D.Ky. 2002); Heise v. Genuine Parts Co., 900 F.Supp. 1137 (D.Minn. 1995); Hutchinson v. United Parcel Serv., Inc., 883 F.Supp. 379 (N.D.Iowa. 1995). While these decisions provide support for plaintiffs' theory, none are directly on point for this case where plaintiffs (unlike the plaintiff in McGregor) seek to proceed as a class action; where the parties (unlike the parties in Hendricks-Robinson) dispute whether the named plaintiffs and putative class members are qualified individuals under the ADA;[82] and where

---

[82]Defendants argue, as UPS did in Bates, that plaintiffs' prima facie showing must include a showing that plaintiffs are "qualified individuals" under the ADA – and because this is an inherently individualized inquiry, class certification is inappropriate.  Plaintiffs counter that because they seek to litigate their claim in this case under the pattern-or-practice framework established in Teamsters, at the initial liability stage of litigation, plaintiffs are not required to

plaintiffs also allege retaliation claims.[83]  The court, however, need not at this time assess the

merits of plaintiffs' argument that 100% healed policies are per se violations of the ADA.  It is

enough for the court to find that this issue presents a common issue of law to further support the

finding that the Rule 23(a) commonality requirement is met in this case with respect to plaintiffs'

100% policy claim.

    Another common issue that exists with respect to the 100% healed policy claim is whether

the alleged policy, if it exists, constitutes treating every employee subject to the policy as

"regarded as" disabled.  See Henderson v. ARDCO, Inc., 247 F.3d 645, 652-54, 653 n.6 (6th Cir.

2001)(reversing summary judgment on grounds relating to an alleged 100% healed rule and

"regarded as" disability); Edwards v. Ford Motor Co., 218 F.Supp.2d 846, 852-53 (W.D. Ky.

2002).  In this case plaintiffs allege that members of the class, including named plaintiffs, were

either disabled or "regarded as" disabled.  Defendant challenges plaintiffs' use of "regarded as"

disability in this case.

    In Henderson, the United States Court of Appeals for the Sixth Circuit reviewed a district

_____

offer evidence that each person for whom it will ultimately seek relief was a victim of the
employer's discriminatory policy.  Rather, at the initial liability stage, plaintiffs argue that they
will need only to establish a prima facie case that the alleged policy existed.  See Cooper, 467
U.S. at 876 ("The crucial difference between an individual's claim of discrimination and a class
action alleging a general pattern-or-practice of discrimination is manifest. The inquiry regarding
an individual's claim is the reason for a particular employment decision, while 'at the liability
stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but
on a pattern of discriminatory decisionmaking.'") (quoting Teamsters, 431 U.S. at 360-61 n. 46;
citing Furnco Construction Corp. v. Waters, 438 U.S. 567, 575, n. 7 (1978)).  At the class
certification stage, this issue really goes to the named plaintiffs' typicality and adequacy to
represent the class and to the appropriateness of individual relief.  These issues will be addressed
in more detail supra.

    [83]Plaintiffs' reliance on these decisions does little to advance plaintiffs' theory that their
retaliation claim can be proven using the pattern-or-practice framework.

court's grant of summary judgment in favor of an employer in a case implicating Kentucky's disability discrimination statute, which is interpreted consonant with the ADA.  247 F.3d at 647, 649.  The plaintiff in that case worked at a manufacturing facility, eventually obtaining a position as a welder, for several years until injuring her back and taking medical leave.  Id. at 647.  When the plaintiff attempted to return to work subject to bending and lifting restrictions (not more than 25 pounds frequently and no more than 40 pounds infrequently), the plant manager allegedly told her: "You know what company policy is . . . you have to be 100 percent to work here."  Id.[84]  The plaintiff later requested by letter any work consistent with her restrictions, but was informed that the employer had no light duty work that she could perform.  Id. at 648.  The plaintiff worked elsewhere for some time, but approximately three years later was rehired by the defendant, although not as a welder.  Id.

In her lawsuit, the plaintiff in Henderson alleged that, despite her ability to work, the defendant employer perceived her as having a disability.  She argued that the employer's alleged "100% healed policy" was per se illegal under Kentucky's disability discrimination statute.  Id.  In addition, the plaintiff alleged retaliatory discharge for applying for workers' compensation benefits.  Id.  The court of appeals affirmed the district court's grant of summary judgment in favor of the employer on the retaliatory discharge claim because the plaintiff had produced insufficient evidence that her filing for workers' compensation was a substantial and motivating factor in her discharge.  Id. at 654.  The court of appeals, however, reversed the district court's grant of summary judgment with respect to the disability discrimination claim finding that, with

---

[84]In Henderson, the court of appeals noted that the employers' " '100% healed rule' appear[ed] to have been well-known and consistently applied, at least with regard to lifting restrictions, and [was] assumed to exist for purposes of summary judgment."  247 F.3d at 647.

respect to the "crux" of that case – whether the plaintiff was "disabled" under the statute – the

plaintiff had produced sufficient evidence in support of her "regarded as" disabled theory of

discrimination to withstand summary judgment.  Id. at 649-54.

In its analysis of plaintiff's disability discrimination claim, the court of appeals addressed

"regarded as" disability in the context of an alleged 100% healed policy.  The court of appeals

first noted that the plaintiff in that case proceeded on the theory that her employer regarded her as

substantially limited in the major life activity of working.  Id. at 650.  The court of appeals noted:

> In a "regarded as" case, "it is necessary that a covered entity
> entertain misperceptions about the individual – it must believe . . .
> that one has a substantially limiting impairment when, in fact, the
> impairment is not so limiting. These misperceptions often 'resul[t]
> from stereotypic assumptions not truly indicative of ... individual
> ability.' "

Id. (quoting Sutton v. United Airlines, Inc., 527 U.S. 471, 489 (1999) (quoting 42 U.S.C. §

12101(a)(7)); citing Plant v. Morton Int'l Inc., 212 F.3d 929, 938 (6th Cir.2000)).  The court of

appeals noted that the major life activities involved in Henderson included lifting and working,

and in particular the ability to lift, bend, and stoop, commenting that "working," is "particularly

problematic category for courts," and "[w]here possible, it is preferable to identify another more

specific impairment before considering ability to work."  Id. (citing Sutton, 527 U.S. at 491-93;

McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369, 371 (6th Cir.1997)).

The court of appeals, however, acknowledged that the alleged 100% healed rule in

Henderson implicated the ability to work and required the court to focus on the major life activity

of working:

> [The defendant's] "100% healed rule" purports to concern the
> ability to work, linking other physical impairments to this ability,

144

> and requiring us to focus on whether [the defendant's] perception
> of [the plaintiff] was such that they misperceived or treated her
> physical restrictions as substantially limiting her ability to work
> when in fact they were not substantially limiting.

Id. (citing Plant, 212 F.3d at 938).

The court of appeals further noted that Sutton required that in order to be "regarded as"
disabled in the major life activity of working, an individual must be regarded as precluded from
more than a particular job.  Id. (citing Sutton, 527 U.S. at 491).  The court of appeals
distinguished Hutchinson v. United Parcel Serv., Inc., 883 F.Supp. 379 (N.D.Iowa 1995), on these
grounds, noting that in Hutchinson the district court, although it considered the alleged 100%
healed rule at issue in that case against UPS to be "outrageous," determined that the employee in
that case had only shown that UPS believed her to be incapable of the "narrow task of lifting
'between 30 and 70 pounds;'" while in Henderson, the plaintiff had presented evidence including
the testimony of her plant manager that "there is not a job in the plant that her restrictions would
not bump into," which implicated a broader range of jobs.  Id. at 651 (quoting Hutchinson, 883
F.Supp. at 395-96).

The court of appeals ultimately held that in Henderson there was enough of an issue to go
to trial on plaintiff's regarded as theory of disability discrimination:

> Where the 100% rule is applied to mildly impaired persons to
> exclude them from a broad class of jobs, it may be treating them as
> disabled even if they are not, thereby qualifying them for protection
> under the ADA and parallel statutes, and activating the individual
> assessment rule.

Id. at 653.  The court noted, however, that "[t]he variability of the impairment-relevant job
requirements within the business applying the 100% rule is thus important, because it indicates

the breadth of the class the employer perceives when the employer applies the rule." Id.[85]  This

court at this stage is not making any findings or conclusions  with respect to whether the alleged

100% healed policy in this case constitutes unlawful discrimination.  Whether plaintiffs can prove

their "regarded as" theory of discrimination in this case with respect to the 100% healed policy

and the other policies in the lawsuit that are certified, however, presents an additional common

issue in this case.[86]

    **b. The Other Reasonable Accommodation Policies Claims**

        **(i) Implementation of the Formal ADA Compliance Policy**

The court finds that Rule 23(a)'s commonality requirement has been met with respect to

whether UPS's implementation of its formal ADA compliance policy violates the ADA.  There

are common issues of fact and law with respect to what the formal policies consist of, the extent

of management personnel being trained in the formal policies, and whether the formal policies are

lawful or not.  The evidence relating to this claim – in particular, the contents of the Manual and

the notorious ten-step process much-reviled by plaintiffs and much-vaunted by defendant – is

summarized in detail above and will not be recounted again.  Suffice it to say that the court finds

---

[85]In the accompanying footnote the court of appeals commented:
    Hence if the employer had only a set of relatively physically
    demanding jobs available and prevented a plaintiff from working
    these jobs, the employer would not necessarily be "regarding" the
    plaintiff as disabled, even if the plaintiff could show that the
    excluded employment was in fact within his capacities. . . .
247 F.3d at 653 n.6.

[86]As noted previously, plaintiffs need to show that a wide-spread discriminatory policy
exists, but not that the 100% healed policy was applied all the time.  See note 76 infra.

that plaintiffs have adduced evidence that commonality has been met with respect to their claim challenging the implementation of UPS's formal ADA compliance policies.

The court notes that much of the evidence relevant to this claim and UPS's defense overlaps with the evidence that UPS will rely upon in order to refute the allegation that the 100% healed policy is standard operating procedure at UPS.  In addition, evidence presented by UPS in defense of its formal ADA compliance policy supports a finding of commonality in light of UPS itself directing the court to common issues that can be raised in defense of the policy and its implementation – for example, defendant's arguments that the procedure complies with the ADA's statutory and regulatory framework by requiring information from health care providers to be limited to what is allowable under the law and the procedure comports with the law in not considering accommodation requests where an employee has failed to provide information.  At the merits stage of this litigation, as opposed to the certification stage, plaintiffs can attack, for example, Step 3 of the process and defendant can defend it.  In light of the commonality prong of Rule 23(a) requiring only that the named plaintiffs share at least one question of fact or law with the grievances of the prospective class, and in light of the court's finding that plaintiffs can litigate their claims pursuant to the pattern-or-practice framework set forth in <u>Teamsters</u>, this is not a close call.

### (ii) Uniform Pretextual Job Descriptions

Plaintiffs allege that UPS uses uniform job descriptions that are pretextual in an effort to prevent UPS employees from receiving accommodations under the ADA.  For example, plaintiffs allege that a review of the job descriptions indicates that the ability to lift seventy pounds is an "essential job function" of virtually every job in the country, citing the deposition of Robert Lee

147

("Lee Dep.") at 12-13.  See Lee Dep., Plaintiff's Appendix of Depositions in support of Motion

for Class Certification ("Pls.' Dep. App."), Tab 14 (indicating that the only union job he could

think of that did not require lifting over 70 pounds was the "small sorter position," for which there

are no full-time positions).  Plaintiffs also argue that supervisors are not supposed to handle

packages, and yet the essential job functions for "preload supervisors," for example, include the

requirement that an employee be able to lift seventy pounds.  See, e.g., Pls.' Dep. App., Tab 3

(Deposition of Scott Briggs) at 28-34.  Plaintiffs argue whether the essential functions in UPS's

written job descriptions are consistent with the way the jobs at UPS are actually performed, or

instead are a pretext for discrimination, is a common question of law that can be adjudicated on a

class-wide basis at the merits phase in this civil action if the class is certified.

UPS argues in opposition, however, that plaintiffs' counsel themselves have asserted that

determining actual job duties requires a case-by-case analysis of all the relevant circumstances

because, as the position descriptions themselves indicate, that they do not completely describe the

duties of any given position.  UPS Opp. App at 1746 (Feb. 28, 2003 Letter from Christian Bagin

to David McAllister).  In addition, UPS argues that this claim is "an irrelevant distraction"

because employees capable of lifting only ten or twenty pounds fall outside of the

protection of the ADA.  The court disagrees.  If the lifting requirement is generally imposed

without regard to the eventual needs of the relevant jobs, that lifting requirement could implicate a

violation of the ADA.  See Coneen v. MBNA America Bank, N.A., 334 F.3d 318, 326-29 (3d Cir.

2003) (discussing essential job functions in context of reasonable accommodations and being a

qualified individual with a disability; analyzing whether starting time of 8:00 a.m. was essential

job function for marketing manager) (citing Skerski v. Time Warner Cable Co., 257 F.3d 273,

148

276-81 (3rd Cir.2001) (analyzing whether climbing skills were essential job function for cable

technician); Deane v. Pocono Med. Ctr., 142 F.3d 138, 147-48 (3rd Cir.1998) (en banc)

(analyzing whether "frequent lifting of patients" was essential job function for nurse); 29 C.F.R.

pt. 1630, app. § 1630.2(n)).  Whether UPS has a company-wide policy of non-accommodation

based upon the use of job descriptions as a pretext for discrimination is a common question of law

that meets Rule 23(a)'s commonality requirement and, if it satisfies the other elements of Rule 23,

can be litigated in this lawsuit regardless of defendant's assertions.[87]

### (iii) Prohibiting Employees from Returning to Work With Restrictions and Preventing Use of Seniority Rights to Transfer Positions

With respect to this alleged challenged policy, the court finds that Rule 23(a)'s

commonality requirement has not been met.  Although the commonality requirement is "not a

high bar," and requires only that the named plaintiffs share at least one question of law or fact

with the grievances of the prospective class, with respect to these claims – while there may be

common issues of law at the most general level – plaintiffs have not directed the court's attention

to sufficient evidence that could support a finding of commonality with respect to an alleged

company-wide policy implicating these claims under an alternative theory of liability under the

ADA; rather, the evidence supports the more general challenge to the implementation of UPS's

formal ADA compliance policies.

These claims represent general allegations of multiple individual experiences of alleged

discrimination.  These experiences might be relevant in this case as evidentiary support for

---

[87]If this claim otherwise satisfies Rule 23, plaintiffs will need to refine whether they are challenging the use of these job descriptions as alternative violations of the ADA or relying on this policy as evidentiary support for the challenge to UPS's overall formal ADA compliance policy.

plaintiffs other pattern-or-practice claims which satisfy commonality – such as the existence of

the alleged 100% healed policy or the implementation of UPS's formal ADA compliance

procedures in violation of the ADA – but plaintiffs have not directed this court to evidence

specific to this policy adduced during class discovery that supports a finding that commonality has

been met with respect to a company-wide pattern-or-practice of the activities alleged in these

claims.  The court cannot discern that sufficient evidence exists to support commonality with

respect to a "pattern or practice of discrimination" with respect to these claims, and thus,

certification of these claims for Rule 23 class action treatment is not warranted.

### (iv) Withdrawing of Accommodations Previously Provided and then Denying Requests for the Previously Provided Accommodations Claims

Similarly, Rule 23(a)'s commonality requirement is not met with respect to this alleged

challenged practice.  Either this claim is subsumed into plaintiffs' more general claim challenging

UPS's implementation of its formal ADA compliance policies or plaintiffs have not directed this

court to sufficient stand-alone evidence to support a finding of commonality with respect to a

company-wide policy of withdrawal of accommodations followed by denial of requests for

previously provided accommodations.  Evidence of this nature may be relevant to proving or

disproving the existence of the 100% healed policy and the nature and sufficiency of the

implementation of UPS's formal ADA compliance policies, but there is not sufficient evidence of

commonality for the court to certify a claim of an alleged policy of withdrawal of

accommodations followed by denial of previously provided accommodations for independent

classwide adjudication on these grounds.

**c. Retaliation Claims**

With respect to the retaliation claims alleged by plaintiffs, the court finds that the commonality requirement cannot be met.  Plaintiffs failed to direct the court to sufficient evidence of Rule 23(a) commonality regarding their claims that UPS engages in a pattern or practice of retaliation  against individuals who seek reasonable accommodations.  See Selwood, 2004 WL 1946379 at *3.  Myriad individual issues prevent certification of the pattern-or-position retaliation claim alluded to by plaintiffs in this case.  Plaintiffs devote relatively little of the argument in the briefing in support of certification of the retaliation claim vis á vis the other claims in the case.

Beyond multiple individual allegations of retaliation peppered throughout the anecdotal evidence submitted by plaintiffs for the court to review and compile, there is little, if any, evidence that plaintiffs direct to the court's attention in the record that is suggestive of a company-wide policy of retaliation that implicates common issues of fact or law.  With respect to these claims, individual issues, not common issues, control disposition of whether class action treatment is appropriate.  Indeed, there is little in common among the multiple allegations of retaliation beyond the bare assertion of a policy of retaliation and the commonality of the legal elements required to state an individual claim of retaliation.  Merely asserting a "policy" of something provides the court with insufficient grounds to make a finding of commonality sufficient to meet Rule 23(a).  It is unclear that there is any evidence that plaintiffs adduced during class discovery that could support common issues of fact with respect to a pattern-or-practice of retaliation.  For this reason, the court finds that classwide adjudication of plaintiffs' retaliation

claims under the ADA is not appropriate.  Regardless of other Rule 23(a) and (b) requirements, the court will not certify the retaliation claim for class treatment.[88]

### d. Summary of Commonality Findings

The court, therefore, finds that plaintiffs have adduced evidence sufficient for the court to find that the Rule 23(a) commonality is met with respect to the 100% healed policy claim, the implementation of the formal ADA compliance policy claim, and the use of uniform pretextual job descriptions claim.  The court finds that commonality is not met with respect to the prohibiting employees from returning to work with restrictions and using seniority rights claim and the withdrawal of accommodations claim because those claims are either subsumed into the more general implementation claim or plaintiffs failed to adduce sufficient evidence to support a finding of commonality with respect to a company-wide policy relating to those claims.  The court finds that commonality is not met with respect to the retaliation claim because those claims lack sufficient evidentiary support to implicate commonality on a classwide basis.  The court will proceed to analyze the remaining claims with respect to the other Rule 23 requirements.

### 3. Typicality

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed.R.Civ.P. 23(a)(3).  It has been noted that "[t]he concepts of commonality and typicality are broadly defined and tend to merge" and both seek to assure that the interests of absentees will be fairly and adequately represented.  Baby Neal, 43 F.3d at 56

---

[88]The court notes briefly that even if plaintiffs could meet Rule 23(a) commonality, they could not meet Rule 23(a) typicality or Rule 23(b)(2)'s requirement that defendant acted towards plaintiffs on "grounds generally applicable to the class" with respect to the retaliation claims. Rule 23(b)(2) certification of the retaliation claim is not available on the facts adduced during class certification discovery in this case.

(citing 7A CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1764, at 247 (1986)); see In re Community Bank, 418 F.3d at 303.  Neither commonality nor typicality, however, mandates that all putative class members share identical claims.  In re Community Bank, 418 F.3d at 303; Baby Neal, 43 F.3d at 56.  Moreover, despite their similarity in seeking to protect the interests of absentees, commonality and typicality are distinct requirements.  Baby Neal, 43 F.3d at 56.  Where commonality evaluates the sufficiency of the class, typicality evaluates the sufficiency of the named plaintiff.  Id. (citing Hassine v. Jeffes, 846 F.2d 169, 177 n.4 (3d Cir. 1988).[89]

Typicality assesses whether the named plaintiff has incentives that are aligned with those of absent class members so as to assure that the absentees' interests will be fairly represented by the named plaintiff.  Baby Neal, 43 F.3d at 57.  "The typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the named absentees."  Id.  Typicality, it has been explained, entails an inquiry whether the named plaintiff's individual circumstances are markedly different, or the legal theory upon which the named plaintiff's claims are based is different from one upon

---

[89]The court in Baby Neal noted further that:
> We underscore at the outset that neither [typicality nor commonality] mandates that all putative class members share identical claims, and that factual differences among the claims of the putative class members do not defeat certification.

Id. at 56; see Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir. 1985) (certifying securities fraud class action despite differences in injuries); Troutman v. Cohen, 661 F.Supp. 802, 811 (E.D.Pa. 1987) (certifying subclass of 1,973 nursing home patients challenging reductions in levels of nursing care designations over commonality and typicality objections "because it is not the unique facts of the individual appeals which give rise to this action but rather the decision making process").

which the claims of other class members will be based.  Id. (citing Hassine, 846 F.2d at 177;

Eisenberg, 766 F.2d at 786).

Inquiries related to typicality ask whether the named plaintiffs' individual circumstances

are different from that of absentees and whether the plaintiffs' legal theory is different from that of

absentees.  Yet, as the United States Court of Appeals for the Third Circuit explained with respect

to typicality in Baby Neal, even claims marked by factual differences in injury, but in which the

same course of conduct gives rise to claims based upon the same legal theory, are not necessarily

rendered atypical by virtue of those factual differences:

> Commentators have noted that cases challenging **the same
> unlawful conduct** which affects both the named plaintiffs and the
> putative class usually satisfy the typicality requirement
> **irrespective of the varying fact patterns underlying the
> individual claims**. . . . **Actions requesting declaratory and
> injunctive relief to remedy conduct directed at the class clearly
> fit this mold.**
>
> [F]actual differences will not render a claim atypical if the claim
> arises from the **same event or practice or course of conduct** that
> gives rise to the claims of the class members, and if it is **based on
> the same legal theory**.. . . . Indeed, even relatively pronounced
> factual differences will generally not preclude a finding of
> typicality where there is a strong similarity of legal theories.
> **Where an action challenges a policy or practice, the named
> plaintiffs suffering one specific injury from the practice can
> represent a class suffering other injuries, so long as all the
> injuries are shown to result from the practice. . . .**

43 F.3d at 58 (internal citations and quotations omitted) (emphasis added).

Here, plaintiffs argue Rule 23(a)'s typicality requirement is easily met because the named

plaintiffs allege legal theories shared by each putative class member – that UPS's

unacknowledged de facto 100% healed policy as well as the practices involved in implementing

its acknowledged formal policies and the pretextual job descriptions violate the ADA.  Plaintiffs

argue that their incentives are aligned with those of absent class members because they are

challenging policies or practices to which all putative members of the class were subjected.  In

addition, plaintiffs rely on the decision of the court of appeals in Baby Neal for the proposition

that where, as here, "defendant's conduct is central to the claims of all class members irrespective

of their individual circumstances and the disparate effects of their conduct," typicality is met.

Baby Neal, 43 F.3d at 57-59.  Plaintiffs acknowledge that the provision of a reasonable

accommodation is an individualized inquiry; but argue that a challenge to UPS policies and

practices does not require individualized proof under the Teamsters pattern-or-practice framework

to establish liability.[90]

Defendant contends that ADA cases rarely satisfy the typicality requirement because the

statute mandates a detailed, individualized analysis of an individual's circumstances and

characteristics.  Defendant cites cases such as Lintemuth v. Saturn Corp., No. 1:93-0211, 1994

WL 760811 (M.D. Tenn. Aug. 29, 1994), in support:

> The variance in the named plaintiffs' personal characteristics,
> coupled with the individualized, case-by-case analysis required by
> the ADA, renders the proposed representatives . . . unable to
> establish the necessary elements of the claims of the class in the
> course of establishing their own.  Furthermore, the highly personal
> nature of each representative's disability also subjects their claims
> to unique defenses under the ADA which are significant enough to
> destroy typicality.
>
> *   *   *

---

[90]This reasoning may not apply with equal force if plaintiffs seek individual monetary
damages.  The court, however, will not certify the class for compensatory or punitive damages.

> The ADA mandates that the determination of what hardship is
> undue entails a close analysis of each plaintiff's disability, the
> extent to which their disability affects their ability to perform the
> duties of the position desired, and the reasonable accommodation
> requested.  Thus, even though the representatives are classified
> with the same types of disabilities as the class, the ADA's
> case-by-case approach provides Saturn with a unique defense
> applicable to each representative, rendering their claims atypical of
> the claims of the class.

1994 WL 760811, at *4; see McClendon v. Sch. Dist. of Phila., Civ. A. No. 04-1250, 2005 WL 549532, at *1, 3-4 (E.D. Pa. Mar. 7, 2005) (Individuals with Disabilities Education Act). In Lintemuth, however, the district court determined that, because typicality applies not only to the characteristics of a representative's claims, but also to defenses applicable to that claim, and because the plaintiffs' allegations in that case regarding the failure to make reasonable accommodations were highly variable, class certification was inappropriate.  Id. at *3.

The plaintiffs in Lintemuth, unlike plaintiffs here, did not allege or substantiate for the purposes of Rule 23 a company-wide policy or practice of non-accommodation or make allegations that implicate a "regarded as" disability due to the effect of the policies in issue.  Other decisions cited by UPS are distinguishable because they did not proceed under the pattern-or-practice framework set forth in Franks, Teamsters, and Cooper or did not set forth a cohesive pattern-or-practice suitable for classwide adjudication, see, e.g., Jones v. GPU, Inc., 234 F.R.D. 82 (E.D.Pa. 2005)(race-based disparate treatment case; class certification denied in part because plaintiffs could not establish typicality; noting that plaintiffs could not satisfy Falcon's requirement showing that they suffered the same discrimination at the hands of a company-wide policy), or because the analysis of typicality in a pattern-or-practice case differed from this case,

see, e.g., Sokol v. New United Mfg., Inc., 1999 WL 1136683 (N.D.Cal. September 20, 1999)(denial of motion for class certification in ADA case where plaintiff employees challenged employers policies because the court found typicality was not met).

In Sokol, the district court noted that "[c]ourts have been cautious to certify disability discrimination claims as class actions due to the individualized determinations required by such claims." Id. at *4 (citing Mantolete v. Bolger, 767 F.2d 1416, 1425 (9th Cir. 1985); Chandler v. City of Dallas, 2 F.3d 1385, 1396 (5th Cir. 1993); Davoll v. Webb, 160 F.R.D. 142, 143 (D.Colo. 1995); Lintemuth, 1994 WL 760811, *4 (M.D.Tenn. 1994)).  The court in Sokol, however, did recognize that "[t]he need for individualized determinations, however, has not precluded class actions based on claims of disability discrimination." Id. at *5.  "Courts have certified class actions in the ADA/Rehab Act context where the challenged conduct is a specific policy that allegedly discriminates in a broad-based manner against class members."  Id. (citing, among others, Guckenberger v. Boston University, 957 F.Supp. 306, 325-327 (D.Mass. 1997); Hendricks-Robinson v. Excel Corp., 164 F.R.D. 667 (C.D.Ill. 1996); Wilson v. Pennsylvania State Police Dept., 1995 WL 422750 (E.D.Pa. 1995); Kimble v. Hayes, 1990 WL 20208 (E.D.Pa. 1990))(emphasis added).

The court distinguished the facts in Sokol from the factual backgrounds in those decisions certifying class actions in the ADA context because the court reasoned that while the alleged policies in those decisions were formal written policies that were easily identifiable and uniformly applied, the alleged de facto policies at issue in Sokol – including refusing to consider the possibility of tool and assembly line modifications as reasonable accommodations and a policy, practice and administrative method of using personnel who lack qualifications to determine and

157

provide appropriate reasonable accommodations for employees with disabilities – were not.  Id. Assuming that the reasoning of Sokol is correct, Sokol is distinguishable from this case.  In this case, the implementation of UPS's formal ADA compliance policies and the use of job descriptions implicate easily identifiable formal written policies.  With respect to the alleged 100% healed policy claim, significant evidence related to the existence of the policy was adduced during class discovery and makes identification of this policy less problematic.  It is clear what the alleged 100% healed policy claim challenges – questions related to whether it exists and whether it was uniformly applied implicate a merits inquiry, not the issue of typicality.

In addition, UPS argues that Hohider and DiPaolo are atypical for a variety of reasons — largely because UPS argues that they are not qualified individuals under the ADA.  Plaintiffs respond that Hohider and DiPaolo are qualified individuals under the ADA because they are either "disabled," "regarded as disabled," or otherwise entitled to protection under the ADA.  The court finds for the purposes of Rule 23(a)'s typicality analysis that plaintiffs have adduced sufficient evidence for the court to find for the purposes of Rule 23 that plaintiffs' claims are typical of the class with respect to the remaining putative class claims implicating the alleged 100% healed policy, implementation of the formal ADA compliance policy, and the use of uniform pretextual job descriptions.  Merely alleging a pattern-or-practice is not sufficient to satisfy Rule 23's typicality requirement; where evidence, however, is adduced in support of a common policy or practice that has been identified in detail, and plaintiffs like potential class members make typical complaints concerning the effects of that policy, typicality can be met.  Here, the evidence discussed above shows that plaintiffs' claims concerning UPS's policies are typical of the class with respect to the pattern-or-practice claims implicating the alleged 100% healed policy, the

158

implementation of UPS's formal ADA compliance policy, and the use of allegedly pretextual job descriptions.[91]  Moreover, plaintiffs assert they are regarded as disabled and that allegation, especially under the 100% healed policy, would be typical of the class members.  See Henderson, 247 F.3d 645.  The question whether plaintiffs are qualified individuals under the ADA more directly affects plaintiffs' adequacy as class representatives.[92]

In addition, UPS challenges Hohider as atypical because his grievance challenging UPS's denial of his request for an ADA accommodation proceeded to arbitration and resulted in a finding that UPS had engaged in good faith in the interactive process with respect to Hohider.  In addition, UPS challenges Hohider as atypical because when his work restrictions evolved he was no longer substantially limited in a major life activity.  UPS challenges DiPaolo because at some point after denial of his request to return to work his doctor opined that he was unable to work and because UPS argues that he is subject to unique mitigation defenses.  In addition, UPS challenges Branum as atypical because he alleges only harassing conduct.  These issues do not defeat typicality because, at a minimum, plaintiffs' arguments that they are regarded as disabled would be typical of the other putative class members.  These issues go more directly to plaintiffs' adequacy as class representatives and to the weight of plaintiffs' evidence in proving their allegations at the merits stage of litigation.

---

[91]Defendant's arguments that individualized issues predominate and each named plaintiff's claim implicates unique defenses fail in light of the court's finding that plaintiffs can litigate these claims challenging alleged company-wide policies pursuant to the pattern-or-practice framework.

[92]See Bates, 465 F.3d at 1077 (recognizing that to maintain private-plaintiff ADA class action, the named plaintiffs needed to establish that at least one named plaintiff was "qualified" in order to have statutory standing to bring a lawsuit under the ADA) (citing Melendez v. Ill. Bell Tel. Co., 79 F.3d 661, 668 (7th Cir. 1996)).

### 4. Adequacy

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." FED.R.CIV.P. 23(a)(4).  The adequacy requirement, thus, primarily addresses the sufficiency of the named plaintiffs.  As the United States Court of Appeals for the Third Circuit explained, "[a]dequacy of representation assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." Baby Neal, 43 F.3d at 55; see New Directions Treatment Services v. City of Reading, No. 05-4355, __ F.3d __, 2007 WL 1720105 at *13 (3d Cir. June 15, 2007) ("We have held that '[a]dequate representation depends on two factors:  (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'")(quoting Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975)); In re Community Bank, 418 F.3d 277, 303 (3d Cir. 2005)(The adequacy requirement thus "encompasses two distinct inquiries designed to protect the interests of absentee class members: 'it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees' [interests], and it tests the qualifications of the counsel to represent the class.'") (quoting In Re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 800 (3d Cir. 1995)); Hassine v. Jeffes, 846 F.2d 169, 179 (3d Cir. 1987) ("The inquiry that a court should make regarding the adequacy of representation requisite of Rule 23(a)(4) is to determine that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class.").

160

Plaintiffs have the burden of proving that the prerequisites for a class action are met, and the initial burden to adduce evidence to support a finding that they will fairly and adequately protect the interests of the class.   As to adequacy, however, traditionally and "in most cases, adequate representation presumptions are usually invoked in the absence of contrary evidence by the party opposing the class." ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 7:24 (4th ed. 2002).  More specifically:

> On the issue of no conflict with the class, one of the tests for adequate representation, the presumption fairly arises because of the difficulty of proving negative facts.  On the issue of professional competence of counsel for the class representative, the presumption fairly arises that all members of the bar in good standing are competent.  Finally, on the issue of intent to prosecute the litigation vigorously, the favorable presumption arises because the test involves future conduct of persons, which cannot be prejudged adversely.
>
>  . . . .
>
> If there are any doubts about adequate representation or potential conflicts, they should be resolved in favor of upholding the class, subject to later possible reconsideration, or subclasses might be created initially.  Alternatively, notice should be sent to the class inviting others to come in as additional class representatives.

Id. (citations omitted).

In light of the 2003 amendments to Rule 23, however, and in particular in light of new subdivision (g) ("Class Counsel") which "guide[s] the court in assessing proposed class counsel," FED.R.CIV.P. 23 2003 Adv. Comm. Notes, the court must examine the factors set forth in Rule 23(g) in order to assess adequacy under Rule 23(a)(4).  Id. ("Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in

161

assessing proposed class counsel as part of the certification decision.").  Rule 23(g) provides in

relevant part:

> **(1) Appointing Class Counsel.**
>
> (A) Unless a statute provides otherwise, a court that certifies a
> class must appoint class counsel.
>
> (B) An attorney appointed to serve as class counsel must fairly and
> adequately represent the interests of the class.
>
> **(C) In appointing class counsel, the court**
>
> **(i) must consider:**
>
> > **• the work counsel has done in identifying or
> > investigating potential claims in the action,**
> >
> > **• counsel's experience in handling class actions, other
> > complex litigation, and claims of the type asserted in the action,**
> >
> > **• counsel's knowledge of the applicable law, and**
> >
> > **• the resources counsel will commit to representing the
> > class;**
>
> **(ii) may consider any other matter pertinent to counsel's ability
> to fairly and adequately represent the interests of the class;**
>
> (iii) **may direct** potential class counsel to provide information on
> any subject pertinent to the appointment and to propose terms for
> attorney fees and nontaxable costs; and
>
> (iv) may make further orders in connection with the appointment.

FED. R. CIV. P. 23(g)(1)(emphasis added).

In this case, the court concludes that plaintiffs have met Rule 23(a)(4)'s adequacy

requirement.

### a. Class Counsel

First, with respect to plaintiffs' counsel, Scott + Scott, LLC, Wienand & Bagin, and Equal

Justice Foundation, the court finds that plaintiffs' counsel have met the requirements set forth in

Rule 23(g).  The court notes that an attorney appointed to serve as class counsel must fairly and

adequately represent the interests of the class.  Plaintiffs' counsel have considerable combined

experience in the areas of employment law and class action practice.  See Pls.' Ex. App., Tab 64

(Declaration of Anita Meley Laing ("Laing Decl."); Firm Profile of Scott+Scott, LLC); Tab 65

(Declaration of Bruce Bagin ("Bagin Decl."); Curriculum Vitae of Bruce Bagin, Christian Bagin,

and Jerry W. Wienand).  For example, Ms. Laing of Scott+Scott, LLC, has extensive experience

litigating employment discrimination class actions and class actions in a variety of other areas of

substantive law, including class actions certified in the Western District of Pennsylvania.  Laing

Decl. ¶¶3-4.  The attorneys of the law firm of Scott+Scott, LLC, have extensive litigation

experience and have successfully prosecuted class actions in the past.  Id. ¶¶  5-6.  The law firm of

Wienand & Bagin focuses on employment discrimination law.  Bagin Decl. ¶¶ 3-8.  Defendant

does not seriously challenge the combined litigation experience of these attorneys or the attorneys

of the Equal Justice Foundation who have also entered an appearance and assisted in the case.

In this case, considering the substantial amount of work that plaintiffs' counsel have done

in identifying or investigating potential claims in the action as evidenced by the investigation,

discovery, and briefing heretofore and reflected by the voluminous record in this case,

considering the experience of plaintiffs' counsel in handling class actions, other complex

litigation, and employment discrimination claims as set forth in the declarations attached to the

motion for certification, considering the apparent knowledge of plaintiffs' counsel concerning the

applicable law, and considering the considerable resources that counsel have already committed to

representing the class, the court finds that plaintiffs' counsel meet the requirements of Rule 23(g).

Plaintiffs' counsel have demonstrated sufficient professional competence to represent the class if

the court finds that certification is appropriate.

### b. Plaintiffs' Adequacy

With respect to the named plaintiffs, the court finds that the named plaintiffs' interests are sufficiently aligned with the class, there is no evidence to suggest that their interests are antagonistic to the class, and the court finds no reason why they will not vigorously pursue these claims on behalf of the class.  A few issues raised concerning the adequacy of the named plaintiffs, however, deserve closer attention.

First, defendant challenges Hohider's credibility, alleging that he attempted to substantively alter material portions of his testimony under the guise of making corrections under Federal Rule of Civil Procedure 30(e); challenges DiPaolo's credibility and alleged "gross bad faith" in allegedly avoiding alternative employment; and challenges Branum as adequate alleging that his claims of individualized harassment are "off point" to the claims of the class.  The credibility challenges do not rise to the level of defeating adequacy.  They go to the weight of the named plaintiffs' individual experiences in proving the alleged de facto 100% healed policy, the implementation of the formal written policy in violation of the ADA, and the pretextual job descriptions claim.  As to Branum's alleged individualized harassment making him inadequate, the court has already determined that the retaliation claims will not be certified.  The fact that plaintiffs each exhibit somewhat individualized circumstances relating to UPS's ADA procedures does not, without more, make them inadequate in a case implicating the pattern-or-practice framework of proof.  As discussed, individual circumstances will of necessity be relevant in proving or disproving the existence of a pattern or practice.  In addition, the court has the ability

to permit the substitution of named representatives if these issues are shown to be so serious as to make named plaintiffs inadequate.

Second, defendant challenges named plaintiffs' adequacy because defendant argues that the named plaintiffs are not qualified individuals with disabilities entitled to reasonable accommodation under the ADA.  Plaintiffs reply that at the merits stage they can show that they are either disabled or regarded as disabled and therefore entitled to the ADA's protections.  In addition, plaintiffs argue that, because they seek to proceed under the pattern-or-practice framework of proof, they need not prove that each member of the class is substantially limited in order to prove that the challenged policies exist and are illegal under the ADA.

Plaintiffs are correct that, under the pattern-or-practice framework, at the initial liability stage, plaintiffs need not prove that each member of the class was a qualified individual with a disability or individually entitled to reasonable accommodation.  Some courts, however, have required named plaintiffs – at least in order to have standing to assert an ADA claim alleging an illegal policy and to represent the class adequately – to establish that they are qualified individuals within the meaning of the ADA at the certification stage.  Here, for the purposes of establishing adequacy, plaintiffs adduced sufficient evidence either that they will be able to show that they are disabled, or that defendant regarded them as disabled, at the merits stage in order for them to be adequate to represent the class at this stage.

For example, plaintiff Hohider was hired in 1986 at UPS as a part-time loader/unloader at UPS's New Stanton, Pennsylvania, facility and over the years worked part-time at UPS in various positions including as a sorter, a loader, and a driver.  Pls.' Decl. App., Tab H ("Hohider Decl.")

165

¶¶1-3.  He injured his back at work on August 4, 1999, when a vehicle he was operating was struck from behind.  Id. ¶ 6.  He sustained a back injury that was later diagnosed to be disc herniation with left leg radiculopathy.  Pls.' Ex. App., Tab 57 (August 24, 2000 Independent Medical Examination Report by Dr. Jack Smith) at 2.  He attempted to return to work subject to restrictions but was unable to return to work.  See, e.g., Hohider Decl. ¶6; Pls.' Ex. App., Tab 58 (November 12, 1999 Letter from Linda Mayers, UPS Human Resources)("Although Mr. Hohider was released to light duty work on October 13, 1999, there is currently no work available within the restrictions placed upon Mr. Hohider by the doctor.").  He received workers' compensation in connection with the injury.  See Pls.' Ex. App., Tab 54 (August 31, 2000 Letter from Albert Sarokin, Senior Case Manager, Liberty Mutual).  He attended a meeting at UPS regarding the possibility of returning to work subject to ADA accommodations sometime after January 2001, claims that he identified several jobs he could do, but that management only discussed whether he could return to a package car position  which he claims they knew was outside his restrictions, which were at some point light duty but ultimately determined to be medium duty.  Hohider Decl. ¶6.  The actions of UPS with respect to Hohider implicate the policies in issue and if at the merits stage they are proven to exist would implicate that Hohider was regarded as disabled.  See Henderson, 247 F.3d 645.

Plaintiff DiPaolo was hired as a part-time employee in the position of loader / unloader at UPS's Beaver Avenue hub in Pittsburgh, Pennsylvania, in 1972 and went to the New Stanton, Pennsylvania facility in 1977 and became a full-time package car driver in 1978.  See Pls.' Decl. App., Tab D ("DiPaolo Decl.") ¶2.  He suffered an on-the-job injury in April 1997, was unable to perform the job of package car driver, and worked that summer in jobs consistent with his

166

restrictions.  Id. ¶2.  He was diagnosed with a progressive neurological disorder, reflex sympathetic dystrophy, "a chronic condition characterized by severe burning pain, pathological changes in bone and skin, excessive sweating, tissue swelling, and extreme sensitivity to touch." Id.  He was given a medical release with restrictions by his doctor, has bid on available positions at UPS, but has been refused to return to work.  Id. ¶¶2-4.  His request to meet with someone at UPS about identifying a job that he could do was denied.  Id. ¶5.  He claims that it is well-known at UPS that the company will not allow workers who have any work restrictions to return to work – and it's called a "full 100% release policy."  Id. ¶6.  He claims that this policy was openly stated by UPS management at grievance meetings and workers' compensation proceedings.  Id.  The actions of UPS with respect to DiPaolo implicate the policies in issue and if at the merits stage they are proven to exist would implicate that DiPaolo was regarded as disabled.  See Henderson, 247 F.3d 645.

Plaintiff Branum worked at UPS beginning in 1981 as a mechanic.  Pls.' Decl. App., Tab B, ("Branum Decl.") ¶1.  He is a veteran of the Vietnam War and suffers from Post-Traumatic Stress Disorder ("PTSD"), depression, and anxiety, as well as suffering from an on-the-job neck injury that required surgery in November 2004.  Id. ¶¶2-3.  He attempted to return to work after his neck injury but claims that he was told that he could not return to work unless he could resume his mechanic position without any medical restrictions.  Id. ¶3.  Prior to that, he had incidents at work related to his mental health issues which he describes as harassment.  Id. ¶¶4-24.  After several incidents at work related to stress and physical injuries, he underwent a physical examination and started working light duty on May 10, 2004.  Id. ¶24.  In September 2004, he was told that he had to go on workers' compensation because he was not permitted to work any more

days on light duty, and was told by a supervisor that he could not return to UPS until he was
"100%" and until he stopped taking medication for his PTSD.  Id. ¶25.  He has been off work on
workers' compensation ever since September 2004.  Id.[93]  The actions of UPS with respect to
Branum implicate the policies in issue and if at the merits stage they are proven to exist would
implicate that Branum was regarded as disabled.  See Henderson, 247 F.3d 645.

Plaintiffs argue that all three named plaintiffs are either disabled or "regarded as disabled"
under the ADA and are substantially limited in several major life activities, including that of
working.  Plaintiffs argue that the record demonstrates that UPS knew about the named plaintiffs'
conditions and regarded them as disabled as evidenced by UPS' refusal to permit Hohider and
DiPaolo to return to work, with or without accommodation.  The court finds that the evidence is
sufficient for the court to determine for the purposes of certification that plaintiffs are adequate to
bring this lawsuit and have statutory standing to sue under the ADA.  In addition, the court has the
ability to permit the substitution of the named representatives if the  issues raised by defendant are
shown to be so serious as to make named plaintiffs inadequate.

Finally, defendant argues that the fact that named plaintiffs are seeking monetary relief
including substantial compensatory damages calls their adequacy into question.  The court, as will
be discussed in more detail in the next section, will not permit any compensatory damages to be

---

[93]UPS argues that Branum is not typical or adequate as a named plaintiff in light of the
individualized instances of harassment he alleges against UPS.  As noted above, however,
plaintiff Branum also alleges he was told that he could not come back to work as a mechanic
unless he was "100%" – implicating the 100% healed policy claim.

part of the class relief and defendants' argument on that matter will not preclude a finding of adequacy.[94]

## B.  Rule 23(b)(2) Requirements

A court may certify a class pursuant to Rule 23(b)(2) only when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  FED. R. CIV. P. 23(b)(2).   Plaintiffs argue that Rule 23(b)(2) is satisfied in this case because they have adduced evidence of formal and informal company-wide policies pursuant to which UPS has acted or refused to act on grounds generally applicable to the class.  In addition, plaintiffs argue that final injunctive relief is appropriate with respect to the class as a whole.  UPS argues, however, that Rule 23(b)(2) certification is inappropriate because (1) the record of numerous accommodations precludes plaintiffs from establishing that UPS acted on grounds generally applicable to the class; (2) the putative class is not cohesive; and (3) plaintiffs' claims are primarily for monetary relief.

### 1.  Grounds generally applicable

With respect to defendant's first argument against Rule 23(b)(2) certification, plaintiffs respond that an evaluation of which party has presented more compelling statistical, anecdotal, and other evidence is a question that should be resolved at the merits stage and not the class

_____

[94]If a court allows the plaintiffs to seek compensatory damages in addition to declaratory and injunctive relief and back pay, a court may exercise its discretion under Rule 23(d) and require notice and opt-out.  Without requiring these procedural protections if compensatory claims are included as part of the damages, and perhaps in certain circumstances even in spite of them, a named plaintiffs' adequacy to represent all class members might be called into question.

certification stage.  Plaintiffs dispute defendant's evidence about its accommodations, arguing that UPS manipulates the process and the well-known 100% healed policy discourages some employees from ever requesting accommodation.  Without resolving this merits dispute, the court agrees with plaintiffs that many of these issues are best resolved at the merits stage of litigation. Plaintiffs produced sufficient evidence to show that UPS acted on grounds generally applicable to the class, making final injunctive relief or corresponding declaratory relief with respect to the class as a whole appropriate if there is a finding of liability.

To be certified under Rule 23(b)(2), plaintiffs must show in addition to the class meeting the prerequisites for certification under Rule 23(a) that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  FED. R. CIV. P. 23(b)(2).  In this case, in the putative class claims plaintiffs allege a de facto pattern or practice of requiring employees who return to work after injury or medical leave to be "100% healed" or have a full medical release.  They also challenge the implementation of UPS' formal written compliance policy.  The further challenge the use of uniform job descriptions as pretext for discrimination.  On these grounds, plaintiffs argue that they are challenging UPS for "act[ing] or refus[ing] to act on grounds generally applicable to the class. . . ."  FED. R. CIV. P. 23(b)(2).

Defendants argue that plaintiffs have not shown that UPS has acted in a manner generally applicable to the class as a whole because of the highly idiosyncratic circumstances surrounding individual requests for accommodation and because class discovery has established that UPS in fact made hundreds of job-related accommodations, and that hundreds of employees are in

170

fact working at UPS today after returning from disability-related absences.[95]   Moreover,

defendant correctly argues that retaliation claims for the most part involve inherently

individualized circumstances and not behavior by an employer acting on grounds generally

applicable to the proposed class.

On the record before the court, as discussed in detail above, the court finds that plaintiffs

have adduced sufficient evidence for the purposes of Rule 23(b)(2) that UPS has acted on grounds

generally applicable to the class, therefore making injunctive or declaratory relief appropriate if a

violation of the ADA were to be established with respect to the 100% healed policy claim, the

implementation of UPS's formal ADA compliance policy claim, and the use of uniform job

descriptions as a pretext for discrimination claim.  The court does not make a finding for merits

purposes whether the alleged de facto 100% policy exists or does not exist.  Nor does the court

make a finding that UPS implements its formal ADA compliance procedures in violation of the

ADA or in compliance with it.  Those are merits inquiries.  It is sufficient in order to certify a

class pursuant to Rule 23(b)(2) for the court to find that either UPS has acted on grounds generally

applicable to the class by <u>engaging</u> in the alleged de facto 100% healed policy or by <u>not engaging</u>

in the alleged de facto 100% healed policy; by implementing its formal ADA compliance

procedures <u>in violation of the ADA</u>, or by implementing them <u>in compliance with it</u>; or by

creating job classifications that are designed <u>without regard to essential job functions</u> to preclude

anyone from returning to work who could not lift seventy pounds, or by creating job

---

[95]Defendant also argues that these factors also undercut commonality and typicality
within the proposed class.

classifications that are designed <u>with regard to essential job functions</u>.

Assuming for the purposes of argument only that liability can be established, the final injunctive relief and corresponding declaratory relief that is sought with respect to the class as a whole relates to the claims that plaintiffs allege. The 100% healed policy claim, the implementation of UPS's formal ADA compliance policy claim, and the use of uniform job descriptions claim, litigated pursuant to the pattern-or-practice framework discussed in detail above, satisfy Rule 23(b)(2). While defendant argues plaintiffs have failed to substantiate these claims of uniform conduct, the court finds that for the purposes of Rule 23(b)(2) certification, plaintiffs adduced sufficient evidence that UPS acted on grounds generally applicable to the class with respect to these claims. Whether these claims can be substantiated for merits purposes is an entirely different matter.

**2. Cohesiveness**

UPS argues that the proposed class is not sufficiently cohesive, principally relying on the reasoning set forth in <u>Barnes v. American Tobacco Co.</u>, 161 F.3d 127 (3d Cir. 1998), and thus should not be certified as a class under Rule 23(b)(2). In <u>Barnes</u>, the court of appeals affirmed a district court's decertification of a Rule 23(b)(2) class of cigarette smokers alleging a single claim for medical monitoring against several defendant tobacco companies. Initially the plaintiffs in <u>Barnes</u> had moved for certification of a class to litigate claims that included negligence and strict products liability in addition to medical monitoring claims. <u>Id</u>. at 131. The district court found that those claims were not appropriate for Rule 23(b)(2) treatment because plaintiffs were seeking predominantly monetary relief and the district court also found that those claims were not

172

appropriate for Rule 23(b)(3) treatment because individual issues such as addiction and causation meant that the class action was not the superior method for adjudicating the controversy.  <u>Id</u>.  The district court, however, suggested that the request for court-supervised medical monitoring might be the "paradigmatic" request for injunctive relief under a medical monitoring claim and might be appropriate for Rule 23(b)(2) treatment.  <u>Id</u>.

The plaintiffs subsequently filed an amended complaint and sought certification of the class only for the medical monitoring claim.  <u>Id</u>. at 132.  The district court conditionally certified the class to litigate that claim under Rule 23(b)(2).  <u>Id</u>. at 133.  The defendants subsequently asked the court to certify the class certification order for interlocutory appeal or, in the alternative, to reconsider the order.  <u>Id</u>.  They also filed motions for summary judgment.  <u>Id</u>.  The district court denied the request to certify or reconsider the class certification order, but <u>decertified the class under Rule 23(c)(1)</u>, finding that three individual issues – addiction, causation, and affirmative defenses – precluded class certification.  <u>Id</u>. at 133-34.

On appeal, the court of appeals reviewed the district court's decertification, commenting that the crucial issue on appeal was whether the plaintiffs' medical monitoring claim required inquiry into individual issues.  <u>Id</u>. at 138.  After reviewing the elements required to prove a claim of medical monitoring under Pennsylvania law, the court of appeals explained its reasoning for affirming the district court's decertification of the class for this claim.  <u>Id</u>. at 138-49.  Defendant in this case cites the court of appeals' reasoning with respect to Rule 23(b)(2) issues, and the issue of cohesiveness, in <u>Barnes</u> in support of its argument that plaintiffs in this case cannot make out cohesiveness.  <u>Id</u>. at 142-43.

The court of appeals in <u>Barnes</u> analyzed the concept of "cohesiveness" in connection with its analysis whether the defendants had "acted or refused to act on grounds generally applicable" to the proposed class.  <u>Id</u>. at 142-49.  The court of appeals commented that while Rule 23(b)(2) class actions have no predominance or superiority requirements, "it is well established that class claims must be cohesive."  <u>Id</u>. at 143.  The court of appeals commented that district courts had discretion not to certify Rule 23(b)(2) classes where disparate factual circumstances made certification inappropriate and when significant individual issues would need to be litigated.  <u>Id</u>. The court of appeals held that the district court was correct that, in that case, too many individual issues existed with respect to addiction, causation,  affirmative defenses, and the statute of limitations for Rule 23(b)(2) certification to be appropriate.  <u>Id</u>. at 143, 143-49.

The discussion of cohesiveness in <u>Barnes</u>, however, does not create a separate requirement for Rule 23(b)(2) certification, but rather flushes out the meaning of "grounds generally applicable" and the appropriateness of Rule 23(b)(2) certification in the face of multiple individual issues of proof that control adjudication of a claim.  Issues related to cohesiveness, therefore, overlap with issues related to commonality, typicality, and whether the party opposing the class "acted or refused to act on grounds generally applicable to the class."  FED. R. CIV. P. 23(b)(2); <u>see</u> <u>Barnes v. Am. Tobacco Co.</u>, 176 F.R.D. 479, 488 (E.D.Pa. 1997), <u>aff'd</u>, 161 F.3d 127 (3d Cir. 1998) ("Thus, when a court determines whether the defendant 'has acted or refused to act on grounds generally applicable to the class,' the court is perforce examining whether the class is cohesive in nature.")(quoting FED. R. CIV. P. 23(b)(2)); <u>Wetzel</u>, 508 F.2d at 248.

In this case, where plaintiffs seek Rule 23(b)(2) certification to adjudicate their claims that certain of defendant's employment policies constitute a pattern or practice of discrimination under

the ADA, and where the court has reviewed the factual record and found that commonality,

typicality, and the Rule 23(b)(2) requirement that defendant treated plaintiffs on "grounds

generally applicable" to the class are met, defendant's reliance on Barnes and other cases

discussing cohesiveness and situations where individual issues preclude certification does not

change this court's analysis.  Barnes itself is distinguishable on the grounds that the court of

appeals was considering Rule 23(b)(2) certification in that case in the context of mass tort class

actions, see id. at 138-40, 142-32 (discussing, inter alia, In re Paoli Railroad Yard PCB Litig., 916

F.2d 829 (3d Cir. 1994) and Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)).  The court

of appeals specifically noted in Barnes that "[t]he (b)(2) class 'serves most frequently as the

vehicle for civil rights actions and other institutional reform cases that receive class action

treatment,' " id. at 142 (citing Baby Neal, 43 F.3d at 58-59), and "[i]ndeed, (b)(2) was 'designed

specifically for civil rights cases seeking broad declaratory or injunctive relief for a numerous and

often unascertainable or amorphous class of persons,' " id. (quoting 1 NEWBERG ON CLASS

ACTIONS § 4.11 at 4-39).  See Wetzel, 508 F.2d at 250 ("Thus a Title VII action is particularly fit

for (b)(2) treatment, and the drafters of Rule 23 specifically contemplated that suits against

discriminatory hiring and promotion policies would be appropriately maintained under (b)(2).").

Defendant's reliance on Barnes does not alter this court's analysis that Rule 23(b)(2) is met in this

case with respect to the 100% healed policy claim, the implementation of UPS's formal ADA

compliance policies claim, and the use of uniform pretextual job descriptions claim.

### 3.  Claims primarily for monetary relief

UPS's other main complaint – that this class action improperly seeks predominantly money damages – requires close scrutiny.  In plaintiffs' Hohider and DiPaolo's original complaint, they indicated that they sought certification pursuant to Rule 23(a) and Rule 23(b)(1), (b)(2), and (b)(3).  Compl. ¶19.  Subsequent filings with the court, and in particular plaintiffs' briefing in support of their motion for class certification, however, indicate that plaintiffs seek certification solely under Rule 23(a) and Rule 23(b)(2).  Defendant disputes that Rule 23(b)(2) certification is appropriate, arguing that plaintiffs seek predominantly monetary damages.  This court, therefore, as a threshold matter in the Rule 23(b) analysis, must determine whether plaintiffs can proceed under Rule 23(b)(2) in light of the relief that they seek.[96]

The text of the rule is clear that claims seeking declaratory or injunctive relief are appropriate for Rule 23(b)(2) certification.  The text of Rule 23(b)(2) is silent, however, as to what extent, if any, monetary relief may also be sought in a Rule 23(b)(2) class action.  The

---

[96]As recently noted by the United States Court of Appeals for the Third Circuit, there is a "conflict between certification under Rules 23(b)(1) and (b)(2) – which is binding on all class members – and under Rule 23(b)(3) – which allows class members to opt-out."  Beck v. Maximus, Inc.,  457 F.3d 291, 302 (3d Cir. 2006)(vacating class certification order under all categories of Rule 23(b) and remanding for the district court to reconsider class certification issues); see Richards v. Delta Airlines, Inc., 453 F.3d 525, 530 (D.C. Cir. 2006).  It is important, therefore, for a court considering certification to analyze certification in light of the appropriate Rule 23(b) category.  Some of the concerns requiring separate treatment of Rule 23(b)(3) class actions and Rule 23(b)(1) and (b)(2) class actions, however, may be alleviated by requiring notice and opt-out in the latter category even though these procedural matters and other procedural protections are not required by Rule 23.  See FED. R. CIV. P. 23 2003 Adv. Comm. Notes ("The first change made in Rule 23(c)(2) is to call attention to the court's authority  – already established in part by Rule 23(d)(2) – to direct notice of certification to a Rule 23(b)(1) or (b)(2) class. The present rule expressly requires notice only in actions certified under Rule 23(b)(3). Members of classes certified under Rules 23(b)(1) or (b)(2) have interests that may deserve protection by notice.").

Advisory Committee's Notes to Rule 23(b)(2) contemplate that Rule 23(b)(2) class actions may

be appropriate even if some monetary relief is sought:

> **This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate.** Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief. **The subdivision does not extend to cases in which the appropriate final relief relates exclusively or <u>predominantly</u> to money damages**. Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.

FED.R.CIV.P. 23(b)(2), 1966 Advisory Committee Notes (emphasis added). What is unclear from

the text of the rule and the Advisory Committee Notes, however, is what standard a district court

should apply to assess whether the "final relief relates . . . predominantly to money damages."

In this case, plaintiffs allege harm that includes pecuniary and nonpecuniary damages,

including, among other things, lost wages and benefits. Compl. ¶28. Accordingly, plaintiffs seek

relief that is declaratory and injunctive in nature as well as pecuniary damages. In their complaint,

plaintiffs seek the following relief:

> (A) Determining that this is a proper class action to be certified under Rule 23 of the Federal Rules of Civil Procedure;
>
> (B) Grant a permanent injunction enjoining Defendant, its directors, officers, employees, agents, successors, heirs, and assigns, and all persons in active concert or participation with them, from engaging in, ratifying, or refusing to correct, employment practices which discriminate in violation of the ADA . . . . ;

(C) Order Defendant to institute and implement, and individual Defendants to attend and/or otherwise participate in, training programs, policies, practices and programs which provide equal employment opportunities for persons with present, past, or perceived disabilities;

(D) Order Defendant to make Plaintiffs and the Class whole by providing appropriate back pay with prejudgment interest, in amounts to be proved at trial, reinstatement to positions consistent with their physical or mental abilities and restrictions having compensation, responsibility, and duties, commensurate with their education, experience, and skills;

(E) Order Defendant to remove and expunge, or cause to be removed and expunged, all negative, discriminatory, and/or defamatory memoranda and documentation from Plaintiffs' and the Class's records of employment;

(F) Award extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure;

(G) Awarding Plaintiffs and Class members all restitutionary and remedial relief;

(H) Awarding Plaintiffs and Class members pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs; and

(I) Award such other legal and equitable relief as the court deems appropriate and just.

Compl. ¶30(A)-(H).  Branum's consolidated complaint seeks similar relief.  See  Doc. No. 1 in

Civil Action No. 04-1686 at ¶31(A)–(I).  The complaint thus specifically identifies injunctive and

equitable relief, but also seeks catch-all relief in the form of "all other legal and equitable relief as

the court deems appropriate and just."

Defendant submitted plaintiffs' Rule 26(a)(1) initial disclosures,  in which plaintiffs

indicated that they "will seek the following classes of relief: lost wages and benefits, front pay and

benefits, out of pocket expenses, reasonable attorneys fees and costs, compensatory damages,

liquidated damages, additional payment to offset the negative tax consequences of receiving a large payment in a single year, and interest at the legal rate."  UPS. Opp. App. at 1733 (emphasis added).  Plaintiffs further disclosed that the lost wages of Hohider and DiPaolo in present figures total approximately $250,000.00 and $402,000.00 respectively, and that "[i]n the event the court finds UPS' discriminatory and retaliatory animus to be so great that reinstatement is not possible, Plaintiffs will seek equitable relief of front pay in lieu of reinstatement for five years lost wages." Id.  Further, plaintiffs estimate that "[c]ompensatory damages are calculated at five times lost wages to date and are presently $1,250,000.00 for Hohider and $2,010,000.00 for DiPaolo."  Id. at 1734.  At the date of the disclosures, plaintiffs estimated the total amount of named plaintiffs' damages to exceed $3.9 million plus interest.[97]

Plaintiffs, therefore, appear to be seeking declaratory and injunctive relief, equitable relief in the form of back pay ("lost wages") and front pay (in lieu of reinstatement), attorneys' fees and costs, and sizable compensatory damages and potentially punitive damages.  The court must determine whether the "final relief [sought in this case] relates exclusively or predominantly to money damages" in order to determine whether Rule 23(b)(2) certification is appropriate.  See FED.R.CIV.P. 23(b)(2), 1966 Advisory Committee Notes.

The United States Courts of Appeals that have addressed the issue of how a district court should determine whether monetary relief predominates in a Rule 23(b)(2) class have taken

---

[97]In addition, the court notes that plaintiffs' proposed order certifying the class mentions punitive damages in addition to compensatory damages.  See Plaintiffs' Amended [Proposed] Order Granting Plaintiffs' Motion for Class Certification (Doc. No. 155-2).  The court need not address whether plaintiffs would be prevented from seeking punitive damages in light of Federal Rule of Civil Procedure 26(a)(1)(C) and (e) in light of the court's decision that these damages are not appropriate in this class action.

179

roughly two approaches.  In Richards v. Delta Air Lines, Inc., 453 F.3d 525, 531 n.8 (D.C. Cir.

2006), the court commented:

> There is a split among circuits on how a court determines whether
> monetary relief predominates in a Rule 23(b)(2) class suit.
> Compare Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th
> Cir.1998) ("[M]onetary relief predominates in (b)(2) class actions
> unless it is incidental to requested injunctive or declaratory
> relief."); Coleman v. Gen. Motors Acceptance Corp., 296 F.3d 443,
> 447-50 (6th Cir.2002); Murray v. Auslander, 244 F.3d 807, 812
> (11th Cir.2001); Lemon v. Int'l Union of Operating Eng'rs, Local
> No. 139, 216 F.3d 577, 580-81 (7th Cir.2000), with Robinson v.
> Metro-North Commuter R.R., 267 F.3d 147, 162-67 (2d Cir.2001)
> (adopting a more ad hoc balancing approach to whether monetary
> damages predominate); Molski v. Gleich, 318 F.3d 937, 949-50
> (9th Cir.2003).

Id.  The court of appeals in Richards noted this apparent split in authority in passing, determining

that the issue was not presented in that case because both the district court and the court of appeals

had determined that monetary relief was effectively the only remedy sought in that case, although

the plaintiff there had framed the relief sought in terms of declaratory and injunctive relief. Id. at

530-31.[98]

---

[98]In Richards, the court of appeals stated:
> Though framed in terms of declaratory and injunctive relief, this class
> claim is for monetary damages. "Almost invariably . . . suits seeking
> (whether by judgment, injunction, or declaration) to compel the defendant
> to pay a sum of money to the plaintiff are suits for 'money damages,' as
> that phrase has traditionally been applied, since they seek no more than
> compensation for loss resulting from the defendant's breach of legal duty' .
> . . . The injunction and declaration Richards seeks is no exception. No
> matter how she phrases it, what she wants is a judicial decree directing
> Delta to pay the class members the damages each is due. . . .  Yet the rule
> has long been that "[a] plaintiff cannot transform a claim for damages into
> an equitable action by asking for an injunction that orders the payment of
> money."
Richards, 453 F.3d at 530-31 (citations and quotations omitted).

On the one hand, following the rationale adopted by the United States Court of Appeals for the Fifth Circuit in Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir.1998), several courts of appeals have followed the so-called "incidental damages approach." See Reeb v. Ohio Dept. of Rehab. & Correction, 435 F.3d 639 (6th Cir. 2006); Coleman v. Gen. Motors Acceptance Corp., 296 F.3d 443, 447-50 (6th Cir. 2002); Murray v. Auslander, 244 F.3d 807, 812 (11th Cir.2001); Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, 216 F.3d 577, 580-81 (7th Cir. 2000). The incidental damages approach, however, has been rejected by courts of appeals in at least two circuits in part because those courts of appeals reason that it amounts to a per se prohibition of the recovery of compensatory damages in Title VII anti-discrimination Rule 23(b)(2) class action lawsuits and strips district courts of discretion traditionally vested in them under Rule 23. See Molski v. Gleich, 318 F.3d 937, 949-50 (9th Cir.2003); Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 162-67 (2d Cir. 2001). This court shall examine both approaches and the decisions cited in a recent although nonprecedential decision of the United States Court of Appeals for the Third Circuit to determine whether monetary relief predominates over declaratory or injunctive relief in this class action, and if so, what consequences follow in this putative Rule 23(b)(2) class action.

**a. The Incidental Damages Approach**

In Allison, the United States Court of Appeals for the Fifth Circuit affirmed the district court's denial of class certification in a race discrimination case in which the plaintiffs challenged particular employment practices including the alleged failure to post or announce job vacancies, the alleged use of an informal word-of-mouth announcement process for filling job vacancies, the alleged use of racially biased tests to evaluate candidates for hire or promotion, and the alleged

use of a subjective decisionmaking process by a predominantly white supervisory staff in reviewing applicants for hire and employees for promotion under both disparate impact and disparate treatment theories of Title VII discrimination.  151 F.3d at 407.  The plaintiffs in that case sought certification primarily under Rule 23(b)(2).  Id. at 408.  They sought damages including every form of injunctive, declaratory, and monetary relief available under Title VII (including back pay, front pay, interest, and attorneys' fees) as well as compensatory and punitive damages to the maximum amount permissible under the law.  Id. at 407.  The district court, adopting the report and recommendation of a magistrate judge, denied class certification finding that Rule 23(b)(2) certification was inappropriate in light of the relief sought, Rule 23(b)(3) certification was inappropriate because plaintiffs could not satisfy predominance, and bifurcation and certifying the claims as to injunctive relief only was not appropriate given Seventh Amendment concerns about multiple juries.  Id. at 408.

On appeal, the United States Court of Appeals for the Fifth Circuit examined in detail the nature of class actions and pattern-or-practice lawsuits under Title VII.  Id. at 408-10 (noting that changes to Title VII cases brought about by the Civil Rights Act of 1991 regarding procedures – availability of jury trial when plaintiff seeks compensatory and punitive damages –  and remedies – availability of compensatory and punitive damages–  are "not inconsequential" in the class action context).  The court of appeals addressed the Rule 23(b)(2) requirement that injunctive or declaratory relief be the predominant relief sought for the class.  The court of appeals upheld the district court's position, supported by "nearly every other circuit," that adopted the position taken by the advisory committee that monetary relief may be obtained in a Rule 23(b)(2) class action so long as the predominant relief sought is injunctive or declaratory.  Id. at 411.

182

With respect to the "substantially more difficult question" of what it means for relief to be "predominant" in the context of Rule 23(b)(2), and due to the lack of clear guidance from the rule or earlier case law, the court of appeals examined the principles and assumptions underlying the (b)(2) class and class actions in general – noting that the Rule 23(b)(2) class was intended to focus on cases where broad, class-wide relief is necessary and where the class is assumed by its nature to be a homogenous and cohesive group with few conflicting interests among the members. Id. at 412-13. The court of appeals also reasoned that this cohesion begins to break down when the class seeks to recover back pay or other forms of monetary relief to be awarded for individual injury. Id. at 413. "Thus, as claims for individually based money damages begin to predominate, the presumption of cohesiveness decreases while the need for enhanced procedural safeguards to protect the individual rights of class members increases . . . thereby making class certification under (b)(2) less appropriate." Id. (citations omitted).[99]

The court of appeals reasoned that, in addition to procedural protection for class members, the Rule 23(b)(2) predominance requirement also incorporates concerns for the need and efficiency of a class action. Id. at 414. The court of appeals explained:

> In sum, the predomination requirement of Rule 23(b)(2) serves essentially the same  functions as the procedural safeguards and efficiency and manageability standards mandated in (b)(3) class actions. In balancing the competing interests underlying the class action device, (b)(2)'s predomination requirement serves two basic purposes: first, it protects the legitimate interests of potential class members who might wish to pursue their monetary claims

---

[99]"Because it automatically provides the right of notice and opt-out to individuals who do not want their monetary claims decided in a class action, Rule 23(b)(3) is the appropriate means of class certification when monetary relief is the predominant form of relief sought and the monetary interests of class members require enhanced procedural safeguards." 151 F.3d at 413.

individually; and, second, it preserves the legal system's interest in judicial economy.

Id. at 414-15.

The court of appeals therefore held that "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief." Id. at 415. "By incidental, we mean damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." Id. (citing Fed.R.Civ.P. 23(b)(2)). Under this approach, "[i]deally, incidental damages should be only those to which class members automatically would be entitled once liability to the class (or subclass) as a whole is established." Id. (citations omitted).

> That is, the recovery of incidental damages should typically be concomitant with, not merely consequential to, class-wide injunctive or declaratory relief. Moreover, **such damages should at least be capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances**. Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations. Thus, **incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions**.

Id. at 415 (emphasis added). The court of appeals clarified that its holding did not preclude back pay under Title VII in Rule 23(b)(2) class actions, noting earlier precedent construing Rule 23(b)(2) to permit monetary relief including back pay when it was an equitable remedy. Id. at 415-16, 416 n.10 ("[T]o the extent the district court applied an incidental damages standard to the

184

plaintiffs' claims for back pay, its analysis was flawed."); <u>see</u> <u>id.</u> at 422 ("As noted previously, injunctive, declaratory, and other forms of equitable relief such as back pay are available to a disparate impact claimant and in class actions certified under Rule 23(b)(2). Indeed, our cases have held that failure to certify a class action on such claims may amount to an abuse of discretion.")(citation omitted).

The court of appeals in <u>Allison</u> applied its newly-minted incidental damages test to the compensatory and punitive damages sought in that case.  Reasoning that compensatory damages for emotional distress and other forms of intangible injury will not be presumed from a mere violation of rights, and noting that the amount of compensatory damages to which any individual class member would be entitled cannot be calculated by objective standards but would require individualized proof of injury, and that punitive damages similarly would require additional proof and some relation to compensatory damages, the court of appeals held that the compensatory and punitive damages in that case "clearly [did] not qualify as incidental damages."  <u>Id</u>. at 417-18. "Such damages, awarded on the basis of intangible injuries and interests, are uniquely dependent on the subjective and intangible differences of each class member's individual circumstances."  <u>Id</u>. The court of appeals upheld the district court's determination that the monetary damages sought were not incidental and Rule 23(b)(2) certification was not appropriate.  <u>Id</u>. at 416 ("We have little trouble affirming the district court's finding that the plaintiffs' claims for compensatory and punitive damages are not sufficiently incidental to the injunctive and declaratory relief being sought to permit them in a (b)(2) class action.").

Other courts of appeals have followed the incidental damages approach set forth in <u>Allison</u>.  <u>See</u>, <u>e.g.</u>, <u>Reeb v. Ohio Dept. of Rehab. & Correction</u>, 435 F.3d 639 (6th Cir. 2006);

Coleman v. Gen. Motors Acceptance Corp., 296 F.3d 443, 447-50 (6th Cir. 2002); Murray v.

Auslander, 244 F.3d 807, 812 (11th Cir. 2001); Lemon v. Int'l Union of Operating Eng'rs, Local

No. 139, 216 F.3d 577, 580-81 (7th Cir. 2000).  The United States Court of Appeals for the Sixth

Circuit in Reeb expanded the Allison incidental damages approach further, adopting a per se rule

that individual compensatory damages are never recoverable by a Rule 23(b)(2) class:

> [W]e hold that, because of the individualized nature of damages
> calculations for Title VII plaintiffs and the ability of those
> plaintiffs to bring individual actions, the claims for individual
> compensatory damages of members of a Title VII class necessarily
> predominate over requested declaratory or injunctive relief, and
> individual compensatory damages are not recoverable by a Rule
> 23(b)(2) class.

Reeb, 435 F.3d at 651.[100]  The United States Court of Appeals for the Sixth Circuit emphasized,

however, that its holding in Reeb did not foreclose all Title VII class actions:

> Plaintiffs now have the choice of proceeding under Rule 23(b)(3)
> in an action for money damages or in an action under Rule 23(b)(2)
> for declaratory or injunctive relief alone or in conjunction with
> compensatory and punitive damages that inure to the group benefit.
> And, as always, plaintiffs remain free to bring Title VII actions as
> individuals.

435 F.3d at 651.

---

[100]See Allison, 151 F.3d at 426-27 (Dennis, J., dissenting)("The majority opinion
introduces a new interpretation of Rule 23(b)(2) which provides, in effect, that a class action
cannot be certified under that subdivision when the plaintiffs seek individual compensatory or
punitive damages in addition to injunctive or declaratory relief. . . . Because of this formulation,
trial courts in this circuit will, in fact, have no discretion to certify a (b)(2) class where individual
compensatory and punitive damage claims are sought.").

### b. The Discretionary Approach

Two United States Courts of Appeals have declined to adopt the approach set forth in Allison and its progeny.  See Molski v. Gleich, 318 F.3d 937, 949-50 (9th Cir.2003); Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 162-67 (2d Cir.2001).  In Robinson, the United States Court of Appeals for the Second Circuit vacated and remanded the district court's denial of class certification and bifurcation and entry of judgment in favor of defendant in a case involving present and former employees of a public benefit corporation responsible for providing commuter rail transportation between New York City and its northern suburbs.  The plaintiffs in that case asserted both pattern-or-practice disparate treatment claims and disparate impact claims under Title VII.  Specifically, they challenged the company's policy of delegating discretionary authority to supervisors, and relying on statistical and anecdotal evidence, argued that this delegated authority had been exercised in a racially discriminatory manner.  Id. At 155.  The plaintiffs sought injunctive and equitable relief including back and front pay and compensatory damages. Id.

The case had already been up on appeal one time.  In the first instance, the district court denied certification holding that the Rule 23(a) prerequisites – and in particular commonality and typicality – had not been met.  The court of appeals reversed the district court's holding and remanded for the district court to consider whether Rule 23(b) had been met.  Id. at 156.  After remand, the district court denied the plaintiffs' motion for class certification under Rule 23(b)(2) for both the pattern-or-practice disparate treatment claim and the disparate impact claim and denied the plaintiffs' motion in the alternative for bifurcation of the pattern-or-practice claim.  Id. The district court applied the incidental damages test set forth in Allison and determined that Rule

23(b)(2) certification was inappropriate because individualized compensatory damages issues would overwhelm the classwide equitable relief question.  Id.

The court of appeals, on appeal for the second time, vacated the district court's judgment dismissing the action and remanded the case.  Id. at 154.  On remand, the court of appeals instructed the district court to certify the plaintiffs' disparate impact claim for Rule 23(b)(2) class treatment and consider whether the pattern-or-practice disparate treatment claim is appropriate for (b)(2) certification in light of the standard set forth in its decision.  Id.  The court of appeals further instructed the district court that, if the court determined that (b)(2) certification of the pattern-or-practice claim was inappropriate, the district court shall bifurcate the claim under Federal Rule of Civil Procedure 42(b) and certify the liability stage of the claim for (b)(2) class treatment under Federal Rule of Civil Procedure 23(c)(4)(A).  Id.

In so holding, the court of appeals reviewed the 1991 Civil Rights Act and changes to Title VII claims generally and to Title VII class actions.  Id. at 157-62 (discussing in detail the elements and evidentiary requirements for pattern-or-practice disparate treatment claims and disparate impact claims).  The court of appeals also reviewed the standard for determining whether a Rule 23(b)(2) class could be maintained notwithstanding that plaintiffs sought  monetary damages.  See id. at 162-67.  In so doing, the court of appeals examined and rejected the approach set forth in Allison, interpreting it as entailing a bright-line prohibition of Rule 23(b)(2) certification of claims including compensatory or punitive damages in addition to injunctive relief.  Id. at 162-63 (rejecting Allison for "limiting (b)(2) certification to claims involving no more than incidental damages" and thereby "foreclos[ing] (b)(2) class certification of all claims that include compensatory damages (or punitive damages) even if the class-wide injunctive relief is the form

188

of relief in which the plaintiffs are primarily interested.")(internal quotations omitted).

Declining to adopt the incidental damages approach, the United States Court of Appeals for the Second Circuit rejected a bright-line rule in favor of a discretionary approach:

> Thus, the question we must decide is whether this bright-line bar to (b)(2) class treatment of all claims for compensatory damages and other non-incidental damages (e.g., punitive damages) is appropriate. For the reasons we discuss below, we believe that it is not and therefore decline to adopt the incidental damages approach set out by the Fifth Circuit in Allison and followed by the district court below. **Rather, we hold that when presented with a motion for (b)(2) class certification of a claim seeking both injunctive relief and non-incidental monetary damages, a district court must "[consider] the evidence presented at a class certification hearing and the arguments of counsel," and then assess whether (b)(2) certification is appropriate in light of "the relative importance of the remedies sought, given all of the facts and circumstances of the case."** Hoffman, 191 F.R.D. at 536. **The district court may allow (b)(2) certification if it finds in its "informed, sound judicial discretion" that (1) "the positive weight or value [to the plaintiffs] of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed,"** Allison, **151 F.3d at 430 (Dennis, J., dissenting), and (2) class treatment would be efficient and manageable**, thereby achieving an appreciable measure of judicial economy.

The Court of Appeals for the Second Circuit acknowledged that "the assessment of whether injunctive or declaratory relief predominates will require an ad hoc balancing that will vary from case to case," but set forth certain conditions which a district court should consider before allowing (b)(2) certification:

> [A] district court should, at a minimum, satisfy itself of the following: (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were

189

> the plaintiffs to succeed on the merits. Insignificant or sham
> requests for injunctive relief should not provide cover for (b)(2)
> certification of claims that are brought essentially for monetary
> recovery. See, e.g., In re Sch. Asbestos Litig., 789 F.2d 996, 1008
> (3d Cir. 1986).

Id. at 164.  In support of its ad hoc approach, the Court of Appeals for the Second Circuit

recounted considerations including that (1) Rule 23 historically has vested district courts with

substantial discretion to determine if Rule 23 requirements have been met, and the court of

appeals could see no basis for nullifying this legislatively-granted discretion; and (2) an ad hoc

approach satisfies the very concerns that have led other courts to adopt the incidental damages

standard – namely, achieving judicial efficiency and ensuring due process for absent class

members.  Id. at 164-65.  Additionally, the court of appeals advised district courts that where non-

incidental monetary relief is sought, such as compensatory damages, due process may require

enhanced procedural protections in the form of notice and opt-out for absent class members, and

the court may in its discretion require these protections if it believes it to be desirable to protect

the interests of absent class members.  Id. at 166.[101]

Recognizing that  certification of a claim for non-incidental damages under Rule 23(b)(2)

poses a due process risk because Rule 23(b)(2) does not expressly afford the procedural

protections of notice and opt out set forth in Rule 23(b)(3) for damages class actions, the Court of

_____

[101]Notwithstanding the general consensus among courts following the more restrictive
incidental damages approach originally set forth in Allison and the more permissive approach
articulated in Robinson that back pay, as an equitable remedy that flows from liability and can be
determined based on relatively objective standards, is a permissible remedy under Rule 23(b)(2),
the Court of Appeals for the Second Circuit insinuated in Robinson that due process risks for
non-incidental damages might also apply to back pay, and like the other non-incidental damages,
these can be addressed at the damages portion of the trial. Id. at 166 n.10-11.

Appeals for the Second Circuit conceded that "[t]he bright-line prohibition of (b)(2) class treatment for claims seeking non-incidental damages [i.e., the approach set forth in <u>Allison</u>] eliminates this risk" by "ensur[ing] that claims presenting individual specific damage issues that might require heightened due process protections are not certified under (b)(2)." <u>Id</u>.  The Court of Appeals for the Second Circuit, however, proposed an alternative solution to due process problems: "[A]ny due process risk posed by (b)(2) class certification of a claim for non-incidental damages can be eliminated by the district court simply affording notice and opt out rights to absent class members for those portions of the proceedings where the presumption of class cohesion falters –  i.e., the damages phase of the proceedings."  <u>Id</u>. (quoting <u>Holmes v. Cont'l Can Co.</u>, 706 F.2d 1144, 1154-55 (11th Cir.1983)( "[A] district court acting under its Rule 23(d)(2) discretionary power[ ] may require that an opt-out right and notice thereof be given should it believe that such a right is desirable to protect the interests of the absent class members.") and citing FED.R.CIV.P. 23(d)(2),(5)).[102]

**c. Decisions by the United States Court of Appeals for the Third Circuit**

The United States Court of Appeals for the Third Circuit has not recently addressed in detail the standard a district court should use to determine whether plaintiffs seeking Rule 23(b)(2) class certification are seeking predominantly money damages instead of declaratory or

---

[102]<u>See</u> FED.R.CIV.P. 23(d)(2)("the conduct of actions to which this rule applies, the court may make appropriate orders: . . . requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action. . . .").

injunctive relief.  Plaintiffs urge the court to be guided by <u>Wetzel v. Liberty Mutual Ins. Co.</u>, 508 F.2d 239 (3d Cir. 1975), and argue that the Court of Appeals for the Third Circuit would adopt an approach like the one set forth by the Court of Appeals for the Second Circuit in <u>Robinson</u>. Defendant, however, urges the court to rely on <u>Barabin v. Aramark Corp.</u>, 2003 WL 355417 (3d Cir. 2003)(nonprecedential), as support for its argument that the Court of Appeals for the Third Circuit already has adopted, or would adopt, the incidental damages test set forth in <u>Allison</u>.

In <u>Barabin</u>, the court of appeals reviewed a denial of class certification on Rule 26(f) interlocutory appeal.  The plaintiffs in that case sought certification under Federal Rule of Civil Procedure 23(b)(2) alleging a pattern and practice case.  The defendants contended that the plaintiffs had not shown that their alleged conduct constituted a pattern of allegedly discriminatory activity.  <u>Id</u>. at *1 (citing <u>Teamsters</u>, 431 U.S. at 336, for the proposition that "a pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature.").  The court of appeals noted that "[c]ontrary to the usual pattern and practice case, defendants contend that plaintiffs' claims of intentional discrimination were not directed at a company-wide pattern, practice or policy, but rather to alleged isolated acts of two [particular] supervisors."  <u>Id</u>.

The court of appeals in denying plaintiffs' motion for an interlocutory appeal briefly considered the developing case law under <u>Allison</u> and <u>Robinson</u>.  In <u>Barabin</u>, the plaintiffs were seeking substantial compensatory and punitive damages.  The court of appeals noted that class actions certified under Rule 23(b)(2) are limited to those cases where the primary relief sought is injunctive or declaratory relief and cited with favor <u>James v. City of Dallas</u>, 254 F.3d 551, 571 (5th Cir.2001), for the principle: "To maintain an action under Rule 23(b)(2), [injunctive] relief

192

rather than monetary damages must be the predominant form of relief the plaintiffs pursue." Id. at

*1.

The court of appeals addressed the issue whether monetary relief predominates as to make

Rule 23(b)(2) certification inappropriate by reference to Molski, Allison, and Robinson, appearing

to endorse the incidental damages test set forth in Allison without discussing in detail the

differences between it and the Robinson approach:

> At least two courts of appeals have devised a test for certification
> of a (b)(2) class. Under this test, where parties seek monetary
> relief, a court may only certify a class if the damages claim is
> incidental to the primary claim for injunctive or declaratory relief.
> See Molski v. Gleich, 307 F.3d 1155, 1165 (9th Cir.2002) ("In
> order to permit certification, the claim for monetary damages must
> be incidental to the primary claim for injunctive or declaratory
> relief."); Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th
> Cir.1998) (promulgating a test under which "monetary relief
> predominates in (b)(2) class actions unless it is incidental to
> requested injunctive or declaratory relief"). **We agree**.

Id. (emphasis added).  The court of appeals observed that "[b]ecause unnamed members of classes

certified under Rule 23(b)(2) cannot opt out (as under Rule 23(b)(3)), class cohesion is necessary,

and is presumed where a class suffers from a common injury and seeks class-wide injunctive

relief."  Id. (citing Robinson v. Metro-North Commuter Railroad, Co., 267 F.3d 147, 163-66 (2d

Cir.2001)).  The court noted that, where monetary relief is requested, however, "cohesion is less

apparent, as awarding damages normally entails examination of individual claims."  Id.

Adopting without analysis the Allison test, the court of appeals determined that:

> Incidental damages are those "that flow directly from liability to
> the class *as a whole* on the claims forming the basis of the
> injunctive or declaratory relief." Allison, 151 F.3d at 415

(emphasis in original). Consistent with this analysis, whether damages are "incidental" depends on: (1) whether such damages are of a kind to which class members would be automatically entitled; (2) whether such damages can be computed by "objective standards" and not standards reliant upon "the intangible, subjective differences of each class member's circumstances"; and (3) whether such damages would require additional hearings to determine. See id.

Id. (emphasis in original).  The court of appeals upheld the district court's finding in that case that the primary relief sought there was monetary relief, and not injunctive or declaratory relief.  The court stated:

As the District Court here found:

In reviewing the complaint in the case at bar, we cannot find that the primary relief sought is injunctive and/or declaratory in nature. Rather, it appears that the primary relief which plaintiffs seek is monetary in nature and that the request for injunctive/declaratory relief is secondary at best. Indeed, Plaintiffs do not claim that damages in this matter can be computed on the basis of some objective, uniform calculation or in an amount which naturally follows from an entitlement to a declaration or injunction against further harm. In lieu of a claim for damages that automatically flow directly to the class as a whole, Plaintiffs aver that they have been "damaged in an amount to be proven at trial." This requires that evidence of the harm suffered by each plaintiff be produced for the jury's consideration at trial. We therefore conclude that the plaintiffs do not meet the criteria for class action certification under Rule 23(b)(2).

Barabin v. Aramark, 210 F.R.D. 152, 161 (E.D.Pa.2002). We see no error.

Id. at *2.[103]

Although Barabin was a nonprecedential decision denying Rule 26(f) interlocutory appeal, this court predicts that the United States Court of Appeals for the Third Circuit would follow the rationale of Allison with respect to Rule 23(b)(2) certification.  This court will apply an incidental damages approach to plaintiffs' claims for relief.  The court, therefore, if the class otherwise satisfies the requirements of Rule 23 for class certification, will certify the class for the purpose of seeking injunctive or declaratory relief and monetary relief that is incidental to the requested injunctive or declaratory relief.

Plaintiffs reliance on Wetzel does not alter this court's analysis.  In Wetzel, a 1975 decision, the court of appeals considered a class action lawsuit alleging that the defendant employer's hiring and promotions policies with respect to female technical employees violated Title VII and the Equal Pay Act.  508 F.2d at 244.  The district court certified a class under Rule 23(b)(2) but not 23(b)(3), but acknowledged that the class action was maintainable under either subsection.  Id.  The district court entered partial summary judgment on the Title VII claims, but not the Equal Pay Act claims, holding that the hiring and promotions policies violated Title VII, but denying injunctive relief because the district court found that evidentiary materials submitted in the case showed that, subsequent to the filing of the administrative charge or complaint in that lawsuit, the defendant had ceased or discontinued the discriminatory practices.  Id. at 244-45.

---

[103]The court of appeals also found no error in the district court's finding that plaintiffs had not satisfied the predominance and superiority requirements set forth in Rule 23(b)(3).  Id. at *2-3.

On appeal, because the defendant employer challenged the district court's decision to certify under Rule 23(b)(2) and not require the plaintiffs to meet the requirements of Rule 23(b)(3), the court of appeals reviewed, among other things, the appropriateness of 23(b)(2) treatment and the characteristics of (b)(2) and (b)(3) class actions  Id. at 248-53.  The court of appeals ultimately affirmed the district court's decision to certify pursuant to Rule 23(b)(2) and not (b)(3).  Id.  The decision of the court of appeals did not address in detail the appropriate relief in that case.  Id. at 248 n.11 ("We intimate no opinion as to what relief, if any, is appropriate.").  The court of appeals, however, commented throughout the opinion on the scope of relief that might be ordered in that case.

For example, with respect to adequacy, the court of appeals commented that "[t]he relief to be granted by the district court, whether it takes the form of back pay, mandatory hiring of female claims adjusters, or increased promotional opportunities for women will benefit all members of the class."  Id. at 247-48 (footnote omitted).  With respect to the appropriateness of (b)(2) treatment, the court of appeals stated:

> Moreover, although the [district] court found that injunctive relief was unnecessary, it did determine the presence of liability on the part of [the defendant employer].  The [district] court did not preclude the possibility of directing affirmative action, in addition to back pay, to remedy conditions caused by the offensive discriminatory practices. Such affirmative action ultimately would, in effect, constitute final injunctive or declaratory relief.  "No one has suggested that this (relief) violates the dictates of subdivision (b)(2)." Pettway v. American Cast Iron Pipe Co., [494 F.2d 211, 257 (5th Cir. 1974)].

Id. at 251 (footnote omitted).[104]

Plaintiffs appear to be relying on Wetzel for the following general statement by the court of appeals:

> Courts have held that a (b)(2) class is appropriate in a Title VII suit where both final injunctive and monetary relief are granted.

Id. (citing Franks, 495 F.2d at 422; Pettway, 494 F.2d at 257; Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1375 (5th Cir. 1974); Robinson v. Lorillard Corp., 444 F.2d 791, 801-802 (4th Cir. 1971), petition for cert. dismissed, 404 U.S. 1006 (1972); Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 720 (7th Cir. 1969)).  In Wetzel and each of these decisions, however, the various courts of appeals were examining the propriety of monetary relief in the form of back pay only – not broader monetary relief such as compensatory damages.  Indeed, compensatory and punitive damages were not available under Title VII until the passage of the Civil Rights Act of 1991, which occurred after Wetzel and the decisions cited within that decision.  The Civil Rights Act of 1991 for the first time provided plaintiffs in Title VII cases with a right to compensatory and punitive damages as well as a jury trial.  See Allison, 151 F.3d at 407; Pollard v. E.I. du Pont de Nemours, 532 U.S. 843 (2001)(addressing the equitable remedies traditionally available in Title VII employment discrimination cases and holding that front pay is an equitable remedy not subject to the statutory cap on compensatory damages).

At the outset, the court notes that whether or not the court follows the approach set forth in Allison or the more discretionary approach set forth in Robinson, under either test plaintiffs in this

---

[104]In an accompanying footnote, the court of appeals again emphasized: "We do not suggest what relief, if any, may be appropriate."  508 F.2d at 251 n.23.

case would not necessarily be precluded from seeking back pay.  Both of those decisions

recognize back pay as the kind of equitable remedy that could flow directly from liability to the

class as a whole on the claims forming the basis of the injunctive or declaratory relief.  See

Allison, 151 at 415-16.  Recovery of back pay, if it is "capable of computation by means of

objective standards and not dependent in any significant way on the intangible, subjective

differences of each class member's circumstances," "does not require additional hearings to

resolve the disparate merits of each individual's case," and does not "introduce new and

substantial legal or factual issues, nor entail complex individualized determinations."  Id.  That

relief is precisely the kind of monetary relief that could constitute incidental damages under

Allison.  Id. ("[I]ncidental damages will, by definition, be more in the nature of a group remedy,

consistent with the forms of relief intended for (b)(2) class actions.").  Moreover, the court of

appeals in Allison itself recognized that back pay often constitutes relief that is incidental to

requested injunctive or declaratory relief.  See id. at 415-16, 416 n.10 ("[T]o the extent the district

court applied an incidental damages standard to the plaintiffs' claims for back pay, its analysis

was flawed."); id. at 422 ("As noted previously, injunctive, declaratory, and other forms of

equitable relief such as back pay are available to a disparate impact claimant and in class actions

certified under Rule 23(b)(2). Indeed, our cases have held that failure to certify a class action on

such claims may amount to an abuse of discretion.")(citation omitted).

     Under the incidental damages approach, however, compensatory damages for emotional

distress and other forms of intangible injury cannot be included in the relief to be granted to a

Rule 23(b)(2) class because they cannot be presumed from a mere violation of rights, and the

amount of those damages for any individual class member cannot be calculated by objective

standards but requires individualized proof of injury.  Punitive damages similarly require

additional proof and some relation to compensatory damages. Therefore, if the court certifies

plaintiffs proposed class action under Rule 23(b)(2), the court will not allow plaintiffs to pursue

compensatory or punitive damages, or any other monetary damages that are not incidental to the

requested injunctive or declaratory relief, on a class wide basis.  See Allison, 151 F.3d at 417-18

("Such damages, awarded on the basis of intangible injuries and interests, are uniquely dependent

on the subjective and intangible differences of each class member's individual circumstances.").

The court finds that this case is not a case like Richards where plaintiffs are seeking sham

injunctive relief that can be reduced to an order compelling defendant to pay a sum of money to

plaintiffs.  See Richards, 453 F.3d at 530-31.  While plaintiffs seek monetary relief in the form of,

among other things, back pay and compensatory damages, plaintiffs also seek broader injunctive

relief that enjoins defendant from continuing any alleged discriminatory practices if those

practices are proven to violate the ADA.  For example, plaintiffs seek relief that includes an

injunction enjoining defendant from continuing any of the employment practices that are found to

constitute discrimination under the ADA, an order that defendant institute training programs to

correct any discriminatory policies, and other injunctive and equitable relief available under the

law.  This broad injunctive and declaratory relief sought by plaintiffs would be meaningful and

appropriate relief if there is a finding that there are patterns or practices of discrimination at UPS

that violate the ADA.  It is not a disguise for what is essentially an order of court compelling

defendant to pay a sum of money to plaintiffs.[105]

---

[105]The court must briefly respond to one of UPS's other miscellaneous arguments against
class certification in this case:  In the briefing and at the hearing on class certification, UPS

**C. Bifurcation**

The court previously denied without prejudice plaintiffs' motions to bifurcate (Doc. Nos. 118, 125), which UPS opposed (Doc. No. 128), subject to the court's decision on plaintiff's motion for class certification.  (Doc. No. 160).  At the status conference after the issuance of this opinion the court will address the issue of bifurcation with the parties in light of the court's decision concerning certification.  If necessary, the court will set a briefing schedule for the filing of a renewed motion for bifurcation of proceedings at trial.[106]

_____

stressed that class certification was not necessary to adjudicate these individual claims, and that class certification is not the most efficient method of adjudicating these claims, alluding to the burden class certification proceedings placed upon defendant and the court.  This is not a Rule 23(b)(3) class.  The court does not consider whether the class action is the superior device for adjudicating these claims under Rule 23(b)(2).  Defendant's broader efficiency policy arguments notwithstanding, the court is compelled to grant or deny certification based upon whether sufficient evidence has been adduced showing that the applicable Rule 23 requirements have been met.  See ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 4:11 at 62 (4th ed. 2002) ("Rule 23(b)(2) classes have no requirement that common questions predominate over individual questions, or that the class action be superior to other available methods for the fair and efficient adjudication of the controversy."); see also Allison, 151 F.3d at 414-15 (commenting that the predomination requirement of Rule 23(b)(2) serves essentially the same function as the procedural safeguards and efficiency and manageability standard of Rule 23(b)(3)).

[106]To be clear:  At this time, the court is certifying the aforementioned class claims for classwide injunctive and declaratory relief. The court has determined that plaintiffs will not be able to pursue compensatory or punitive damages, or any other monetary damages that are not incidental to the appropriate injunctive or declaratory relief, as part of this class action.  See Allison, 151 F.3d at 417-18 ("Such damages, awarded on the basis of intangible injuries and interests, are uniquely dependent on the subjective and intangible differences of each class member's individual circumstances.").  Plaintiffs may be allowed to seek back pay or other individual equitable relief on behalf of individual class members as part of this class action.  The court will not decide this issue at this time.  The court will address whether plaintiffs can pursue back pay or other individual equitable relief as part of this class action after the court and the parties address the issue of bifurcation.

## VIII. CONCLUSION

For the foregoing reasons, plaintiffs' renewed motion for class certification (Doc. No.180) is **GRANTED IN PART AND DENIED IN PART** as more fully set forth herein.  An appropriate Order follows.

## IX. ORDER

**AND NOW**, this 16th day of July, 2007, upon consideration of plaintiffs' renewed motion for class certification (Doc. No. 180), defendant's opposition, all related submissions, and the hearing held on January 27, 2006, and in accordance with this court's determinations concerning disputed facts and conclusions of law concerning whether the Rule 23 requirements have been met as set forth herein, **IT IS HEREBY ORDERED** that plaintiff's motion for class certification is **GRANTED IN PART AND DENIED IN PART** as more fully set forth in this Memorandum Opinion.

Plaintiffs' motion is **GRANTED** pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) with respect to the modified class for that class to litigate plaintiffs' pattern-or-practice claims that certain of UPS's policies, practices, and procedures controlling reentry into the workplace, or otherwise governing the making of reasonable accommodations under Title I of the ADA, violate Title I of the ADA.

### A.  Class Claims

**IT IS ORDERED** that  the class claims shall be (1) the 100% healed policy claim; (2) the implementation of UPS's formal ADA compliance policy claim; and (3) the uniform use of pretextual job descriptions claim (the "class claims").  Plaintiffs' motion is **DENIED** with respect

to the following claims: (1) the prohibiting employees from returning to work with restrictions and using seniority rights claim; (2) the withdrawal of accommodations claim; and (3) and the retaliation claim.

**B.  Relief**

      **IT IS FURTHER ORDERED** that, with respect to the class claims, plaintiffs may seek appropriate equitable relief including injunctive and declaratory relief and monetary damages incidental to the requested injunctive or declaratory relief.  Plaintiffs, therefore, may be able to seek back pay or other equitable relief for individual class members if there is a protocol for identifying those monetary damages which sets forth the objective standards to be utilized in determining the amount of those damages in a way that does not require additional hearings on individualized circumstances.  Plaintiffs may not seek compensatory and punitive damages or any other monetary damages that are not incidental to any injunctive or declaratory relief that is obtained.  Plaintiffs' motion is **DENIED** to the extent that plaintiffs' seek compensatory damages, punitive damages, or any other monetary damages that are not incidental to any injunctive or declaratory relief that is obtained.

**C.  Class Definition**

      **IT IS FURTHER ORDERED** that the following class of plaintiffs shall be certified:

> Those persons throughout the United States who:
>> (i) according to the records of UPS, its agents and contractors, have been employed by UPS at any time since May 10, 2000, including those employees who were absent from work and were receiving either workers' compensation or short or long term disability insurance benefits; and

(ii) have been absent from work because of medical reasons; and

(iii)(A) did not return to work by reason of UPS's alleged 100% healed policy; or

(B) did not return to work by reason of UPS's allegedly discriminatory implementation of its formal ADA compliance policy; or

(C) did not return to work by reason of the allegedly discriminatory use by UPS of uniform pretextual job descriptions.

Excluded from the Class are all presently working UPS management employees with supervisory authority over the formulation or implementation of the UPS policies and practices alleged in this action to violate the ADA.

**D.  Class Counsel**

**IT IS FURTHER ORDERED** that the following shall serve as class counsel pursuant to Federal Rule of Civil Procedure 23(g): Anita M. Laing, Arthur Shingler, David R. Scott, Donald A. Broggi. Erin G. Comite, and Geoffrey M. Johnson of the law firm Scott + Scott; Christian Bagin of the law firm Wienand & Bagin; and Judith B. Goldstein of the Equal Justice Foundation. Ms. Laing and Scott+Scott shall serve as lead class counsel.

**E.  Other Miscellaneous Matters**

The following pending motions are hereby DENIED AS MOOT:   Plaintiffs' Motion to Strike UPS's Opposition to Class Certification and Response to the Letter of David McAllister (Doc. No. 185); Plaintiffs' Motion to Strike UPS's Refiled Surreply Brief in Opposition to Class Certification (Doc. No. 187); and Plaintiffs' Motions for Leave to File Notice of EEOC Reasonable Cause Determinations (Doc. Nos. 189, 199).

The court will hold a status conference at **5:00 p.m.** on **Thursday,  August 9, 2007**.  At that time, the parties should be prepared to discuss how the case shall proceed in light of the court's ruling on the class certification motion; whether any party is seeking an immediate appeal of the decision concerning class certification pursuant to Federal Rule of Civil Procedure 23(f); and whether any party will seek a stay of proceedings before this court.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

cc:     Counsel of Record

204